# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| RUBI LEVI and EMILY CHICOINE, on behalf of themselves and all others similarly situated,<br><br>                Plaintiffs,<br><br>    v.<br><br>GULLIVER'S TAVERN, INCORPORATED, and SOLID GOLD PROPERTIES, INC., both d/b/a THE FOXY LADY,<br><br>                Defendants. | CASE NO. 1:15-cv-216-S-PAS |

## LOCAL RULE 56(a)(1) STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Local Rule of Civil Procedure 56(a)(1) of the District of Rhode Island, Defendants, Gulliver's Tavern, Incorporated and Solid Gold Properties, Inc., respectfully submit the following statement of undisputed material facts in support of their Motion for Summary Judgment.

### The Club's Business

1.    The Foxy Lady (the "Club") is a nightclub operated by Defendant Gulliver's Tavern, Inc. that provides adult entertainment to customers who are at least 21 years old. *See* Deposition of Dean Robinson ("Robinson Dep."), 9:13-24, excerpts at Ex. A; Deposition of Lori Savickas ("Savickas Dep."), 9:6-9, excerpts at Ex. B.

2.    The Club derives most of its revenues from the sale of alcoholic beverages. *See* Affidavit of John Weber ("Weber Aff."), ¶3, Ex. C.

3.      Age-appropriate members of the public can patronize the Club until 1:00 a.m. or 2:00 a.m., depending on the night of the week.  *See* Gulliver's Tavern's Interrogatory Responses ("GT Int. Resp."), No. 15, <u>Ex. D</u>.

4.      Patrons of the Club can order cuisine from a full menu that includes food ranging from salads, pizza, sandwiches, and appetizers to a 12-ounce rib eye steak or penne alfredo pasta with shrimp.  *See* Weber Aff. ¶5; Website Excerpts, Ex. L.

5.      To provide these services, the Club employs bartenders, servers, kitchen staff, and managers.  *See* Robinson Dep. at 14:13-14.

6.      The Club also offers shoulder and back rubs.  *See* Savickas Dep. at 36:8-22.  The Club has employees who work on-site and are available to customers who wish to purchase a shoulder or back rub in a private room separate from the main Club floor.  *Id.*

7.      Live entertainers perform at the Club as well.  *See* Robinson Dep. at 28:12-23; Savickas Dep. at 14:4-9; Am. Compl. ¶¶2-3.

8.      Plaintiffs refer to these entertainers as "exotic dancers," while others sometimes refer to them as "strippers."  *See* Am. Compl. ¶17; Savickas Dep. at 67:21-71:9.

9.      The Club refers to performers as "Entertainers," in order to distinguish an individual who portrays a unique character and puts on a show, not only in the way she looks and may dance, but also by the way she communicates and interacts with her audience, from an individual who merely takes her clothes off for money.  Savickas Dep. at 67:21-71:9; Weber Aff. ¶7.

10.     To perform as an Entertainer at the Club, there is no application to fill out, no reference request, no background check, no drug test, and no traditional interview process.  *See*

Deposition of Ruby Levi, ("Levi Dep."), excerpts at Ex. E, at 125:6-130:25; Deposition of Emily

Chicoine, ("Chicoine Dep"), excerpts at Ex. F, at 136:9-137:5; Savickas Dep. at 71:10-18.

11.     An Entertainer can audition for a panel.  *See* Chicoine Dep. at 136:9-137:5;

Savickas Dep. at 64:2-5.  The audition often includes the Entertainer donning a costume or other

wardrobe of her choice and demonstrating her dance skills in whatever style she deems

appropriate to whatever music she deems appropriate.  *See* Savickas Dep. at 63:12-18; Weber

Aff. ¶7.

12.     The audition panel also converses with the auditioning Entertainer to gauge her

personality, communication skills, and overall ability to entertain customers.  Savickas Dep. at

67:23-68:10.

13.     If the Entertainer satisfies the panel that she has the appropriate skill, character,

and appearance, she will receive a written contract for consideration.  *Id.* at 74:20-25.

14.     More often than not, the panel rejects auditioning Entertainers.  *See* Robinson

Dep. 38:17-39:14; Weber Aff. ¶7.

15.     While the contracts between Entertainers and the Club have varied over time,

Plaintiffs Ruby Levi and Emily Chicoine both signed the same Performer License Agreement

("Agreement").  *See* Levi Agt., Ex. G; Chicoine Agt., Ex. H.

16.     The Agreement:

- Noted that the Club's business is that of a "nightclub" and each Plaintiff's business as that of a "self-employed entertainer" seeking to utilize the Club's premises "from time to time" "to entertain patrons."  *See* Exs. G and H, p. 1.

- granted each Plaintiff a license to perform at the Club and the right to secure compensation directly from customers, in exchange for a weekly "rental fee" (a/k/a "license fee" or "house fee").  *Id.* p. 1-2.

- specified each Plaintiff's and the Club's intention that the contractual relationship between them be that of a "Lessee" and "Lessor" and "not an employee/employer." *Id*., p. 5.

- stated that the Club "shall have no right to control the manner [sic] or means by which [each Plaintiff] performs." *Id*. p. 3 (under the heading "No Right To Control").

- provided that each Plaintiff could "undertake to render similar services to other persons or entities at other locations and under other circumstances or arrangements at the sole discretion of the [Entertainer]." *Id*. p. 6.

- affirmed that each Entertainer had the "discretion in deciding for whom, when, and how to perform," along with the freedom to negotiate "what the performance will entail." *Id*. p. 2-3.

17.     Under the Agreement, the Club agreed to establish recommended "minimum fees" charged to customers for certain types of private performances in different locations within the Club, a portion of which fee the Club retained and a larger portion of which each Plaintiff retained. *Id.* p. 2; GT Int. Resp. at No. 17.

18.     The Agreement authorized Plaintiffs to charge customers more than the recommended minimum fees for private performances. *See* Exs. G and H, p. 2; Levi Dep. at 160:13-168:13; GT Int. Resp. at No. 17.

19.     The Agreement provided that any tips from an Entertainer to the Disc Jockey or House Mom in the Club were discretionary. *See* Levi Agt., p. 4 ("Performer may provide voluntary gratuities to the DJ, if desired;" and "Performer may provide voluntary gratuities to the House Mom, if desired"); Chicoine Agt., p. 4 (same).

20.     House Moms are individuals who assist Entertainers backstage. *See* Savickas Dep. at 45:9-19.  They help Entertainers with wardrobe, liaise between Entertainers and the Club, and help to coordinate and schedule performances. *Id.*

21.     It is custom in the industry for Entertainers to tip the DJ and House Mom who aid them on any given performance date.    *See* Savickas Dep. at 145:12-147:22; 75:6-22.

22.     Exhibit A to the Agreement provides guidance designed to ensure the Entertainers' safety and compliance with Rhode Island law.  *See* Levi Agt, p. 12; Chicoine Agt, p. 12; Robinson Dep. at 53:6-60:8; Savickas Dep. 99:8-105:7.

23.     The Club does not rigorously enforce even the limited guidance in Exhibit A.  *See* Savickas Dep. 101:12-103:14.

### Plaintiff Emily Chicoine

24.     Under the pseudonym "Phoenix," Chicoine performed as an Entertainer at the Club between October 17, 2013 and October 29, 2014.    *See* GT Int. Resp. at Answer No. 5; Chicoine Performance Records, Ex. I.

25.     During the three years prior to her audition at the Club, Chicoine performed at five other clubs: Center Stage, Cadillac Lounge, Club Fantasies, Wild Zebra, and Rhode Island Dolls.  *See* Chicoine Dep. at 69:19-72:19.

26.     Chicoine danced at Ladder 133 and Rhode Island Dolls during the same time period that she performed at Foxy Lady.  *Id.* at 63:22-64:11; 69:24-71:25.

27.     She acknowledged in her testimony that one of the advantages of her profession is the freedom to perform in the clubs that she likes.  *Id.* at 71:4-7.

28.     Chicoine explained that part of supporting herself as a dancer was "having customers that follow [her] from place to place."  *Id.* at 54:6-8.  One customer, in particular, would go to see Chicoine perform at whichever venue she was performing at any given time.  *Id.* at 53:23-54:5.

29.     Before performing at the Club, Chicoine signed a performer license agreement, although neither she nor the Club has been able to locate a copy of that agreement. *Id.* at 136:9-

20; 140:2-8.  Chicoine subsequently signed the Agreement described in Paragraphs 15-19, *supra*
on January 4, 2014, after reading it.  *Id.* at 182:4-25; 183:21-22; 188:4-11; Chicoine Agt., p 11.

30.     Chicoine believed she was entering an independent contractor relationship and
understood that she would not receive any wages from the Club.  *See* Chicoine Dep. at 139:4-13.

31.     As an Entertainer at the Club, Chicoine bought and chose her own wardrobe and
cultivated her own unique "edgy" look, which she described as a "rocker" and "gothic" look.  *Id.*
at 100:6-8.  She "always wore black" and "never wore colorful things" despite suggestions from
house moms who encouraged her to do so.  *Id.* at 100:9-11.

32.     Chicoine spent "well over" a thousand dollars on makeup for her performances at
the Club.  *Id.* at 156:22-157:2.  She estimated that she spent as much as $15,000 on costumes.
*Id.* at 157:11-22.  She spent additional money on shoes, hair product, lashes and tanning.  *Id.* at
158:3-5.

33.     Chicoine also installed in her home one of the poles typically found in nightclubs
that offer adult entertainment, in order to do "pole fitness" work outs.  *Id.* at 128:6-23.

34.     By investing in her appearance, Chicoine believed that she was able to increase
her appeal to the customers as well as her ability to make money.  *Id.* at 159:1-6.

35.     For her 2013 tax return, Chicoine claimed these expenses as a deduction from her
income as a cost of doing business.  *Id.* at 56:7-57:2.

36.     As a marketing tool, Chicoine utilized social media to promote herself and to
persuade customers to come to the Club and pay for her performances.  *Id.* at 126:7-127:19.

37.     Chicoine received no training from the Club, nor did she receive any performance
reviews.  *Id.* at 141:1-12.  She also did not receive a handbook.  *Id.* at 141:13-15.

38.    Chicoine was free to drink alcoholic beverages with customers on performance dates, and did so. *Id.* at 159:7-16.

39.    Chicoine chose when to perform; she testified that she could perform at the Club as often as she wanted to do so. *Id.* at 144:22-145:6.

40.    The number of performances that Chicoine did at the Club in any given week varied widely, and she could not identify an average number of performances per week. *Id.* at 194:17-196:14; Chicoine Performance Records. The Club's records establish that she performed an average of 1.95 times per week during the period that she contracted with the Club. *See* Chicoine Performance Records.

41.    Although she generally informed the Club in advance when she intended to perform, Chicoine testified that she was free to "walk in" and perform at the Club without advance notice. *See* Chicoine Dep. at 148:3-20. Chicoine chose to do "walk in" performances at least 49 times between October of 2013 and October of 2014; she did so on 11 occasions in May 2014 alone. *Id.* at Ex. 2.

42.    There were stretches of time ranging from two weeks to two months during which Chicoine would simply decide not to perform. *See* Chicoine Performance Record. For example, after doing a "walk-in" performance on February 3, 2014, Chicoine did not perform at the Club again until April 16, 2014, almost two months later. *Id.* She also decided to not show up on occasions that she had informed the Club that she would perform at least 53 times during the year that she performed at the Club. *Id.*

43.    The Club opens at 6:00 a.m. on Fridays for an event called "Legs and Eggs," during which customers can eat breakfast while Entertainers perform. *See* GT Int. Resp. at No. 15.

44.     Chicoine testified that she did not engaged in "Legs and Eggs" performances, based on her own preferences, and the Club "had no other choice" but to accept her decision. *See* Chicoine Dep. at 146:2-11.

45.     Chicoine testified that she "stayed away from" performing for private bachelor parties that reserved space at the Club, and no representative of the Club ever told her that she had to engage in such performances. *Id.* at 151:22-23.

46.     On at least one occasion, Chicoine also declined to perform on stage while performing at the Club because she simply did not feel like it. *Id.* at 152:6-9.

47.     Chicoine preferred pursuing private dances with customers. *Id.* at 153:1-24 ("[i]t would be your customer. You would have to work for yourself.").

48.     Chicoine acknowledged that she was free to decline performance requests from customers. *Id.* at 153:20-154:6.

49.     Chicoine also testified that the amount of money she earned while performing at the Club depended on her level of initiative. *Id.* at 67:5-9. She was unable to approximate how much money she earned performing at the Club, testifying that she has "[n]o real idea." *Id.* at 131:10-132:8.

50.     According to Chicoine, the Club's Entertainment Manager terminated her Agreement and license to perform at the Club either because of her "edgy" look or the Club's desire to bring in new Entertainers. *Id.* at 99:2-100:12.

**Plaintiff Ruby Levi**

51.     Under the pseudonym "Molly," Levi performed at the Club sporadically between April of 2012 and December of 2014. *See* Stipulation Regarding Plaintiff Ruby Levi's Post-Deposition Supplemental Document Production, dated January 17, 2017 ("Levi Stip"), ¶1 (Ex. A), Ex. J; Levi Performance Record, Ex. K.

52.    Between 2008 and 2015, Levi performed at seven different clubs, some of them contemporaneously: Hustler Club in New Orleans; Cadillac Lounge; Golden Banana; Tens Show Club; Mardi Gras; Mac's Two; and Foxy Lady.  *See* Levi Dep. at 73:19-74:3.

53.    Levi acknowledged that when she auditioned at the Club in 2012, she understood that she would be treated as an independent contractor if she decided to perform there.  *Id.* at 129:12-17.

54.    Before performing at the Club, Levi signed a performer license agreement, although neither she nor the Club has been able to locate a copy of that initial contract.  *Id.* at 125:6.  However, Levi signed the Agreement (described in Paragraphs 15-19, *supra*) in January 2014, which affirmed her intention of entering an independent contractor relationship with the Club.  *Id.* at 191:7-192:7; Levi Agt.

55.    Levi received no training from the Club, instead relying on her ten years of dance training in ballet, tap, jazz, lyrical and gymnastics.  *See* Levi Dep. at 131:1-20.

56.    Levi did not receive any performance reviews from the Club.  *Id.* at 155:12-25.

57.    Levi testified that, other than the Agreement, she does not recall any policies or handbooks being circulated at the Club.  *Id.* at 131:25-132:14.

58.    Levi told the Club which days she wanted to work by submitting a schedule slip each week with her requests.  *Id.* at 137:9-20.  However, she would often decide not to show up on dates that she had previously indicated that she would perform; she did this on at least 58 occasions between April of 2012 and December of 2014.  *See* Levi Performance Record.

59.    Although the Club requested that Levi perform during the "Legs and Eggs" events, Levi either declined to do so or signed up to perform and then chose not to appear for the performance.  *See* Levi Dep. at 139:4-22.

60.     At her discretion, Levi did "walk-in" performances, appearing to perform at the Club on a given occasion without any prior scheduling arrangement. *Id.* at 140:17-141:9. She did this at least 87 times during the period that she performed at the Club. *See* Levi Performance Record.

61.     When she wasn't engaged in an ongoing stage performance, Levi was free to take breaks whenever she wanted to do so. *See* Levi Dep. at 144:5-7.

62.     Levi approached customers to solicit them for private dances, or VIP room performances, because she had an "economic incentive" to do so. *Id.* at 146:2-147:9.

63.     Customers sometimes approached Levi for private performances, but no one from the Club ever told her that she had to perform or not perform for any particular customer. *Id.* at 146:13-17.

64.     Levi elected not to perform at bachelor parties in the Club because she preferred not to. *Id.* at 147:10-149:7.

65.     Levi bought "a lot" of clothing to wear for her performances at the Club; she provided all of her own dresses and gowns, and spent a "good amount" on cosmetics, which she applied herself. *Id.* at 149:25-154:23.

66.     Customers often bought Levi drinks while she was performing. *Id.* at 157:2-19.

67.     The Club did not regulate the tips that Levi received; customers gave Levi tips for stage dancing, for private dances, for VIP room performances, and even for mere conversation. *Id.* at 157:20-160:25.

68.     Customers paid Levi more than the minimum amounts recommended by the Club for private performances. *Id.* at 161:7-162:7.

69.     Levi testified that on one single occasion performing at the Club, she earned $2,000; she averaged $600 per performance date; and she once made $500 for a single stage performance.  *Id.* at 163:18-21; 168:1-7; 167:10-11.

70.     Levi testified that "[t]he sky's the limit" when it came to how much she could earn in performing at the Club, depending on whether she put additional initiative into her performances and engaging with customers.  *Id.* at 163:6-164:6.   In a record that Levi created contemporaneously with her performances at the Club, she recorded earnings of between $200 and $2,360 per performance date.  *See* Levi Performance Record.   In the same record, Levi calculated her hourly earnings as ranging from $36 to $240 per hour, with an average hourly rate of $105 per hour.  *Id.*  On June 29, 2013, for example, she performed at the Club for 5.5 hours and made $1,320.  *Id.*

71.     Levi performed on an average of 2.2 occasions per week at the Club.  *Id.* at 183:2-184:11; 204:6-16; Levi Performance Record.

72.     Beginning in June of 2014, Levi elected not to perform at the Club for more than four months; she then started performing again in November of 2014.  *See* Levi Dep. at 185:8-187:7; Levi Performance Record.

73.     According to Levi, she chose to terminate her relationship with the Club after her ex-boyfriend caused a scene at the Club, which left her feeling unsafe.  *See* Levi Dep. at 187:13-189:2.

Dated:  April 3, 2017

Respectfully submitted,

GULLIVER'S  TAVERN,  INCORPORATED
D/B/A THE FOXY LADY AND SOLID GOLD
PROPERTIES, INC.,

By Their attorneys,

/s/ Lauren J. O'Connor
Barry J. Miller (admitted *pro hac vice*)
bmiller@seyfarth.com
Anthony S. Califano (admitted *pro hac vice*)
acalifano@seyfarth.com
Lauren J. O'Connor (Bar No. 7808)
loconnor@seyfarth.com
SEYFARTH SHAW LLP
Seaport East
Two Seaport Lane, Suite 300
Boston, Massachusetts 02210
Telephone:  (617) 946-4800
Facsimile:  (617) 946-4801

## CERTIFICATE OF SERVICE

I hereby certify that, on April 3, 2017, a copy of the foregoing motion was filed electronically through the Court's CM/ECF system, which will send notice of this filing to all counsel of record.

Lauren J. O'Connor
Counsel for Defendant

37797525v.4