# Exhibit A

1

Volume I
Pages 1 to 131
Exhibits 1 to 13

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

- - - - - - - - - - - - - - - - -x
                                  :
RUBY LEVI and EMILY CHICOINE,     :
on behalf of themselves and       :
all others similarly              :
situated,                         :
              Plaintiffs,         :
                                  :
       vs.                        :   C.A. No.
                                  :   1:15-cv-216S-PAS
GULLIVER'S TAVERN,                :
INCORPORATED, and SOLID GOLD      :
PROPERTIES, INC., both d/b/a      :
THE FOXY LADY,                    :
              Defendants.         :
                                  :
- - - - - - - - - - - - - - - - -x

        DEPOSITION OF GULLIVER'S TAVERN,
INCORPORATED, and SOLID GOLD PROPERTIES, INC.,
THROUGH THEIR DESIGNEE DEAN ROBINSON, ESQ., a
witness called on behalf of the Plaintiffs, taken
pursuant to Rule 30(b)(6) of the Federal Rules of
Civil Procedure, before Ken A. DiFraia, Registered
Professional Reporter and Notary Public in and for
the Commonwealth of Massachusetts, at the Offices of
Seyfarth Shaw LLP, Two Seaport Lane, Boston,
Massachusetts, on Monday, November 28, 2016,
commencing at 9:58 a.m.

PRESENT:

    Fair Work, P.C.
        (by Brant Casavant, Esq.)
        192 South Street, Suite 450,
        Boston, MA 02111,
        brant@fairworklaw.com, 617.607.3260
        for the Plaintiffs.

(Continued)

                                                                    2

PRESENT:   (Continued)

     Seyfarth Shaw LLP
          (by Barry J. Miller, Esq.)
          Seaport East, Two Seaport Lane, Suite 300,
          Boston, MA 02210-2028,
          BMiller@seyfarth.com, 617.946.4806
          for the Defendants.

                    * * * * *

1    A.    Yes.
2    Q.    What is the name of the law firm?
3    A.    The same, Dean Robinson.
4    Q.    Are you the only attorney that works at
5  that firm?
6    A.    Yes.
7    Q.    Are you familiar with a company called
8  "Gulliver's Tavern, Inc."?
9    A.    Yes.
10   Q.    Are you familiar with a company called
11 "Solid Gold Properties, Inc."?
12   A.    Yes.
13   Q.    What is Gulliver's Tavern, Inc.?
14         MR. MILLER:  Objection.  You can answer if
15 you have an answer.
16   A.    It's a corporation that was formed some
17 years ago to operate a business.
18   Q.    And what business does it operate?
19   A.    A nightclub.
20   Q.    What nightclub is that?
21   A.    It's known as "The Foxy Lady."
22   Q.    Is that nightclub located at 318 Chalkstone
23 Avenue in Providence?
24   A.    Yes, "Chalkstone."

1  not going to instruct him not to answer a question
2  that's phrased in the present tense as you just
3  posed that one, but I want to make that objection
4  for the record.
5          MR. CASAVANT:  Okay.  That's fine.
6      Q.   For purposes of your answer, I think we can
7  agree to the extent there was some ambiguity about
8  the time period in my questions, you can assume that
9  I'm referring to the time period after May 23, 2012,
10 unless I specify otherwise.  For the time period of
11 May 23, 2012 going forward, what other employees has
12 Gulliver's Tavern had?
13     A.   I believe they had bartenders, waitresses
14 and managers.
15     Q.   Are those individuals who all work at The
16 Foxy Lady?
17         MR. MILLER:  Objection.
18     A.   In the nightclub?
19     Q.   Yes.
20     A.   Yes.
21     Q.   This is just so that we're clear about who
22 was working where.  Does Gulliver's Tavern own and
23 operate any nightclubs besides The Foxy Lady in
24 Providence?

```
 1   Foxy Lady?
 2       A.   Yes.
 3       Q.   Are there any other positions that work at
 4   The Foxy Lady that we have not identified that I
 5   missed?
 6            MR. MILLER:  Objection.
 7       A.   That work at or for?
 8       Q.   At.
 9       A.   Well, I believe there may be women that
10   come in and provide hairdressing services, but they
11   are not employees.
12       Q.   I think one category we probably overlooked
13   is there are entertainers that work at The Foxy
14   Lady; is that right?
15       A.   At The Foxy Lady?
16       Q.   At The Foxy Lady, yes.
17       A.   Yes.
18       Q.   And what services do these entertainers
19   provide at The Foxy Lady?
20            MR. MILLER:  Objection.
21       A.   Entertainment services.
22       Q.   What type of entertainment services?
23       A.   They dance at The Foxy Lady.
24       Q.   Going back to the list of positions we just
```

38

1  A. Not that I'm aware of.
2  Q. Does The Foxy Lady or Lori require the
3  entertainers to carry any particular type of
4  insurance?
5  A. I don't think it's a requirement. I mean,
6  if they want to have insurance, that's up to them.
7  Q. In the past three years, has The Foxy Lady
8  ever had a recruiting drive or a job fair for new
9  entertainers?
10 A. Not that I'm aware of.
11 Q. Are there times of the year where The Foxy
12 Lady does not accept new applicants or entertainers?
13     MR. MILLER: Objection.
14 A. No, not that I'm aware of.
15     MR. CASAVANT: Excuse me one second.
16     (Pause)
17 Q. Are you aware of circumstances in which
18 Lori has ever declined to allow a dancer to work at
19 The Foxy Lady after auditioning?
20 A. When you say "circumstances," are you
21 asking me if she ever turned anybody down?
22 Q. Yes.
23 A. Yes, she has.
24 Q. How often has that happened?

```
 1        A.    More often than not I would say.
 2        Q.    What are the circumstances in which she
 3   would decline someone?
 4              MR. MILLER:  Objection.
 5        A.    I couldn't tell you that.  It's really up
 6   to her in the end.
 7        Q.    Are you aware of any particular instance
 8   that's been brought to your attention that someone
 9   was not allowed to work at The Foxy Lady after
10   auditioning?
11        A.    Not particularly, no.  I mean, I'm aware
12   that many individuals have not been allowed, but I
13   don't know the circumstances.  I really have not
14   discussed that with her.
15        Q.    Aside from auditioning prospective
16   entertainers, what other responsibilities does Lori
17   have?
18              MR. MILLER:  Objection.
19        A.    My understanding is that she also does some
20   of the bookkeeping work for the corporation.
21        Q.    For Gulliver's Tavern?
22        A.    Gulliver's Tavern, correct.
23        Q.    What about John Webber, what are his
24   responsibilities with respect to The Foxy Lady as
```

1    Q.    When did that discussion take place?
2    A.    It was a number of years ago, I don't know,
3  seven, eight, nine years ago.
4    Q.    So prior to 2012?
5    A.    Oh, yes.
6    Q.    Do you know if this Exhibit A has been
7  included as an attachment to all the performer
8  license agreements in use since May 2012?
9    A.    I don't know the answer to that.
10   Q.    Would Lori know the answer to that?
11         MR. MILLER:  Objection.
12   A.    She may.
13   Q.    Exhibit A, for lack of a better word, the
14 title seems to be "Club Rules for Entertainers"; is
15 that fair to say?
16         MR. MILLER:  Objection.
17   A.    That's what it says, yes.
18   Q.    Have these bulleted items changed at all
19 over the past three years?
20   A.    I don't think so, but I cannot say for sure
21 because I have not seen all of the agreements that
22 have been executed during that time frame.
23   Q.    What was the thought process that went into
24 identifying these particular items under the heading

54

1  "Club Rules for Entertainers"?
2       MR. MILLER:  I will object to the form.  I
3  will instruct you to exclude from the response any
4  attorney-client communications.
5       A.   Well, then, I can't answer.
6       Q.   Okay.  So the thought process that went
7  into crafting this was all part of an
8  attorney-client conversation or communication?
9       A.   I would say so, yes.
10      Q.   Would it be fair to say that these are the
11 rules that the entertainers are required to follow
12 while performing at The Foxy Lady?
13      MR. MILLER:  Objection.
14      A.   I don't think I would phrase it that way,
15 no.
16      Q.   How would you phrase it?
17      A.   Well, there's no requirement.  I think
18 these rules are more for their own safety than
19 anything else, also to make sure that nothing is
20 done by anybody really to put the licenses, the
21 entertainment and liquor license, in jeopardy.  So
22 it's just common sense guidelines, is what I would
23 call them.
24      Q.   Are you aware of circumstances in which

1  managers have enforced these rules with respect to
2  the entertainers at The Foxy Lady?
3          MR. MILLER:  Objection.
4      A.  Well, I believe one of your clients was let
5  go because she brought drugs onto the premises.  So
6  yes, I am aware of that.
7      Q.  Are you aware of any other circumstances?
8      A.  Personally?
9      Q.  Sure.
10     A.  In the last three years?
11     Q.  Yes.
12     A.  No.
13     Q.  Aside from the incident that you just
14 mentioned with regard to one of the Plaintiffs in
15 this case?
16     A.  I am not, but that doesn't mean it didn't
17 happen.  They don't tell me every time someone fails
18 to follow a rule like that.
19     Q.  What is the reason for stating that the
20 entertainer must possess proper picture
21 identification showing that you are at least
22 21 years old?
23         MR. MILLER:  Objection.
24     A.  To make sure that the entertainers are of

1    an age that they won't run afoul of the state and
2    local statutes and ordinances.
3        Q.   Do you have to be 21 years old in order to
4    work as an entertainer at The Foxy Lady?
5            MR. MILLER:  Objection.
6        A.   According to this you do, yes.
7        Q.   As a practical matter, do you know if
8    entertainers are expected to be 21 years old in
9    order to work at The Foxy Lady?
10       A.   I believe so, yes.
11       Q.   The second item on this list is "Have
12   respect for other entertainers."  What is the
13   rationale or the basis for that?
14       A.   Again, I think it's common sense.  I would
15   think you would always want to have individuals who
16   are performing services with other individuals to
17   treat them with respect.
18       Q.   The third item is, "Do not leave the
19   premises with a customer or meet a customer outside
20   the premises."  What is the basis or the rationale
21   for that?
22           MR. MILLER:  Objection.
23       A.   Well, clearly I think the safety of the
24   entertainer is what they are trying to ensure there.

1    Q.   I assume that the item, "No possession or
2  use of illegal drugs on the premises" is in order to
3  comply with drug laws?
4         MR. MILLER:  Objection.
5    A.   Well, certainly that's a primary
6  consideration, but again, as I mentioned earlier,
7  the club has a vested interest in maintaining their
8  entertainment and liquor licenses, and so they want
9  to make sure that events don't occur that would put
10 those licenses in jeopardy.  That's part of it as
11 well.
12   Q.   Is that the same rationale for the "No
13 excessive drinking in the club" item under that?
14        MR. MILLER:  Objection.
15   A.   I would assume so, safety as well.
16   Q.   Safety of who?
17   A.   Well, excessive drinking is not good for
18 your health.
19   Q.   Any reason other than those two items?
20   A.   Which two items?
21   Q.   The safety and the not jeopardizing the
22 liquor license or other licenses.
23   A.   I would think those would be the reasons,
24 yes.

1    Q.    Are the entertainers allowed to consume
2  alcoholic beverages at The Foxy Lady?
3         MR. MILLER:  Objection.
4    A.    I don't know if they are allowed to.  They
5  may.  I just don't know.
6    Q.    Do you know who would know that?
7         MR. MILLER:  Objection.
8    A.    Well, I would think Lori Savickas would
9  know.
10   Q.    The next item is "You must be dressed
11 before you leave the stage or dance area."  What is
12 the reason for that item?
13   A.    I'm guessing that they probably don't want
14 entertainers walking around the club premises
15 without clothes on.  Again, that's just...
16   Q.    But the performances that the entertainers
17 do at the club involve them removing their clothes,
18 correct?
19        MR. MILLER:  Objection.
20   A.    Yes, while they are on the stage or a dance
21 area.
22   Q.    Skipping the next two, the item reads, "Two
23 feet are to remain on the floor when in any dance
24 area," do you see that?

1      A.     Yes.

2      Q.     What is the rationale behind that line
3  item?

4             MR. MILLER:  Objection.

5      A.     Well, I'm sure that is there to discourage
6  activities which, again, may jeopardize the license
7  and/or be illegal.

8      Q.     What about the item "All booths, cabanas
9  and other semi private rooms are subject to
10 inspection at any time," what is the reason or
11 rationale for that?

12            MR. MILLER:  Objection.

13     A.     I would say the same.

14     Q.     Being safety and not jeopardizing the
15 licenses?

16     A.     Yes, and not participating in illegal
17 activities.

18     Q.     The next item is "All purses, bags and
19 lockers are subject to searches if drug activity is
20 suspected."  Have such searches been conducted at
21 The Foxy Lady during the past three years that you
22 are aware of?

23     A.     I'm not aware that they have.  I just don't
24 know.

1  Q. What was the reason for implementing this
2  item?
3       MR. MILLER: Objection.
4  A. Well, as you can see from your own client,
5  there are times when illegal substances are brought
6  onto the club premises, and so they really want to
7  make sure that there are no illegal activities going
8  on within the club premises.
9  Q. What is the reason behind the item that
10 says that no item is allowed to enter the DJ area
11 for any reason?
12      MR. MILLER: Objection. I think you
13 misread that.
14 Q. What did I say? In any event, what is the
15 reason behind that item?
16 A. Well, I'm guessing, but I would think that
17 you want to make sure that there's no interference
18 with the DJ as he is performing his services.
19 Q. Have there been circumstances in which an
20 entertainer has interfered with the DJ during the
21 performance of his services?
22      MR. MILLER: Objection.
23 A. In the last three years?
24 Q. Uh-huh.