## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

RUBI LEVI and EMILY CHICOINE, on
behalf of themselves and all others similarly
situated,

        Plaintiffs,

    v.                            CASE NO. 1:15-cv-216-S-PAS

GULLIVER'S TAVERN, INCORPORATED,
and SOLID GOLD PROPERTIES, INC., both
d/b/a THE FOXY LADY,

        Defendants.

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO PRECLUDE CLASS OR COLLECTIVE CERTIFICATION UNDER 29 U.S.C. § 216(b) AND FED. R. CIV. P. 23

Gulliver's Tavern, Incorporated d/b/a The Foxy Lady (the "Club") and Solid Gold Properties, Inc. (together, "Defendants") request an order precluding certification of a class action under Fed. R. Civ. P. 23 or a collective action under Section 216(b) of the Fair Labor Standards Act ("FLSA") in this case. The central questions of liability are whether each Entertainer who performed at The Foxy Lady was properly classified as an independent contractor or an employee under both the FLSA and Rhode Island's wage laws. The Entertainers at issue in this litigation had varying relationships with The Foxy Lady; even the two named Plaintiffs differed in their relationships with the Club in ways that are germane to their contractor status. Among other factors impacting employee versus contractor status, Entertainers experienced varying levels of supervision and control, economic independence, permanency in their relationships with the Club, application of initiative and investment in their businesses, and opportunity for profit and loss. Given this diversity of experiences, a determination as to whether any Entertainer was properly an independent contractor or a misclassified employee,

under either statutory regime, requires individualized inquires to assess these factors.  Other factors also render this case inappropriate for class action treatment.  Members of the putative class and collective in this case differ as to whether they are subject to unique defenses, including release agreements or arbitration agreements with class action waivers, which implicate their legal ability to participate in this action.  Likewise, even if liability could be addressed through representative proof and on a classwide basis, the damages potentially owed to any given Entertainer would require a separate set of time-consuming and individualized inquiries, in light of their differing experiences.  As such, Plaintiffs cannot establish the criteria for certification of a class under Rule 23 or certification of a collective action under the FLSA.

Even if Plaintiffs could overcome the lack of issues in this case susceptible to adjudication in common, a class action would not be superior to adjudication of Plaintiffs' claims on an individual basis.  The individuals whom Plaintiffs purport to champion have no interest in Plaintiffs' cause and are hostile to Plaintiffs' objectives in bringing this action.  Notwithstanding the fact that this case has been pending for almost two years and garnered substantial publicity and attention, there is a glaring paucity of evidence that any other Entertainer seeks to pursue claims like those that the two Plaintiffs have asserted.  This is not a mere lack of interest or initiative among putative class members; other Entertainers have come forward to express their disagreement with Plaintiffs' legal and factual claims and plainly stated that they consider this action to be a threat to both their pecuniary interests and the unique privacy interests presented by their chosen profession.

Accordingly, for reasons of both fairness and judicial economy, the Court should preclude this case from proceeding as a class or collective action and should proceed with the disposition of Plaintiffs' claims on an individual basis.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

### A.      Plaintiffs' Putative Class and Collective Action Claims

Ruby Levi filed this action on May 23, 2015.  *See* Dkt. 1.  She then turned to the press to publicize her claims, drawing attention from the print and television media.  *See* News Articles, Ex. 1.  Levi's publicity-seeking efforts resulted in one person joining her cause, when Emily Chicoine joined the action in June 2015.  *See* Dkt. 13 (Am. Compl.).

Both Plaintiffs performed as Entertainers or, in their words, "exotic dancers" at the Club. Am. Compl. ¶1-2.  They claim that Defendants misclassified them as independent contractors when they were properly employees under the FLSA, the Rhode Island Minimum Wage Act and Payment of Wages Law.  *Id.* ¶1-2, 17-23.  Based on this alleged misclassification, Plaintiffs claim that Defendants deprived them of minimum wage and unlawfully required them to pay various sums to the Club or other service providers.  *Id.* ¶17-27.  Instead of an hourly wage, Plaintiffs note that they received compensation for their performances directly from customers. *Id.* ¶19.  They claim to have paid Defendants a weekly "house fee" of $40 in order to perform at the Club.  *Id.*  ¶20.  They also claim that Defendants collected "fines" from them for various infractions of the Club's rules or policies, such as a failure to undertake required stage performances. *Id.* ¶21.  Finally, Plaintiffs assert that Defendants required them to tip "house moms," bouncers, and disc jockeys.  *Id.* ¶22.  These tips, Plaintiffs contend, varied substantially "depending on who is being tipped and what day of the week it is."  *Id.*

Most of Plaintiffs' assertions regarding the money they received and paid out to others are disputed.  While customers paid Plaintiffs directly for their performances, this is the only aspect of the parties' financial relationship that is undisputed.  In particular, the record belies Plaintiffs' assertion that Entertainers paid house fees on any consistent basis, and the record

includes no evidence of any fines imposed on the Entertainers or even the existence of a set of rules on which fines could be based. *Id.* ¶20-22. Likewise, the record reflects that tipping practices varied from Entertainer-to-Entertainer, at the discretion of each Entertainer. *Id.*

### B.    The Club's Business

Like other nightclubs, the Club derives most of its revenues from the sale of alcoholic beverages. Robinson Dep. 9:13-24, excerpts at Ex. 2; Savickas Dep. 9:6-9, excerpts at Ex. 3; Weber Aff. ¶3, Ex. 4. The Club touts four functioning bars and additional stations for the sale of beer, and music is almost always playing. *Id.* ¶¶3-4. However, the Club's features are not limited to those of a typical nightclub. For example, the Club has a full-service kitchen and offers a complete dining menu offering salads, pizza, sandwiches, and appetizers to a 12-ounce rib eye steak or penne alfredo pasta with shrimp. Website Excerpts, Ex. 5; Weber Aff. ¶5. The Club also offers shoulder and back massages to patrons. Savickas Dep. 36:8-22. Customers can also pay to enjoy the comfort of a private room separate from the main floor, where they can relax and enjoy a shoulder or back massage while listening to music. *Id.*; Club Floor Plan, Ex. 6.

The Club is also a venue for live entertainment. Robinson Dep. 28:12-23; Savickas Dep. 14:4-9. Plaintiffs refer to the Entertainers who perform at the Club as "exotic dancers." Am. Compl. ¶17. Others sometimes refer to them crudely as "strippers," because their performances can (but do not always) include erotic dancing in sensual attire and in the nude. *Id.* The Club, however, is determined to engage "Entertainers"--not strippers. Weber Aff. ¶7. To Club management, a stripper is someone who just takes off her clothes for money; an Entertainer is someone who portrays a unique character for customers, not only by the way she looks and may dance, but also by the way she communicates and interacts with her audience. *Id.*; Savickas Dep.

67:21-71:9. These performances can occur in a number of different public, semi-private, and private settings within the Club. Savickas Dep. 26:3-10; 76:14-12; 133:15-136:9.

The process by which the Club enters into a relationship with an Entertainer is analogous to the process for retaining a band or other live act. There is no application to fill out, no reference request, no background check, no drug test, and no traditional interview process. Levi Dep. 125:6-130:25, excerpts at Ex. 7; Chicoine Dep. 136:9-137:5, excerpts at Ex. 8; Savickas Dep. 71:10-18. Instead, there is an audition, which often includes the Entertainer donning a costume of her choice and demonstrating her dance skills in whatever style she prefers to whatever music she selects. Savickas Dep. 63:12-64:5; Chicoine Dep. 136:9-137:5. The audition also includes dialogue, to permit the panel to gauge the Entertainer's personality, communication skills, and overall capacity to entertain her customers. Savickas Dep. 67:23-68:10. The Club maintains high standards for the Entertainers with whom it contracts, and more than half of those who audition are rejected. Robinson Dep. 38:17-39:14; Weber Aff. ¶7 ("Because the Club is particular about the entertainers we engage, the Club rejects most individuals who audition to perform at the Club.").

The Club maintains secure dressing room facilities and a state-of-the-art sound system. Savickas Dep. 38:6-8; 170:22-24; Weber Aff. ¶4. If an Entertainer who performs on stage requests a certain type of music or specific songs, the DJ may accommodate her requests. *Id.* The DJ also provides enthusiastic introductions for Entertainers as they begin a stage performance. Weber Aff. ¶8; 2nd Doe Aff. ¶15, Ex. 9. This introduction promotes the Entertainer to the audience and helps her to generate tips and engagements for lucrative private performances. Weber Aff. ¶8; 2nd Doe Aff. ¶15. House Moms assist Entertainers. Savickas Dep. 45:9-19; 2nd Doe Aff. ¶15. They help with wardrobe; liaise between Entertainers and the

Club; and coordinate and schedule performances based on the Entertainers' availability and preferences.  Savickas Dep. 45:9-19; 2nd Doe Aff. ¶15.

### C.    The Various Written Agreements Between Entertainers and the Club

The Club has promulgated different license agreements in its relationships with Entertainers.  During the period of time at issue (May 23, 2012 to the present), an Entertainer could have entered into any one or more of three distinct agreements.  An Entertainer with whom the Club contracted in July 2012, signed the agreement attached as Exhibit 10 (the "2012 Agreement").  Later, in January 2014, Plaintiffs signed the agreements attached as Exhibits 11 and 12 (the "2014 Agreement").  Still later, an Entertainer with whom the Club contracted in August 2015 signed the agreement attached as Exhibit 13 (the "2015 Agreement).

These three agreements share certain characteristics.  None of them reference any supervisors, handbooks, or manuals that purport to dictate an Entertainer's conduct or duties.  Exs. 10-13.  All three agreements disclaim any employment relationship and reflect the parties' mutual understanding that the Entertainer is self-employed and seeks a license to perform at the Club on dates her choosing, with no minimum performance requirements.  *Id.*  All three agreements acknowledge that the Entertainer will not receive compensation from the Club, but instead will receive compensation directly from her customers.  *See id.*  All three agreements provide that the Entertainer has the right to perform for other individuals and entities, including the Club's competitors.  *See id.*

On the other hand, there are several distinctions between the agreements in place during the putative class period that bear on the viability of Plaintiffs' bid to address the employee versus contractor status of all Entertainers on a class or collective action basis.

### 1.     The 2012 License Agreement

The 2012 Agreement was designed to create an independent contractor relationship and afford significant flexibility to Entertainers. Nonetheless, the Club reserved certain rights, at least in theory, including limited control over the Entertainer's wardrobe. 2012 Agreement, p. 3 ("[c]ostumes worn by the [Entertainer] must be in good taste . . . and the Entertainer must "immediately make changes to his or her costume if asked to do so by [the Club].") However, the 2012 Agreement says nothing about a number of subjects at issue in this case, including any fees that Entertainers could or must charge customers for private performances. It says nothing about tip-outs paid by Entertainers to any other service providers in the Club. It also says nothing about any fines for any conduct inimical to the Club's interests. Further, it contains no indemnity or release provisions implicated by Plaintiffs' claims in this matter.

Entertainers who performed at the Club during the class period but only prior to January 2014 may be subject only to this Agreement, as may any Entertainers who signed a contract with the Club prior to January 2014 and continued to perform without renewing or revising their agreement with the Club.

### 2.     The 2014 License Agreement

The 2014 Agreement is more thorough. It states that the Club has no right to control the Entertainer and includes a section titled "No Right To Control." 2014 Agreement, p. 3. To that end, the 2014 Agreement does not adopt the 2012 Agreement's provision granting the Club authority to control the Entertainer's wardrobe, leaving the Entertainer sole discretion to choose

her wardrobe during performances. *See id.* The 2014 Agreement also notes the Entertainer's freedom to perform or not to perform for any given customer, and to negotiate the nature of her performances with customers, points not addressed in the 2012 Agreement. *Id.* p. 3.

Also in contrast to the earlier form of agreement, the 2014 Agreement reflects that the Club will set recommended "minimum fees" for customers to pay for certain types of private performances, a fraction of which is payable to the Club, with the larger share kept by the Entertainer.[1] *Id.* p. 2; GT Int. Resp. No. 17, Ex. 14. The 2014 Agreement also authorizes Entertainers to charge customers more than the recommended fees for private performances. *Id.*

Unlike its predecessor, the 2014 Agreement notes that if the Entertainer schedules herself for a given day or evening performance, but fails to appear, the Entertainer "may be subject to a late fee." 2014 Agreement, p. 3. Further contrasting the 2012 Agreement, the 2014 Agreement expressly addresses the Entertainer's payment of tips to other service providers in the Club, unambiguously stating that there is no requirement that an Entertainer tip anyone. *Id.* p. 4. (stating Entertainer "may provide voluntary gratuities to the DJ, if desired," with similar language about tips to House Moms).

The 2014 Agreement also contains indemnity and release provisions that distinguish it from the 2012 Agreement. *Id.* pp. 8-9. Under the 2014 Agreement, the Entertainer indemnified the Club for any tax liabilities, property damage, or personal injury arising out of the

---

[1] Although they have changed over time, common suggested fees for private performance have been as follows:

- $50 for a performance lasting two songs in a semi-private room, of which $40 is retained by the Entertainer.
- $160 for a performance lasting 15-minutes in a private Cabana enclosure, of which $100 is retained by the Entertainer.
- $300 for a performance lasting 30-minutes in a larger and fancier private Skybox enclosure, of which $200 is retained by the Entertainer.

GT Int. Resp., No. 17; Savickas Dep. 132:14-138:11.

Entertainer's performances, and the Entertainer released all known and unknown claims that she had against the Club arising before the date of execution, presumably including any wage claims of the sort at issue in this action arising prior to the date on which each Entertainer signed the document. *Id*. p. 9.  The 2012 Agreement contains no similar indemnity or release provisions.

### 3.   The 2015 License Agreement

The 2015 Agreement differs from both of the prior versions.  The 2015 Agreement includes indemnity and release provisions that are broader than the 2014 Agreement, requiring the Entertainer to defend and indemnify the Club "against any and all claims . . . in any way relating to or connected with [her] use or occupancy of [the Club]."  2015 Agreement, p. 3-4.  It also states that the Entertainer "unconditionally releases the Club . . . from any and all claims, whether known or unknown, which [she] has or may have against the Club" up to the date that she signed the 2015 Agreement.  *Id*.

The 2015 Agreement also includes a bi-lateral promise between the Entertainer and the Club to arbitrate all claims between them, including "any claims relating to . . . the payment of wages or other compensation."  *Id.* p. 5.  This provision includes a class and collective action waiver providing that the Entertainer must arbitrate any wage claims only "on an individual basis," and each Entertainer who signed it "waive[d] the right to participate in or receive money from any class, collective, or representative proceeding."  *Id.* p. 6.

### D.   Entertainers' Varying Relationships with the Club

Beyond the four corners of their contracts, the Entertainers' relationships with the Club vary in practical terms based on a host of considerations.  Some Entertainers perform at the Club regularly, upwards of five times per week, on days and at times of their choosing.  Savickas Dep. 156:19-157:14 ("Some girls work once a week.  Some girls work six times a week."); Am.

Compl. ¶18(h).  Other Entertainers perform only two or three times per week.  Levi Dep. 137:9-139:22; Chicoine Dep. 144:14-145:4; Loe Aff. ¶20, Ex. 15; Roe Aff. ¶3, Ex. 16, 2nd Doe Aff. ¶5.  Others perform even less frequently.  2nd Doe Aff. ¶4 ("I could perform once per week or less, or not at all."); Savickas Dep. 156:19-157:14; CW Aff. ¶3, Ex. 17.

Some Entertainers are itinerant and move from club-to-club, in some instances roving from state-to-state, performing at a venue for a while, then moving to another club for a change of clientele and profit potential.  Ramos Aff. ¶3, Ex. 18 ("Some entertainers work at a variety of different clubs, including traveling to other states to perform"); Levi Dep. 73:19-74:3 (Plaintiff performed at nine 9 different clubs from 2008 to 2015, including performing at multiple clubs during the same period).[2]  Other Entertainers chose to perform exclusively at The Foxy Lady.  Levi Int. Resp. No. 9.  Some Entertainers perform only during the day, while others perform only at night.  Chicoine Dep. 145:14-16 ("I don't know about day shift.  I never worked a day shift.").  Others perform both day and night.  Chicoine Dep. 145:24-146:1; Savickas Dep. 50:2-6.

Regardless of the frequency of their performances, each Entertainer chooses her own schedule, which depends on her other engagements and personal pursuits and preferences.  Levi Dep. 138:17-19 ("Q. And you told the club which days you wanted to work?  A. Correct."); Chicoine Dep. 146:22-24 ("Q: So you chose the shifts you wanted to work at The Foxy Lady by yourself?  A: Yes.").[3]  Oftentimes, Entertainers show up to perform at their whimsy, without prior scheduling, and "[a]t any given time that the Club is open to the public, between one-third and one-half of the [E]ntertainers performing at the Club are walk-ins. . ."  Creelman Aff. ¶4;

---

[2] *See also* Chicoine Dep. 63:22-64:11; 69:19-72:19; Levi Int. Resp. No. 10, Ex. 19; Chicoine Int. Resp. Nos. 9-10, Ex. 20.
[3] *See also* 2nd Doe Aff. ¶5-7; Creelman Aff. ¶4, Ex. 21; Doe Aff. ¶3, Ex. 22; NIM Aff. ¶3, Ex. 23; Voe Aff. ¶14, Ex. 24; CW Aff. ¶4; Ramos Aff. ¶4, 6; Savickas Dep. 109:19-24.

Levi Dep. 140:17-141:9 ("Q.  And you did it [walk-in performances] whenever you felt it was convenient?  A.  Yes."); 144:22-149:6.

Each Entertainer is left to develop her own means of generating income in the course of performing at the Club.  2nd Doe Aff. ¶9-12 ("Entertainers at the Club have different strategies for making money at the Club"); Savickas Dep. 73:12-22 ("as an entertainer, it's up to them to work the room and work the customers and make money").  They receive no policies or handbooks from the Club, no training, and no performance reviews.  Levi Dep. 131:1-132:14; 155:12-25; Chicoine Dep. 141:1-15.  They also do not receive direction from the Club regarding how to perform or for whom to perform.  Levi Dep. 144:5-149:24 ("Q.  It was up to you to make those decisions?  A.  Yes. . . .  Q.  And each dancer made her own decisions?  A. Yes."); Chicoine Dep. 146:2-11 ("Q. And the club tolerated [your refusal to perform at a weekly "Legs and Eggs" breakfast event]?  A. They had no other choice."); 151:22-154:6 ("Q. When it came to private dances, did anyone ever tell you for whom you had to perform?  A.  I mean no.  It would be your own customer.  You would have to work for yourself.").  Some Entertainers prefer dancing on stage for the entire audience.  2nd Doe Aff. ¶9.  Others dance only for selected customers in the Club's private Cabanas and Skyboxes, and stroll the Club floor engaging the audience and promoting their services.  Savickas Dep. 140:24-143:9;  Other Entertainers do both stage and private performances.  *Id*. ("It varies . . . Some entertainers choose not to go on stage. Other entertainers love going on stage . . . it varies from entertainer to entertainer"); 2nd Doe Aff. ¶9 ("Some entertainers do a lot of stage performances and others do none.").

Some Entertainers never go on stage or provide private dance performances.  Savickas Aff. ¶4, Ex. 25.  Instead, their performances consist of one-on-one interactions with customers, never dancing at all.  2nd Doe Aff. ¶9-11 ("I generate most of my income by entertaining one or

two regular clients of mine . . .  I provide personal attention and companionship to these clients . . . and try to make them smile and feel comfortable.  In return they pay me for my time.").  This type of Entertainer offers personalized attention to customers, including conversation about whatever topics she perceives to be of interest to the customer.  *Id.*

Each Entertainer controls her own earnings.  Levi Dep. 149:8-24; 157:20-158:15 ("Q. And the club did nothing to regulate any amount of money that might be exchanged?  A. Correct.").[4]  Beyond the Club's suggested minimum charges for certain private performances, what a customer pays an Entertainer is between her and the customer.  2012 Agreement, p. 2 ("Any fee and tip income received by the [Entertainer] is to be based upon agreement reached solely by the [Entertainer] and the patron"); Levi Dep. 157:20-158:14.  If an Entertainer performs on stage, the nature and quality of her performance affects what customers pay her. Levi Dep. at 163:22-164:4 ("Q. And as you put it, the sky's the limit because it's totally depending on how much the customers like your performance?  A. Correct.  Q. And if you put additional initiative into it and engage the customers more, you might earn more; is that fair to say?  A. Yes."); Chicoine Dep. 45:18-46:22 (compensation as an Entertainer varied significantly based of initiative; "It depends on how much you work and how hard you work . . . It depends if you're lazy or not basically. . . . We would go up to customers, speak to them, attempt to get a dance, attempt to get a room.").

If an Entertainer chooses to do private performances, her negotiation skills also enter the equation.  Levi Dep. at 166:6-11.  ("[T]he more hour champagne [room engagements] you can get the better, so I always try to upsell.").  Some Entertainers charge only the suggested minimum price for a given private dance performance.  Chicoine Dep. 156:1-15 (Chicoine never

---

[4] *See also* Levi Dep. 158:15-168:25; Chicoine Dep. 150:11-162:19; Savickas Dep. 164:8-166:1.

asked for or received more than the recommended minimum).  Others negotiate or command higher rates.  *Id.* 161:7-22 ("Q.   And did customers sometimes pay more than those [recommended minimum] amounts  . . .?  A. Yes."); 158:15-168:25; Chicoine Dep. 156:7-13 ("Q.  Some performers negotiated with their customers?  A. I'm sure, yes.").  For those who entertain customers through mere conversation, negotiation skills are more important because there are no suggested minimums to use as a benchmark.  2nd Doe Aff. ¶11.

Every Entertainer who performs at the Club has her own strategy for investing in her business.  Levi Dep. 154:12-155:11; Chicoine Dep. 156:22-158:5.  Some Entertainers invest in little more than the all-purpose cosmetics, dresses, and lingerie that they wear in their personal lives.  Other Entertainers invest considerably in wardrobe, accessories, makeup, perfume, and fitness products or services.  2nd Doe Aff. ¶13 ("I spend significant amounts of money on the way I look to help attract clients, including expenses related to my hair, wardrobe, nails, makeup and fitness."); Chicoine Dep. 156:22-158:5 ("Q. How much do you estimate you spent on [makeup]?  A. Well over a grand.").  Others go even farther.  For example, some Entertainers go to considerable lengths to modify their natural appearances.  Savickas Dep. 169:7-10; 170:13-21; 2nd Doe Aff. ¶13.  They not only dye their hair and purchase specialized makeup, but they also get real or fake tattoos, body piercings, and even plastic surgery to augment, reduce, or otherwise modify their natural features.  *Id.*; Chicoine Dep. 91:6-92:2 ("My tattoos made me money").  Chicoine, for example, scaled her investments in the tools of her trade to the amount of revenue she was making.  Chicoine Dep. 98:12-15 ("Q: . . . If you were making more money, you would buy things that you used in performing as an exotic dancer?  A. Yes.").  Chicoine recognized that her substantial investments in clothing, cosmetics and tanning would increase her appeal to her

customers and help her make money.  *Id*. 158:22-159:6.  She even claimed these expenses as deductions representing the costs of doing business when filing tax returns.  *Id*. 56:7-57:2.

Based on variations in their initiative and investment, the revenues that Entertainers generate vary dramatically.  Some Entertainers earn $100 or $200 on an average night, while others earn $2,000 or more in the same period of time.  Levi Stip. Ex. 26.  Likewise, the same Entertainer who performs on a given day for 7 hours and earns $100 can perform for just 5 hours on a different day weeks later and earn well over $1,000.  *Id*.

The amounts that Entertainers pay in tips to other service providers also vary.  Robinson Dep. 95:15-96:12 ("That's totally discretionary.  It's totally up to the entertainers."); Roe Aff. ¶8 ("I choose the amount of any gratuity that I provide"); CW Aff. ¶7 ("the tips that I provide to other service providers, such as DJ and Floor Hosts, are voluntary and at my discretion").[5] Some poll their colleagues to find out what amounts are customary to tip to the DJ, House Mom, or security staff.  2nd Doe Aff. ¶14.   Others tip much more than any customary amount because of the perceived benefits it yields the Entertainer, or simply to show appreciation.  Levi Dep. 175:20-176:10 ("Q. Why would you [tip out more] when you did it?  A.  If somebody did me a favor like gave me an outfit to wear or pointed me to a customer that ended up getting a lot of dances or a private room."); Savickas Dep. 147:11-148:21; 2nd Doe Aff. ¶14-15.  For example, an Entertainer who tips generously may find that the DJ introduces her to the audience with a more glowing endorsement or is more apt to fill her request for particular music.  2nd Doe Aff. ¶15; Robinson Dep. 95:15-23.  Similarly, an Entertainer might tip a Floor Host little or nothing on a given performance date, but if the Floor Host assists the same Entertainer with an unruly

---

[5] *See also* Doe Aff. ¶7; NIM Aff. ¶8;  2nd Doe Aff. ¶¶14-15; Savickas Dep. 75:6-11; 147:11-148:21; Weber Aff. ¶10.

customer on another occasion, the Entertainer may choose to give that Floor Host a gesture of appreciation.  2nd Doe Aff. ¶14-15.

Some Entertainers do not tip because they do not utilize or benefit from other service providers in the Club.  *Id.*  ¶14.  For instance, Entertainers who do not perform on stage or conduct private dance performances may not consider the DJ or House Mom to have earned any tip.  *Id.*  Other times, Entertainers choose not to tip because of insufficient earnings on a given performance date.  Chicoine Dep. 164:3-8 ("it depended on how much I made that night.").

As for fees and fines, when and how often Entertainers pay such amounts fluctuate depending on the circumstances and the Entertainer.  The Club's collection of weekly license fees is inconsistent, with the Club often waiving such fees.  Weber Aff. ¶13; Savickas Dep. 118:9-123:8; Robinson Dep. 70:5-8.  Entertainers who refer new Entertainers to the Club may receive an express waiver of the license fee.  Weber Aff. ¶13.  Entertainers who offer or agree to perform during less popular times may also receive a waiver of the fee.  *Id.*  In other cases, the Club declines to collect stage fees without any stated reason.  *Id.*  The record also reflects that the Club rarely, if ever, imposes any fines on an Entertainer for violations of their agreements.  2nd Doe Aff. ¶8; Robinson Dep. 95:5-14; Weber Aff. ¶12.

### E.   The Named Plaintiffs' Relationships with the Club

Levi's and Chicoine's individual experiences demonstrate the lack of uniformity in relationships between Entertainers and the Club.  In their Amended Complaint, Plaintiffs describe their former relationships with the Club as nearly identical.  Am. Compl. ¶17-22.  Their deposition testimony debunks this assertion of uniformity.  For example:

| CHICOINE | LEVI |
|---|---|
| Read her license agreement before signing it. Chicoine Dep. 140:2-8; 142:3-6. | Did not read her license agreement before signing it.  Levi Dep. 193:9-16. |

15

| | |
|---|---|
| Had no formal training as a dancer or performer. *Id*. 32:15-20. | Had 10 years of formal dance education. *Id*. 131:1-20. |
| Performed sporadically at the Club for 1 year. Chicoine Performance Record, Ex. 27. | Performed at the Club for 2.5 years. Levi Stip.; Levi Performance Record, Ex. 28. |
| Performed at other venues contemporaneously with her performances at the Club. Chicoine Dep. 63:22-64:11; 69:24-71:25. | Performed exclusively at the Club. Levi Int. Resp. No. 9. |
| Advertised her services on social media. *Id*. 126:7-127:19. | Did not advertise on social media. Levi Dep. 113:12-114:6. |
| Had customers who followed her from venue to venue. *Id*. 53:23-54:5. | Had no regular customers. |
| Created a unique "gothic" look for performances. *Id*. 100:6-11. | Did not claim to create any unique look. |
| Invested $6,000 to $16,000 or more annually in business expenses relating to her performances as an Entertainer. *Id*. 156:22-158:5. | Does not know how much she invested on professional expenses. *Id*. 149:25-155:11. |
| Deducted various business expenses on her tax returns. *Id*. 55:12-57:2. | Deducted only travel expenses on tax return. Levi Tax Doc., Ex. 29. |
| Did not pay weekly license fee on occasion. *Id*. 174:24-175:20. | Has no recollection of the Club waiving fee. Levi Dep. 172:20-22. |
| Tipped others in the Club more than the minimum when she had a lucrative night. *Id*. 163:11-164:8. | "Very seldom" tipped more than the minimum amount. *Id*. 175:20-176:10. |
| Has no idea how much she earned at the Club *Id*. 131:10-132:8. | Kept detailed records and averaged $600 per performance date. Levi Stip.; Levi Performance Records. |
| Never received more from customers than the Club-recommended minimum for private performances. *Id*. 156:1-15. | Often received more from customers than the recommended minimum. Levi Dep. 166:6-11. |
| Never received payment from a customer for mere conversation while working at The Foxy Lady. *Id*. 161:17-162:1. | Received payments from customers for conversation. *Id*. 158:2-159:2. |

Plaintiffs recognize that Entertainers varied in their practices and in their relationships with the Club. As such, each Plaintiff recognizes that she is in no positon to provide testimony

or other evidence bearing on the claims of any of the other Entertainers whom they aspire to represent in this action. Levi Dep. 173:9-13 ("Q. Fundamentally, you just don't know what other fees other people paid? A. Yes. Q. That's true? Yes."); 176:11-13 ("Q. And do you have any information about what other entertainers tipped out to these people? A. No."); Chicoine Dep. 26:19-25 ("I wasn't friends with anyone from there. . . . I go there, I work, I go home."); 88:13-14 ("I just know how I was treated, and I believe that's what this is about -- how I was treated."); 108:7-8 (in reference to class members, "I have no idea. I don't know them. I don't talk to them."); 117:14-16 ("I don't know about anyone else. I just know about me."); 190:12 ("I know nothing about any other dancer. That's all their own business."). Plaintiffs are not even aware of one another's relationship or experiences with The Foxy Lady. Indeed, Chicoine is uncertain as to whether she ever met Levi and knows nothing about Levi's performances at the Club, hours of work, or any tips Levi may have paid out. Chicoine Dep. 105:1-106:7. Similarly, Levi does not know Chicoine, whether she ever performed at the Club, or what Chicoine received or paid in tips. Levi Dep. 95:14-97:6. As such, Plaintiffs recognize they are in no position to represent Entertainers who disagree with their claims in this matter. Chicoine Dep. 118:9-14 ("Q. So you think everyone should have their own decision about whether or not to bring claims . . . to bring claims against the club? A. . . . absolutely.").

### F. Plaintiffs' Failed Efforts to Recruit Participants in this Action

Notwithstanding their differences in circumstance, the Entertainers who have performed at the Club have three important similarities: they value their anonymity; they want to remain independent contractors; and they reject Plaintiffs' claims in this action. Voe Aff. ¶12-20 ("I am afraid that if anything is sent to my mailing address pertaining to this lawsuit . . . then my family will discover that I worked at the Foxy Lady"; "I do not want to be a party to this lawsuit. If a class were to become certified, I would not want to be included in it."); CW Aff. ¶2-8 ("I do not

wish to be treated as an employee in my work as an entertainer.  My independent contractor status provides me with a much more comfortable and flexible lifestyle").[6]

Entertainers enjoy their profession for various reasons.  Their independent contractor relationships afford them nearly unlimited flexibility and the freedom to perform wherever and however they chose.  Voe Aff. ¶14 ("I made my own hours"); Doe Aff. ¶3 ("arrangement provides me with flexibility to work when I want"); Roe Aff. ¶3-6 ("I choose which types of performances I wish to perform and for whom").[7]  Additionally, their earnings far exceed what they could expect to earn from other opportunities for which they are qualified.  CW Aff. ¶3 ("I earn more in one evening . . . than I would in a week in any other job"); Levi Stip. Ex. A (reflecting earnings of $2,360 in one day).[8]  In fact, Levi testified that independent contractor status was her preference.  Levi Dep. 88:10-12 ("Q.  You would have preferred to be treated as an independent contractor?  A. Yes.").  Accordingly, Plaintiffs admit that some of the class members they aspire to represent disagree with their claims.  Chicoine Dep. 114:4-13 ("Q: It wouldn't surprise you to learn that some of those entertainers disagree with the claims you've asserted?  A. No, some of them love it there.  Some of them have been there for many, many years. . . . Q: Some of them like [their] arrangement [with] the club?  A: Yeah."); 116:17-8 ("Q: What about the ones who disagree with you?  A:  Well, then, they're on their own . . .").

Entertainers strongly prefer to keep their identities confidential, and they have expressed a compelling interest in avoiding the disclosure of their work as Entertainers to their parents,

---

[6] *See also* NIM Aff. ¶2-9 ("I do not agree with the claims that these [Plaintiffs] have asserted"); claims "based on tips that I pay out to other workers at The Foxy Lady are ridiculous"; "I do not wish to receive any communications from Ms. Levi or Ms. Chicoine or their lawyers for any purpose, and I do not wish my contact information disclosed to those individuals or their attorneys"); Loe Aff. ¶19-32; Doe Aff. ¶3-8; Roe Aff. ¶2-10; Ramos Aff. ¶2-8.
[7] *See also* CW Aff. ¶2-4; NIM Aff. ¶3; Loe Aff. ¶19-21.
[8] *See also* NIM Aff. ¶7; Levi Dep. 163:6-168:7.

children, professors, and potential employers.   Loe Aff. ¶9-10, 22, 30; Voe Aff. ¶6.[9] Entertainers, including Plaintiffs, have expressed serious concerns for their safety if their names or addresses were made known, even to employees of the courts.  Levi testified as follows:

> . . . I don't want people knowing my real name -- customers knowing my real name.
> Q.  Was that important to you?
> A.  Yes.
> Q.  Why?
> A.  Because you can never be too careful.
> Q.  It's a safety issue?
> A.  Yes.
> Q.  Do you think other dancers feel the same way?
> A.  Yes.

Levi Dep. 135:4 - 136:8.  Chicoine echoed these points and testified that she used a stage name "for protection of my own identity" and so that customers "can't stalk you and things like that." Chicoine Dep. 142:11 - 143:17.  She also recognized that Entertainers prefer that their friends, family, and acquaintances not know about their status as performers at the Club.  *Id*.   In light of these concerns, all Entertainers perform under "stage names."  CW Aff. ¶5; Doe Aff. ¶4.[10]

A desire for anonymity is also one reason that Entertainers have expressed a desire to have nothing in this lawsuit or to allow their identities to be disclosed, or to receive any mail at their homes (or their families' homes) regarding this action.  Loe Aff. ¶19-32.[11]  One Entertainer explains that she travels from out-of-state to perform at the Club, hoping the distance from her home community will help to preserve her privacy.  CW Aff. ¶5.  Another entertainer explains that she has "investments and other interests that might be compromised if [her] work as an entertainer was known," and therefore, "it is very important that [her] name and contact information is not disclosed to anyone."  Roe Aff. ¶6.

---

[9]  *See also* CW Aff. ¶5; Doe Aff. ¶4; Roe Aff. ¶6.
[10]  *See also* Loe Aff. ¶4; Voe Aff. ¶3.
[11]  *See also* Voe Aff. ¶12-20; CW Aff. ¶5-8; Doe Aff. ¶6; Roe Aff. ¶6; NIM Aff. ¶6-9.

Even Entertainers with "no particular interest in the outcome of this litigation" have gone so far as to "retain[] pro bono counsel for the purpose of protecting [their] identit[ies] and privacy with respect to this lawsuit." Loe Aff. ¶¶22, 30; Voe Aff. ¶6. One of them, who attends a prestigious university, explains that she shares her parents' mailing address. Loe Aff. ¶¶3-12. She believes that if any information regarding this lawsuit were mailed to her home, where her parents open her mail, her parents would discover that she performs at the Club, and dire consequences will follow. *Id*. ¶¶9-12. She believes that her parents "would not love [her] anymore" and she is "certain they would stop paying [her] school tuition." *Id*.

Another Entertainer whose mother opens her mail explained that if her "mother knew [she] worked as an entertainer at the Foxy Lady, it would break her [mother's] heart" and it would "ruin her life." Voe Aff. ¶¶8-13. She "believe[s] that [her] anonymity is the difference between this work [as an Entertainer] helping [her] to start a new chapter in [her] life, or destroying [her] life." *Id*. ¶17.

Plaintiffs recognize that strict anonymity is crucial to Entertainers. Levi Dep. 134:17-136:23; Chicoine Dep. 142:7-143:17. Accordingly, Plaintiffs recognize that it would be unfair to do anything to upset Entertainers' expectations of privacy. Levi Dep. 134:17-136:23 ("Q. So you wouldn't want to do anything to upset their expectations of privacy? . . . A. No."); Chicoine Dep. 142:7-143:17.

In contrast to the welter of Entertainers who have come forward to state their opposition to Plaintiffs' efforts to assert claims on behalf of a class of individuals who have performed at the Club, no one has come forward to join this action or even anonymously provide statements in support of Plaintiffs' claims. This lawsuit has received widespread media attention. News Articles, Ex. 1. Entertainers discuss it amongst themselves and receive questions and comments

about it from customers.  Loe Aff. ¶25-29.  Levi and Chicoine have even undertaken failed efforts to recruit Entertainers to join this action.  Levi Dep 98:7-100:17 (an Entertainer rejected her invitation to join the lawsuit even though Levi "told her that she would probably get paid" ); Chicoine Dep. 108:25-112:5 (Chicoine solicited Entertainers to join the suit on Facebook and gave her attorney's business card to other Entertainers).[12]  The available evidence uniformly indicates that the individuals whom Plaintiffs aspire to represent in this action have no interest in being represented by Plaintiffs or in asserting similar claims of their own.

## II.   ARGUMENT

Plaintiffs' claims in this action are not suited to class or collective action treatment.  The class action device is reserved for cases that present questions amenable to representative proof, such that the claims of absent class members can be assessed without a review of each individual's circumstances.  The fundamental issues in this case do not fit that framework.  Plaintiffs' legal claims turn on questions of how each Entertainer chose to approach her trade, a point as to which the record reveals wide variation.  The heterogeneity of Entertainers' circumstances extends not only to the factors that bear on their status as contractors, but also to varying contractual defenses to which each may be subject, in addition to the panoply of factors that bear on any damages that each individual might stand to collect.  Under these circumstances, the governing legal standards do not permit the claims of absent individuals to be adjudicated based on proof offered by the two individuals presently before the Court, and class or collective action treatment is improper.

### A.    Certification of Class and Collective Actions at the Post-Discovery Stage

A class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348

---

[12] *See also* Levi Int. Resp. No. 15; Chicoine Int. Resp. No. 15.

(2011) (quotation omitted).   Under Rule 23, Plaintiffs must establish that: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims and defenses that apply to them are typical of the claims and defenses of the class; and (4) they will fairly and adequately protect the interests of the class.  *Id.* at 349-50; Fed. R. Civ. P. 23(a).   Plaintiffs must also establish that common questions of law or fact predominate over individual questions, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.   Fed. R. Civ. P. 23(b).   Courts conduct a "rigorous analysis" of these requirements, and Plaintiffs' failure to satisfy any of them renders class certification improper.   *Dukes*, 564 U.S. at 350-52.   While Plaintiffs bear the burden of proof under this standard, any party may seek a ruling on the propriety or impropriety of class certification.   Fed. R. Civ. P. 23(c)(1)(A); *Richardson v. Bledsoe*, 829 F.3d 273, 288 (3d Cir. 2016); *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 939-941 (9th Cir. 2009).

Critical to Rule 23's requirements is the notion that the key issues in the case must be susceptible to common or representative proof.   If a claim cannot be resolved on behalf of an entire class without resort to examination of the circumstances of each class member, certification is improper.   *Dukes,* 564 U.S. at 350 ("What matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.") (quotation omitted).   The Supreme Court cautioned that Rule 23's commonality requirements are easy to misconstrue because "any competently crafted class complaint literally raises common questions." *Id.*   What matters, however, is whether a question will generate a common answer capable of resolving classwide liability in one stroke.   *Id.*   If

representative proof cannot generate a classwide answer regarding liability then the goal of efficiency underlying the Rule 23 procedural mechanism would be frustrated, and the case would devolve into a series of mini-trials, massive undue effort, and jury confusion.  Allowing a class to proceed in the face of fundamentally individualized liability questions also threatens due process, with defendants and absent class members being bound by evidence that is inconsistent with the relationships between them.  Such an approach is not "superior" to other methods of adjudication.  *See* Fed. R. Civ. P. 23(b)(3).

Similarly, certification of a collective action under the FLSA is improper unless Plaintiffs prove that they and members of the putative class are "similarly situated."  *Reeves v. Alliant Techsystems, Inc.*, 77 F. Supp. 2d 242, 247 (D. R.I. 1999).  In general, employees are "similarly situated" when they "have similar . . . job duties and pay provisions, and are 'victims of a common policy or plan that violated the law.'"  *Prescott v. Prudential Ins. Co.*, 729 F. Supp. 2d 357, 364 (D. Me. 2010) (internal citations omitted).  Mere identification of a shared job title or pay structure is not sufficient to warrant an exception to the longstanding principle that claims should be adjudicated on an individual basis.  *See, e.g.*, *Colson v. Avnet*, 687 F. Supp. 2d 914, 927 (D. Ariz. 2010) ("mere classification of a group of employees . . . is not by itself sufficient"); *Anglada v. Linins 'N Things, Inc.*, 2007 U.S. Dist. LEXIS 39105, *16 (S.D.N.Y. April 26, 2007), *adopted by* 2007 U.S. Dist. LEXIS 38918 (common job title or classification does not evidence a common unlawful policy).

Courts typically adapt their approach to collective action certification to the circumstances in which a motion seeking certification is presented.  *See Reeves*, 77 F. Supp. 2d at 247; *Johnson v. VCG Holding Corp.*, 802 F. Supp. 2d 227, 233 (D. Me. 2011).  In considering certification of a collective at a later stage of the case, "[o]nce discovery is complete" – as is the

case here – "the Court makes a final, more exacting factual determination on the 'similarly situated' issue" and the plaintiffs have a higher burden of proof. *Reeves*, 77 F. Supp. 2d at 247; *Botero v. C'wealth Limousine Serv. Inc.*, 2014 WL 1248158, *3 (D. Mass. 2014). At this stage, relevant factors include "[the] factual and employment settings of the individual[ ] plaintiffs, the different defenses to which the plaintiffs may be subject on an individual basis, [and] the degree of fairness and procedural impact of certifying the action as a collective action" – most of which are also implicated in the Rule 23 analysis. *Prescott*, F. Supp. 2d at 364-65; *Espenschied v. DirectSat USA, LLC*, 705 F.3d 770, 772 (7th Cir. 2013) ("the case law has largely merged the standards [under Rule 23 and the FLSA]"); *Griffith v. Fordham Fin. Mgmt., Inc.*, 2016 WL 354895, *3 (S.D.N.Y. 2016) ("functionally there is little difference between [the FLSA and Rule 23 standards] as both allow for consideration of the same or similar factors, and generally provide a district court with discretion to deny certification for trial management reasons").

Courts frame "the [collective certification] inquiry in terms similar to Rule 23's commonality requirement, requiring a persuasive showing that the original and opt-in plaintiffs were common victims of a FLSA violation pursuant to a systematically-applied company policy or practice such that there exist common questions of law and fact that justify representational litigation." *Griffith*, 2016 WL 354895, at *3 (quotations omitted). For this reason, case law under Rule 23 is "illustrative" in the FLSA's "similarly situated" analysis. *Botero*, 2014 WL 1248158, at *6; *Diaz v. Elec. Boutique of Am.*, 2005 WL 2654270, at *6 (W.D.N.Y. 2005) (for the "same reasons that plaintiffs cannot meet the similarly situated requirement of class certification under the FLSA . . . plaintiffs fail to meet the commonality requirement" of Rule 23); *Pietrzycki v. Heights Tower Serv., Inc.*, 2016 WL 3766344, *2 (N.D. Ill. 2016) ("when a

court is deciding whether to certify a collective action and a class action in one lawsuit, the court treats them as 'a single class action' and applies 'the Rule 23 standards.'") (quotation omitted).

This case is ripe for a decision regarding class and collective action certification. For the reasons outlined below, Plaintiffs cannot meet the rigorous requirements of Rule 23 or the FLSA's strict, post-discovery certification standard.

**B.      Putative Class Members Have Rejected Plaintiffs' Claims and Have Compelling Interests that Conflict with Plaintiffs' Bid for Collective and Class Certification**

Given the considerable burden and expense posed by class and collective action litigation, common sense dictates that the Court should not certify a class or collective in which no one wishes to participate. *Collins v. Peaches Gentleman's Club*, 2013 U.S. Dist. LEXIS 54955, *8-9 (E.D. Kan. April 17, 2013) (denying certification absent evidence of interest, stating "courts . . . have a responsibility to avoid the stirring up of litigation through unwarranted solicitation . . . and an employer should not be unduly burdened by a frivolous fishing expedition conducted by plaintiff at the employer's expense.") (citations omitted); *Johnson*, 802 F. Supp. 2d at 237, 239 ("[a] number of courts regard the identification of others interested in joining the putative class as a requirement before conditional certification.") (collecting cases and denying conditional certification absent showing of interest); *O'Donnell v. Robert Half Int'l, Inc.*, 429 F. Supp. 2d 246, 250 (D. Mass. 2006) ("plaintiffs' personal beliefs, by themselves, are insufficient" for conditional certification). In assessing class certification, courts consider statements from class members regarding their interest or disinterest in the case. *Parker v. Rowland Express, Inc.*, 492 F. Supp. 2d 1159, 1164-1167 (D. Minn. 2007) (plaintiffs' affidavits insufficient to establish interest among putative collective members); *Rodgers v. CVS Pharm., Inc.*, 2006 WL 752831, *5 (M.D. Fla. Mar. 23, 2006) (denying certification based on submitted affidavits from employees stating that they did not wish to participate). In addition to avoiding a waste of resources,

25

precluding certification where there is a lack of interest among putative class members serves to prevent plaintiffs and their counsel from engaging in unwelcome solicitation directed at absent class members. *Armstrong v. Weichert Realtors*, 2006 U.S. Dist. LEXIS 31351, at \*5-6 (D. N.J. May 19, 2006) (denying certification, noting concerns of abuse and "fishing expeditions" where certification is granted absent an adequate showing) (citation omitted).

Relatedly, to satisfy the adequacy requirement under Rule 23(a)(4), Plaintiffs "must show that the representatives' interests will not conflict with class members' interests." *Trombley v. Bank of Am. Corp.*, 2013 WL 5153503, \*4 (D. R.I. 2013); *Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006) (representatives "must have no interests antagonistic to the interests of the other class members"). As such, courts deny class certification where putative class members express a desire not to participate, or where some putative class members benefited from the conduct that others claim inflicted harm. *Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 131 (1st Cir. 1985) (affirming denial of motion for class certification in part because "the lack of interest indicated there was little need for a class action suit"); *Reich v. Heavenly Bodies*, 1997 U.S. Dist. LEXIS 8311, \*23-25 (N.D. Ill. June 2, 1997) (denying certification, in part, given conflict between plaintiffs and exotic dancers who preferred contractor status); *Cutler v. Lewiston Daily Sun*, 611 F. Supp. 746, 756 (D. Me. 1985) (in light of "[t]he lack of interest in entering the legal arena expressed by putative class members is one factor that militates against class certification;" court was "unwilling to breathe the spirit of judicial combat into . . . persons who have shown no desire to litigate"); *Alston v. Va. High Sch. League, Inc.*, 184 F.R.D. 574, 579 (W.D. Va. 1999) (denying certification where members of class were satisfied with or benefited from alleged wrongful conduct); *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d

1181, 1189 (11th Cir. 2003) ("A fundamental conflict exists where some party members claim to have been harmed by the same conduct that benefited other members of the class").

Here, after two years of litigation, the completion of discovery, widespread media attention, Plaintiffs' active recruitment efforts, and ongoing buzz at the Club among Entertainers and customers, there are no opt-in plaintiffs in this lawsuit. One individual filed a consent to join, but she quickly disappeared without even responding to discovery, and the Court dismissed her. *See* Dkt. 14, 30, 33, 36. To this day, there is no evidence that any Entertainers agree with Plaintiffs' claims or have any intention of joining this case, should the Court grant certification. *See Collins*, 2013 U.S. Dist. LEXIS 54955, at *8-19 (denying certification given absence of evidence that other exotic dancers wanted to join). The only individuals with any apparent interest in pursuing this lawsuit as a collective or class action are Plaintiffs and their lawyers.

In contrast, several Entertainers have submitted affidavits explaining that they reject Plaintiffs' claims on multiple grounds. *See, e.g.,* Roe Aff. ¶7 ("I disagree with the claims in the lawsuit and believe that if the plaintiffs were successful in the lawsuit, it would be harmful to entertainers like myself, who may find themselves with less independence, flexibility, and anonymity"). They not only disagree with Plaintiffs' wage claims, they maintain that reclassification from independent contractor to employee status would be detrimental to their economic and personal interests. Entertainers enjoy the flexibility, control, and independence that their contractor status affords them, along with their lucrative compensation arrangements. *Id.* If Plaintiffs were to prevail, leaving the Club no choice except to reclassify Entertainers and pay them as hourly employees, Entertainers would lose the benefits of independent contractor status that attracted them to the profession. *Id.* Consequently, Plaintiffs' claims conflict with Entertainers' beneficial and preferred work relationships with the Club. *See Reich*, 1997 U.S.

27

Dist. LEXIS 8311, at *23-24 (denying certification on adequacy grounds where exotic dancers may not share plaintiffs' views regarding independent contractor classification).

Equally important, Entertainers reject Plaintiffs' claims because they threaten their interests outside the Club. Entertainers demand anonymity. Loe Aff. ¶22 ("My sole concern is to protect my identity and privacy. I do not want my name or address turned over to anyone-- party, counsel, or, with respect, the court"); CW Aff. ¶5; Doe Aff. ¶4; Loe Aff. ¶4; Voe Aff. ¶3. Plaintiffs admit this fact. Chicoine Dep. 142:7-143:19 ("Q. Why did you [use a stage name]? A. For protection of my own identity."); Levi Dep. 134:17-136:23 ("Q. Why did you use a stage name? A. . . . I like to for privacy.") Nearly all Entertainers perform under pseudonyms, and many of them travel to the Club from great distances to avoid contact with individuals from their personal lives. CW Aff. ¶5. They take these steps because they do not want their relatives, educators, or business contacts to know what they do. Loe Aff. ¶¶9-10, 22, 30; Voe Aff. ¶6; CW Aff. ¶5; Doe Aff. ¶4; Roe Aff. ¶6. They fear stereotypes and unfair judgment. Voe Aff. ¶15. Among other possibilities, they fear losing college tuition and they fear irreparable harm to relationships with loved ones. Loe Aff. ¶¶9-12; Voe Aff. ¶8. To many Entertainers, disclosure of their true identities and receipt of notifications regarding this lawsuit could be devastating, because such notices would go to addresses that Entertainers share with some of the same individuals whom they most fear learning of their profession. Loe Aff. ¶¶3-12; Voe Aff. ¶¶8-13. Many Entertainers also fear for their personal safety if their relationship with the Club became a matter of public knowledge or record. Levi Dep. 135:2-20 ("Q. It's a safety issue? A. Yes. Q. Do you think other dancers feel the same way? A. Yes.").

Plaintiffs' legal claims and their bid to pursue those claims on a class and collective action basis are directly antagonistic to a significant portion of the individuals whom they seek to

represent.  The Court should not allow Plaintiffs to conscript unwilling or uninterested class members into this action to serve Plaintiffs' own pecuniary interests, given the class members' express desires to the contrary and the threats posed to putative class members' stated and legitimate interests in avoiding this litigation.

### C.   Class and Collective Treatment Are Improper Because Individualized Inquires Are Necessary to Assess Plaintiffs' Claims

#### 1.   Whether any Given Entertainer Was an Independent Contractor under Federal and/or State Law Requires Individualized Inquiries

An employer-employee relationship is a predicate to coverage under each of the statutes that Plaintiffs invoke.  *See* 29 U.S.C. § 206; R.I.G.L. §§ 28-14-19.1, 28-12-3, 28-14-2, 28-14-2.2. Thus, in seeking to pursue their claims on a class action basis, Plaintiffs take on the burden to prove that all Entertainers who have worked at The Foxy Lady during the relevant period were properly employees, rather than contractors.  Under the FLSA, the existence of an employment relationship is assessed in a context-dependent "economic reality" test, under which courts evaluate: "(1) the degree of control exercised by the alleged employer; (2) the extent of the relative investments of the worker and the alleged employer; (3) the degree to which the worker's opportunity for profit or loss is determined by the alleged employer; (4) the skill and initiative required in performing the job; and (5) the permanency of the relationship."  *Lindsley v. BellSouth Telecomms., Inc.*, 401 Fed. Appx. 944, 945 (5th Cir. 2010).  The primary question is whether the individual is economically dependent on the business to which she renders service or is, as a matter of economic reality, in business for herself.  *Id.*  Courts consider the totality of the circumstances, because no one factor controls.[13]  *Brock v. Superior Care, Inc.*, 840 F.2d 1054,

---

[13]   When evaluating independent contractor status under the FLSA, some courts also consider the extent to which the worker's services were "an integral part of" the company's business.  *See Meyer v. U.S. Tennis Ass'n*, 607 Fed. Appx. 121, 122 (2d Cir. 2016).  Other federal Courts of

1059 (2d Cir. 1988).  An employment relationship exists under Rhode Island law when the putative employer has the "right or power to exercise control over the method and means of performing the work . . ."  *Cayer v. Cox Rhode Island Telecom, LLC*, 85 A.3d 1140, 1144 (R.I. 2014).  As the Court has already acknowledged in this action, the existence of an employer-employee versus a contractor-principal relationship under Rhode Island law is "a fact dependent inquiry."  *Levi v. Gulliver's Tavern, Inc.*, 2016 U.S. Dist. LEXIS 16204, *8 (D. R.I. Feb. 10, 2016).  Under the FLSA and Rhode Island law, plaintiffs challenging their independent contractor status bear the burden of proof.  *Eberline v. Media Net, L.L.C.*, 636 Fed. Appx. 225, 226-227 (5th Cir. 2016); R.I.G.L. § 28-14-19.2(a).

In light of these multivariate tests and the circumstances of various Entertainers' relationships with the Club, this case is ill-suited for class or collective action treatment.  Indeed, the basic liability question – whether Entertainers are employees or independent contractors – is not susceptible to common or representative proof and cannot be answered on a classwide basis. The relationships between Entertainers and the Club were so mixed that the Court simply cannot resolve the classification question in one broad stroke by resort to representative proof.  *Adami v. Cardo Windows, Inc.*, 2016 U.S. Dist. LEXIS 42152, *21-24 (D. N.J. March 30, 2016) (decertifying action where record "paints a mixed picture of the window installers' independent contractor status."); *Ouedraogo v. A-I Int'l Courier Svc, Inc.*, 2014 U.S. Dist. LEXIS 132156, *8-9 (S.D. N.Y. Sept. 18, 2014) (independent contractor classification insufficient to support class action because "to satisfy commonality requirement, Plaintiff must prove his ability to "generate common *answers*" to the common question of the putative class members' employment status) (emphasis in original) (quoting *Dukes*, 131 S. Ct. 2551); *Spellman v. Am.*

---

Appeal, like the Fifth Circuit, have disregarded this factor, treating it as subsumed in the other enumerated factors.  The First Circuit has not prescribed a particular formulation of the test.

*Eagle Express, Inc.*, 2013 U.S. Dist. Lexis 35032, *7-14 (E.D. Pa. March 14, 2013) (denying certification due to individualized inquiries necessary to determine contractor or employee status); *Christianson v. Newpark Drilling Fluids, LLC*, 2015 U.S. Dist. LEXIS 34088, *8-11 (S.D. Tex. March 19, 2015) (same); *Pfaahler v. Consultants for Architects, Inc.*, 2000 U.S. Dist. LEXIS 1772, *4-6 (N.D. Ill. Feb. 8, 2000) (same).

Each of the factors relevant to Entertainers' contractor or employee status varies substantially from person-to-person. With respect to the consistency and permanence of the relationship, some Entertainers perform at the Club only sporadically and disappear for months at a time. *See* Chicoine Performance Record. Others perform at the Club three or more times per week. Levi Dep. 137:9-139:22; Chicoine Dep. 144:14-145:4; Loe Aff. ¶20, Ex. 14; Roe Aff. ¶3, Ex. 15. Some Entertainers perform at multiple competing venues contemporaneously. Chicoine Dep. 63:22-64:11; 69:24-71:25 (performed at other venues during the same period she worked at The Foxy Lady). Others perform exclusively at The Foxy Lady, at least for a period of time. Levi Int. Resp. No. 9; Weber Aff. ¶11; 2nd Doe Aff. ¶3-6. Some Entertainers have regular customers who follow them from club-to-club. Chicoine Dep. 53:23-54:5 ("He followed me wherever I went.") Others do not have a regular following. 2nd Doe Aff. ¶7-11. Some Entertainers use social media to advertise their performances and generate business. Chicoine Dep. 126:7-127:1 ("Q. What as the nature of those communications? A. Just me trying to get people to come in. . . . . Q. Kind of a marketing initiative? A. Yes."); 127:5-17 ("Q: So people you'd meet out in the world, you'd try to get them to come to whatever club you were preforming at? A: Absolutely. Q: And when you moved from club to club, you could use Snapchat to tell them where you were? . . . A. Yes, yes . . ."). Others rely on only the Club's advertising efforts. Levi Dep. 113:12-114:6. Each of these facts bears on an Entertainer's level

of economic dependence on the Club – the primary consideration in the FLSA's economic reality test. *Lindsley*, 401 Fed. Appx. at 945; *Adami*, 2016 U.S. Dist. LEXIS 42152, at *34 ("most importantly, courts look to whether . . . the workers at issue are dependent upon the business to which they render service").

An Entertainer who performs sporadically at the Club, also performs at competing venues, has her own regular customers, negotiates her performance rates, and advertises on social media is economically independent.  Conversely, an Entertainer who performed at the Club five times every week, never performed at other venues, had no regular customers, did not negotiate fees, and did nothing to promote her services might be dependent on the Club. Entertainers whose level of independence lies somewhere in between may present a more difficult question.  Critically, a full and complete examination of one Entertainer's contractor or employee status will do nothing to answer the same question as to any other Entertainer, given the wide variation in class members' relationships with the Club.  Each Plaintiff admits that she is no position to testify about the circumstances of anyone other than herself, leaving Plaintiffs in no positon to provide evidence about the status of members of the class they seek to represent. *See* Section I(E), above.  Thus, the only way the Court could evaluate the status of absent class members would be to permit discovery or trials regarding each individual.   Under these circumstances, a representative action poses no advantages of judicial economy, and class or collective action treatment is improper.  *See Adami*, 2016 U.S. Dist. LEXIS 42152, at *34-37 (differences in level of economic dependence required decertification).

The record also demonstrates a spectrum of variation regarding the extent to which Entertainers subjected themselves to the Club's control, the primary factor under the Rhode Island test for employee status and an important factor under the FLSA's economic realities test.

Plaintiffs claim that the Club controlled many aspects of their performances, from when they worked and how often they worked to their makeup and wardrobe.  Levi Dep. 137:9-138:8; 150:6-152:20; Chicoine Dep. 144:14-17.  Plaintiffs also claim that the Club controlled their payment of tips to other service providers who worked in the Club.  Levi Dep. 88:25-89:11; Chicoine Dep. 163:9-13.  Other Entertainers disagree, testifying that they have unfettered control over when they perform, how often they perform, the nature of their performances, their makeup and wardrobe, the tips that they pay, and the amounts that they charged customers.  Loe Aff. ¶¶20-21 ("I have often worked fewer [than three shifts per week] with no adverse consequences"); Voe Aff. ¶14 ("I chose and purchased my own outfits"); Roe Aff. ¶¶3-5, 8 ("I am free to decline a patron's request for a performance"); 2nd Doe Aff. ¶¶4-12, 14-15 ("No member of Club management has ever made me pay a tip to anyone"); CW Aff. ¶¶4, 7-8; Doe Aff. ¶¶3, 7; NIM Aff. ¶8.  The range in the level of control that Entertainers claim to have experienced counsels strongly against certification.  *Adami*, 2016 U.S. Dist. LEXIS 42152, at *24-28 (differences in evidence regarding control over workers supported decertification); *Ouedraogo*, 2014 U.S. Dist. LEXIS 132156, at *10-17 (denying certification, noting "degree of control actually exercised over the class members' schedules varied"); *Spellman*, 2013 U.S. Dist. Lexis 35032, at *7-14 (denying certification where degree of control required individualized inquiries); *Christianson*, 2015 U.S. Dist. LEXIS 34088, *8-11 (same); *Pfaahler*, 2000 U.S. Dist. LEXIS 1772, at *4-6 (same).  Defendants dispute Plaintiffs claims regarding the Club's exercise of control over them.  Savickas Dep. 156:19-157:14; 140:24-143:9; Creelman Aff.  ¶4, Ramos Aff. ¶¶3-6; Robinson Dep. 74:6-7 ("There is no scheduling.  They come and go as they please.") However, even if Plaintiffs could convince a fact finder of the control they claim to have experienced, that showing would do nothing to establish that other class members were subject

to similar levels of control, especially in light of the ample record evidence of Entertainers disclaiming any such control by the Club.  Loe Aff. ¶¶20-21; Roe Aff. ¶¶3-5, 8; CW Aff. ¶¶4, 7-8; Doe Aff. ¶¶3, 7; NIM Aff. ¶8.

Even the named Plaintiffs differ in their claims regarding the level of control the Club exercised with respect to them.  For example, Levi acknowledged that she decided for whom to perform, and that no one at the Club ever required her to perform private dances for a particular customer.  Levi. Dep. 146:2-17.  For her part, Chicoine claims that the amount of control that the Club exerted over her changed during the course of her relationship with the Club, increasing over time.  Chicoine Dep. 84:8-85:25 ("Q.  So during one period of time, [the Club was] more controlling over what you wore as compared to some other period of time?  A.  It started getting more controlling over time.")  This claim is undermined by Chicoine's other testimony and records.[14]  Nevertheless, Chicoine's claim that the Club's level of control increased over time underscores the need for a fact-intensive inquiry and the impossibility of making a uniform determination regarding the level of control that the Club exercised over all Entertainers throughout the class period.

The other economic reality factors in this case similarly require individualized inquiries.  For example, consistency and permanency of Entertainers' relationships vary widely.  Each Entertainer decides when to perform.  Levi Dep. 138:17-19 ("Q. And you told the club which days you wanted to work?  A. Correct."); 146:2-149:7; Chicoine Dep. 146:2-11; 148:13-17 ("Q.

---

[14]  Chicoine's testimony and records establish that: she performed at the Club an average of just 1.95 times per week; disappeared for two months and returned at her convenience; appeared for 49 unannounced "walk in" performances during one year; failed to show up for scheduled performances at least 53 times during the same period; chose how to perform and for whom to perform; received no handbooks or performance reviews; maintained a "gothic" look that she felt the Club frowned upon; and drank alcohol during performances.  Chicoine Performance Record; Chicoine Dep. 100:6-11; 141:1-15; 146:2-11; 159:7-11.

So [you did walk-ins] whenever your personal circumstances allowed?  A.  Yes."), 151:22-23;
152:6-9; 152:24-154:6.  Some Entertainers perform at the Club between three and six times per
week and have done so for years. 2nd Doe Aff. ¶3, 4.  Levi and Chicoine performed at the Club
approximately twice per week, on average.  Levi Performance Record; Chicoine Performance
Record.  Both of them, however, disappeared for months-long gaps during which they did not
perform at the Club at all.  *Id.*  Other Entertainers perform at the Club more sporadically,
preferring to move from club-to-club, and they never perform at the Club consistently for any
extended length of time.  Ramos Aff. ¶3; Levi Dep. 73:19-30; Chicoine Dep. 63:22-64:11;
69:19-72:19; Levi Int. Resp. No. 10; Chicoine Int. Resp. Nos. 9-10.  In fact, some Entertainers
do only random "walk-in" performances.  2nd Doe Aff. ¶7 ("Other entertainers perform at the
Club now and then for extra money, and they do not need or want to perform at the Club on a
regular basis.")  Such variation in factors critical to the employee versus independent contractor
inquiry precludes class certification. *Adami*, 2016 U.S. District LEXIS 42125, at *33 (differences
in permanence of relationship between plaintiffs and putative class members would lead to
different results); *Spellman*, 2013 U.S. Dist. LEXIS, at *17 ("while some class members
demonstrate the exclusivity, continuity, and permanence indicative of an employment
relationship, several performed delivery and other services for other companies, and other class
members worked for [defendant] for only a number of weeks or even days"); *Christianson*, 2015
U.S. Dist. LEXIS 34088, at *10 (variation in permanence counseled against certification where
record showed relationships ranging from nine months to five years).

Analysis of Entertainers' investments, initiative, and opportunities for profit and loss
produces the same result.  Some Entertainers invest thousands of dollars on their wardrobes and
appearances.  Chicoine Dep. 156:22-158:5.  Chicoine, for instance, spent over $16,000 in one

year to increase her opportunity for profit as an Entertainer.  *Id.*  She also cultivated a unique look to set herself apart from other Entertainers and to attract customers for private performances.  *Id.* at 100:6-11 ("I was always edgy.  I was always like the rocker, gothic looking one.  I always wore black.")  Levi, on the other hand, did not go to such lengths. Levi Dep. 149:25-155:11. ("Q.  Do you have any idea how much money you spent on [outfits]?  A.  Say like - - I'm not too sure – um - - I would buy outfits here and there.")   Some Entertainers use initiative in negotiating their fees, and others do not.   *Compare* Levi Dep. at 166:6-11.  ("I always try to upsell.") *with* Chicoine Dep. 156:4-6 ("Q.  You never received more than the minimum $300 for an hour long performance?  A.  No I would never ask them to.").  Those decisions have material effects on Entertainers' earnings.  Depending on her level of initiative and decisions regarding the types of performances she would undertake, Levi earned between $200 and $2,360 per performance date.  Levi Stip.;  Levi Dep. 164:1-4 ("Q.  And if you put additional initiative into it and engage the customers more, you might earn more, is that fair to say?  A.  Yes.").   In contrast, Chicoine never earned even $1,000 on a single performance date. Chicoine Dep.  162:24-25.

On the present record, the factors in the economic reality test are not susceptible to a uniform analysis for the heterogeneous group of Entertainers that Plaintiffs aspire to represent. The central question posed by Plaintiffs' claims – whether they were employees or contractors – is not susceptible to representative proof.  A class or collective action proceeding therefore provides no prospects of increased judicial economy and poses serious questions of fairness and due process if the claims of dozens of absent class members rise or fall on the proof offered by the two named Plaintiffs.  Neither the governing rules nor the case law permit class certification under those circumstances.

**2.    The Extent to which Entertainers Were Required to Tip Other Workers at the Club Requires Individualized inquiries**

If Plaintiffs could overcome the serious obstacles they face in their bid to address the employee or contractor status of all Entertainers on a class or collective action basis, they would only face further obstacles to class treatment of their claims relating to allegedly diverted tips. Taking Plaintiffs' claims regarding the mandatory nature of their own tip-outs at face value, the record reflects no uniform practice at the Club regarding Entertainers' payment of tips to other service providers. Many of the contracts that Entertainers signed (including those that Plaintiffs signed) expressly note that such tipping is entirely at the Entertainer's discretion.   2014 Agreement p. 4 (Entertainer "may provide voluntary gratuities to the DJ, if desired," with similar language about tips to House Moms); 2015 Agreement p. 3 (any gratuities provided to service providers are "entirely at her own discretion").   Plaintiffs thus claim that unidentified Club managers required them to tip the DJ, House Mom, and Floor Hosts, *in contravention to* the express policy of the Club.   *Id.*   Other Entertainers testified that they were subject to no such pressures and any tip-outs were entirely discretionary.   These class members attested that they tip whom they want to tip, when they want to tip, and how much they want to tip.   Roe Aff. ¶8 ("I choose the amount of any gratuity that I provide'); Doe Aff. ¶7 ("I have seen others in the Club provide no tips at all"); CW Aff. ¶7; Doe Aff. ¶7; NIM Aff. ¶8.

Entertainers tip and decline to tip other service providers in the Club for a variety of reasons.   Some tip consistently because it is customary and other service providers help them to generate profits.   Levi Dep. 175:20-176:10.   Others tip sparingly, and some do not tip at all.   Doe Aff. ¶7 ("While it is my practice to be generous in providing tips to DJs, Floor Hosts, and House Moms, I have seen others in the Club provide no tips to these individuals.").   Given this diversity in practices among the Entertainers, any question of whether their tip-outs were voluntary or

compelled by the Club is immune to representative proof and can be addressed only on a person-by-person basis. Thus while the voluntariness of Entertainers' tip-outs is a common question, it is not one amenable to a common answer and therefore not one that renders this case appropriate for class treatment. *Dukes*, 564 U.S. at 350.

> **3.      Whether a Given Entertainer Is Legally Free to Participate in this Action Requires Individualized Inquiries**

Adding to the thicket of individualized inquiries presented by Plaintiffs' affirmative claims are individualized questions presented by defenses to which various Entertainers are subject. Primary among these questions is whether a given Entertainer has released her claims or signed a contract that precludes her from participating in a class or collective action. The 2012 Agreement has no applicable indemnity, release, or arbitration provisions; the 2014 Agreement has limited indemnity and release provisions, but no arbitration provision; and the 2015 Agreement has broad indemnity and release language, along with an arbitration provision that includes a class action waiver precluding signatories from participating in an action like this one. 2015 Agreement pp. 3-6. Any given class or collective member therefore may be subject to one or more contractual provisions that limit or negate her ability to assert claims in this lawsuit. *Id.*

Although no Entertainer has expressed an intention to do so, the only clear means by which a signatory to an agreement containing an indemnity clause, release, or arbitration and class waiver provision could avoid its terms and participate fully in this lawsuit would be to argue that the agreement was coerced or otherwise unconscionable.[15] The enforceability of these agreements and their respective provisions, if Plaintiffs or other Entertainers sought to challenge

---

[15] Plaintiffs are subject only to the 2014 Agreement, through which they released all claims against the Club and agreed to indemnify the Club for claims arising out of their relationship. Having never signed it, Plaintiffs lack standing to challenge the 2015 Agreement, and they also lack typicality in relation to those who signed only the 2012 Agreement.

them, would require an examination of the particulars surrounding the individual agreement to determine its enforceability. *Rivera-Flores v. Bristol-Myers Squibb Caribbean*, 112 F.3d 9, 12 n.4 (1st Cir. 1997) (identifying six factors used to determine the validity of a waiver provision); *Clark v. Legal Sea Foods, LLC*, 14-cv-1026-G, slip op. at *14 (Mass. Super. Ct. Nov. 6, 2014) (declining to invalidate employees' releases because "that decision would require a full record, and perhaps an evidentiary hearing with regard to each of the signed releases"); *Friedman v. Intervet Inc.*, 730 F. Supp. 2d 758, 767 (N.D. Oh. 2010) (voiding releases "*en masse* would not be appropriate given the individualized nature of the inquiry"); *Ralph Oldsmobile, Inc. v. Gen. Motors, Corp.*, 2001 WL 1035132, at *4, *7 (S.D.N.Y.) (declining to void all class member releases because individualized inquiries necessary). Individualized analyses of the enforceability of Entertainers' indemnity, release, or arbitration obligations would be time-intensive because the circumstances under which Entertainers signed them varied significantly. *Compare* Levi Dep. 193:9-16 (did not read agreement); *with* Chicoine Dep. 140:2-142:6 (read agreement before signing); and Doe Aff. ¶ 8 (read agreement "thoroughly" and "understand[s] it"). Whether each Entertainer is subject to an enforceable contract that limits or prohibits her participation in this action is another question presented by Plaintiffs' claims that is not amenable to a common response and a further impediment to class or collective action treatment.

### 4. Determining Each Entertainer's Hours of Work and Any Tip-Outs, Fees, or Fines Entertainers Paid Requires Individualized Inquiries

If Plaintiffs could overcome all obstacles to addressing the liability questions in this case on a class or collective action basis, they would face still further individual questions regarding damages owed to any misclassified Entertainer. These individual questions further undermine the objectives of judicial economy and fairness and further militate against class action treatment. *Ruiz v. Citi Bank, N.A.*, 2015 U.S. Dist. LEXIS 34489, *44 (S.D.N.Y. March 19,

2015) ("the necessity of additional individualized inquiries over damages, while not inherently fatal to class certification, should be considered at the certification stage when weighing predominance issues.") (quotations omitted); *Lugo v. Farmers Pride Inc.*, 737 F. Supp. 2d 291, 303-317 (E.D. Pa. 2010) (decertifying class where evidence suggested some uncompensated work time but inquiry regarding hours of work required individualized determinations); *Sargent v. HG Staffing*, LLC, 2016 U.S. Dist. LEXIS 39893, *104-109 (D. Nev. March 22, 2016) (decertifying class given need for individualized determinations regarding number of off-the-clock hours).  Indeed, the Supreme Court has instructed that certification is improper where "individual damage calculations will inevitably overwhelm questions common to the class." *Comcast Corp. v. Behrend,* 596 U.S. __, 133 S.Ct. 1426, 1433 (2013).

Assessing damages for purposes of Plaintiffs' minimum wage claims (Counts I and IV) would require some means by which to determine the number of hours that each class member worked.  Because the Club understood Entertainers to be independent contractors, the Club did not keep records regarding their hours of work.  The Club maintains some records of the dates on which each Entertainer performs, but not their hours of work.  Levi Performance Record, Ex. 27, Chicoine Performance Record, Ex. 26.  Plaintiffs testified that even the Club's records of the days on which they worked were inaccurate.  Chicoine  Dep. 168:10-171:5 ("Q. So you think that many of the [no-shows] designated here correspond to days that you were late, but did, in fact, show up?  A.  Yes.").  Even if those records were reliable, they would be insufficient to calculate Entertainers' hours of work because there is no standard "shift" length.  Robinson Dep. 118:12-18 ("Q.  Does the Foxy Lady suggest that entertainers work the entirety of a shift when they work? A. No. Q. No? A. No.  Again, they can come and go as they please.")  According to Levi, there were dates when she performed at the Club for up to 14 hours, and there were

other dates when she performed for as few as 4 hours.  Levi Stip.  There are also no records of the breaks that Entertainers took during their performances at the Club.  Hence, there is no means to draw inferences about the hours that any given Entertainer worked without a review of her own personal circumstances, and Plaintiffs' minimum wage claims would require a person-by-person assessment of how frequently each Entertainer performed at the Club and how long she elected to perform in each instance.

Plaintiffs' lone remaining claim for damages follows the same pattern.  In Count V, Plaintiffs assert a claim for "Unlawful Fees and Fines," premised on shift fees and fines.[16]  There is no means by which the Court can reach generalized conclusions about the amount of any such fees that class members paid.  Entertainers' payment of any house fees was inconsistent, and the Club often declined to collect them in a variety of circumstances, as Chicoine admitted.  Chicoine Dep. 174:25.  Plaintiffs also claim in a vague fashion that the amount of any house fee collected varied over time.  Levi Dep. 171:1-13 ("I believe it was $30 when I started, and then the last few months or maybe the last six months I was there was $40."); Chicoine Dep. 94:15-16 ("they upped the house fee.").   Similarly, there is no evidence of any uniform practice regarding the imposition of fines, much less any record of the fines paid by any individual or by Entertainers in the aggregate.  *See* 2nd Doe Aff. ¶8 ("In fact, I have never been subject to any form of fine or other form of discipline as an Entertainer at the Club."); Robinson Dep. 95:5-14.  Any analysis of this issue could proceed only by a eliciting testimony from each individual in the class, which would be anathema to the purposes of the class action device.

---

[16] Plaintiffs originally asserted a claim relating to tipping practices under federal law as Count II of their Complaint.  The Court dismissed this Count for failure to state a claim at an early stage of this action.  *See* Dkt. 21.

To the extent that Plaintiffs seek to recover tips they paid to other service providers, the same practical considerations would frustrate classwide adjudication. [17]   As noted above, Entertainers who paid tips to other service providers in the Club had various practices impacting when they would tip and how much they would tip.  *See* Section II(D)(2), above.  The Club has no information about any tip-outs that any Entertainer paid to other service providers working in the Club, nor do Plaintiffs have records of such payments.  Chicoine Dep. 122:3-6 (Plaintiff has no records of amounts tipped out).  Even if liability for diverted tips were established, an assessment of any tip-outs that Entertainers might recover could proceed only by questioning each individual regarding what she paid and subjecting her to cross-examination on that subject in a manner incompatible with class action practice.

Thus, in addition to individualized liability determinations, the record reflects that a host of individualized damage inquiries would further undermine any efficiencies associated with class or collective treatment.  *Comcast*, 133 S.Ct. at 1433.  Plaintiffs cannot establish that they and other Entertainers are similarly situated or that the central liability or damages issues in this case are susceptible to adjudication based on representative proof.

## III.    CONCLUSION

For all the above reasons, the Court should order that this action may not proceed as a class action pursuant to Rule 23 or as a collective action under FLSA and allow this matter to proceed to judgment as to Plaintiffs' individual claims only.

---

[17] The operative Complaint is unclear as to any legal theory by which Plaintiffs' might recover tips that they paid out to other individuals.  Plaintiffs include in their Prayer for Relief an award of compensatory damages including "tips and gratuities," however.  Dkt. 13.

Dated:  April 3, 2017

Respectfully submitted,

GULLIVER'S TAVERN, INCORPORATED
D/B/A THE FOXY LADY AND SOLID GOLD
PROPERTIES, INC.,

By Their Attorneys,

*/s/* Lauren J. O'Connor
Barry J. Miller (admitted *pro hac vice*)
bmiller@seyfarth.com
Anthony S. Califano (admitted *pro hac vice*)
acalifano@seyfarth.com
Lauren J. O'Connor (Bar No. 7808)
loconnor@seyfarth.com
Michael E. Jusczyk (Bar No. 7791)
mjusczyk@seyfarth.com
SEYFARTH SHAW LLP
Seaport East, Two Seaport Lane, Suite 300
Boston, Massachusetts 02210
Telephone:  (617) 946-4800
Facsimile:  (617) 946-4801

## CERTIFICATE OF SERVICE

I hereby certify that, on April 3, 2017, a copy of the foregoing motion was filed electronically through the Court's CM/ECF system, which will send notice of this filing to all counsel of record.

/s/ Lauren J. O'Connor
Counsel for Defendants