## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| RUBY LEVI and EMILY CHICOINE on behalf of themselves and all others similarly situated, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civ. A. No. 1:15-cv-216S-PAS |
| GULLIVER'S TAVERN, INCORPORATED, SOLID GOLD PROPERTIES, INC., d/b/a THE FOXY LADY, | ) ) ) ) | |
| Defendants. | ) | |

### PLAINTIFFS' RULE 56 STATEMENT OF ADDITIONAL UNDISPUTED FACTS

Pursuant to Fed. R. Civ. P. 56 and Local Rule 56(a)(4), Plaintiffs submit this statement in support of their Cross-Motion for Partial Summary Judgment, and in further response to Defendants' Rule 56 Statement of Undisputed Facts.

### Plaintiffs' Additional Undisputed Facts

**1.    THE PARTIES.**

74.    Defendant Gulliver's Tavern, Inc., is a domestic corporation that owns and operates the Foxy Lady.  It leases that property from Solid Gold Properties, Inc.  Dean Robinson Deposition ("Robinson Tr.") ("Exhibit 1") at 9-11.

75.    Plaintiff Ruby Levi (née Weldon) worked at the Foxy Lady as an entertainer from April 2012 until December 2014.  Lori Savickas Deposition ("Savickas Tr.") ("Exhibit 2") at 77-78; Ruby Levi Performance Records ("Exhibit 3").

76.     Plaintiff Emily Chicoine worked at the Foxy Lady as an entertainer from October

2013 until October 2014.  Savickas Tr. (Ex. 2) at 78; Emily Chicoine Performance Records

("Exhibit 4").

**2.      THE FOXY LADY, "YOUR SOURCE FOR ADULT ENTERTAINMENT."[1]**

77.     The Foxy Lady is an adult entertainment nightclub located at 318 Chalkstone

Avenue in Providence, Rhode Island.  Robinson Tr. (Ex. 1) at 9-10; Savickas Tr. (Ex. 2) at 41.

78.     The Foxy Lady is open to the public during the following hours:

> Monday through Thursday: 11:30 a.m. to 1:00 a.m.
> Friday: 6:00 a.m. to 2:00 a.m.
> Saturday: 12:00 p.m. to 2:00 a.m.
> Sunday: 3:00 p.m. to 1:00 a.m. (or 2:00 a.m. if the Monday is a holiday).

Savickas Tr. (Ex. 2) at 31.

79.     The Foxy Lady occupies two floors.  The customer entrance is on the main floor,

which is the top floor.  Savickas Tr. (Ex. 2) at 23-25.

80.     The customer entrance consists of a lobby with a "little booth."  A "door person

sits" in that booth, greets customers, allows them access to the club and, during evening shifts,

collects a $10 entry fee.  Savickas Tr. (Ex. 2) at 30-32.

81.     The main floor includes two bars, two stages, a "VIP area," a private dance room,

a shower, a massage parlor, a walk-in cooler, a partial dressing room for the entertainers, a

makeup artist's room, and restrooms.  Savickas Tr. (Ex. 2) at 24-25, 35-37.

82.     Previously, the main floor also included an open-space "media room" with chairs

and a large television, in case "customers were interested in watching sporting events … but

realistically, they don't come to watch sports.  […]  They come to watch the show," meaning the

---

[1] These section quotes are taken the Foxy Lady website, available at http://www.foxyladyri.com/home.

performances put on by the "entertainers."  Defendant thus eliminated the media room.  Savickas Tr. (Ex. 2) at 40-41.

83.     The two stages on the main floor consist of the "main stage" and a smaller stage that is located in the VIP area.  Each stage has a pole on it, and both stages have chairs around them for the customers.  Savickas Tr. (Ex. 2) at 25.

84.     The VIP area is a designated area near the back of the club that is separated from the main floor by a "small bannister" and which is available to customers "who want to be important … or who want to be seen."  Savickas Tr. (Ex. 2) at 132.

85.     The private dance room is a separate room on the main floor, which is where customers go for private performances by the entertainers.  A "paid employee" called a "dance track person" stands outside the private dance room to monitor and "track" the entertainers as they enter and leave.  Savickas Tr. (Ex. 2) at 37-38, 127-129.

86.     The lower floor at the Foxy Lady contains an office used by the club's management, a second dressing room for the entertainers, a room for private parties (which is also used for "overflow" on busy nights), cabanas and skyboxes, a kitchen, a waitstaff dressing room, and storage space.  Savickas Tr. (Ex. 2) at 25-26.

87.     The two entertainer dressing rooms at the Foxy Lady contain "over a hundred" lockers between them, as well as "four or five mirrors."  Defendant does not charge the entertainers anything to use the lockers.  Savickas Tr. (Ex. 2) at 38-39.

88.     The private party room on the lower level contains a bar with a pole on it, which the entertainers can use to perform.  Savickas Tr. (Ex. 2) at 39.

89.     The cabanas and the skyboxes on the lower level are private spaces in which two people are allowed at a time, namely, a customer and an entertainer.  The cabanas are slightly

smaller than the skyboxes.  The latter used to "have TVs in them.  They don't have TVs any longer."  Savickas Tr. (Ex. 2) at 132-134.

90.     The lower level of the Foxy Lady also contains a separate, "downstairs" entrance for use by the entertainers and Defendant's employees (e.g., bartenders, waitresses).  Savickas Tr. (Ex. 2) at 172-173.

91.     There is no "dance floor" at the Foxy Lady, meaning a physical space on either floor where customers can dance.  Instead, the open space on the main floor is occupied by tables and chairs.  Savickas Tr. (Ex. 2) at 41-42, 152.

92.     The Foxy Lady's total customer capacity exceeds 200 individuals.  Savickas Tr. (Ex. 2) at 42.

### 3.     THE STAFF AT THE FOXY LADY.

93.     Defendant employs managers, bartenders, floor hosts, waitresses, dance trackers, and masseuses to work at the Foxy Lady.  Defendant provides these individuals with paychecks and Forms W-2.  Robinson Tr. (Ex. 1) at 26-27; Savickas Tr. (Ex. 2) at 42-45.

94.     Disc jockeys, "house moms," makeup artists, and entertainers also work at the Foxy Lady.  Defendant does not classify these individuals as its employees; instead, it considers them to be independent contractors.  Robinson Tr. (Ex. 1) at 26-27, 33; Savickas Tr. (Ex. 2) at 46, 52, 55.

95.     The current general manager of the Foxy Lady is John Webber.  Other members of the management team include Richard Angell, Bobby Travisono, Lori Savickas, Jonathan Oliver, and Poochie Angell.  Robinson Tr. (Ex. 1) at 20, 23-24; Savickas Tr. (Ex. 2) at 17, 27-28.

96.     For the past ten years, Ms. Savickas has been responsible for auditioning women to work as entertainers at the Foxy Lady.  She took over this responsibility from a prior manager

named Carol Moran, who worked for Defendant as its "entertainment manager." Savickas Tr. (Ex. 2) at 13-17.

97.     Ms. Savickas is also responsible for scheduling the house moms and for handling some of the bookkeeping and accounting tasks for the club. On top of that, Ms. Savickas has occasionally worked as a house mom. Savickas Tr. (Ex. 2) at 16, 45-46, 53-54.

98.     Approximately five house moms currently work at the Foxy Lady. Each house mom typically works about three shifts per week, though the most senior house mom, Nadine Ramos, usually works four or five shifts per week. There is always at least one house mom on site while the Foxy Lady is open. Savickas Tr. (Ex. 2) at 49-53.

99.     The house moms' responsibilities include overseeing the entertainer dressing rooms, filling out entertainer performance records, collecting rental fees from the entertainers, filling out the receipts for with the rental fees, monitoring the entertainers' locations within the club (such as whether they are in a cabana), and assisting them with supplies and "private matters." Savickas Tr. (Ex. 2) at 159, 178-179, 191-192.

100.     Defendant employs approximately a dozen floor hosts. The floor hosts function as security the Foxy Lady, and are responsible for "maintaining the floor and making sure that the customers are not out of control, you know, preventing any trouble within the club." Savickas Tr. (Ex. 2) at 44-45.

101.     Floor hosts are responsible for handling conflicts that arise between entertainers and customers, and "intervening" if there is a problem with an entertainer (such as if two entertainers are having a fight, or if an entertainer appears intoxicated). Savickas Tr. (Ex. 2) at 105.

102.     Defendant's floor hosts and house moms carry walkie-talkies so that they can inform each other about the whereabouts of the entertainers within the Foxy Lady.  Savickas Tr. (Ex. 2) at 191-192.

103.     Defendant employs approximately five dance trackers.  The dance trackers work at the customer entrance and stand outside the private dance room.  They are responsible for monitoring the activities in the private dance room and collecting money from the entertainers. Savickas Tr. (Ex. 2) at 128-129.

104.     Defendant employs about 30 waitresses at the Foxy Lady.  Some of those waitresses work as "VIP hostesses."  The VIP hostess is responsible for handling customer requests to use or "book" the cabanas and skyboxes, and for collecting the fees for use of the cabanas and skyboxes.  Savickas Tr. (Ex. 2) at 44, 135-137.

105.     The disc jockeys at the Foxy Lady are responsible for playing music and for setting up a "rotation of girls" to perform on the main stages.  When an entertainer arrives at the Foxy Lady, she lets the disc jockey know she is there and ready to be put on the rotation.  If an entertainer does not want to put on the rotation, she can go to the disc jockey, pay him a sum of money (e.g., $100), and tell him she does not want to be put on the rotation that night.  Savickas Tr. (Ex. 2) at 55, 142-144.

106.     Over the past two or three years, approximately 300 women have worked at the Foxy Lady as entertainers.  Savickas Tr. (Ex. 2) at 91-93.

107.     The services performed by the entertainers at the Foxy Lady include doing semi-nude and nude stage performances, performing in the private dance room, and performing for customers in the VIP area, cabanas, and skyboxes.  Savickas Tr. (Ex. 2) at 73.

4.      "NEW ENGLAND'S HOTTEST LADIES!"

     a.      Becoming an entertainer at the Foxy Lady.

108.    In order to work at the Foxy Lady, a prospective entertainer is required to audition with a house mom and manager.  No dancer is allowed to work at the Foxy Lady without first auditioning.  Often, the manager who conducts the auditions is Ms. Savickas.  Robinson Tr. (Ex. 1) at 35-36, 42-43; Savickas Tr. (Ex. 2) at 14-16, 27, 63-64.

109.    A prospective entertainer can request an audition by "walk[ing] in off the street," calling the club, being brought in for an audition by another entertainer, or submitting her information through the Foxy Lady's website.  Savickas Tr. (Ex. 2) 58-59.

110.    Both Ruby Levi and Emily Chicoine auditioned to work at the Foxy Lady.  Ms. Chicoine auditioned for Carol Moran.  Levi Tr. (Ex. 9) at 125-126; Chicoine Tr. (Ex. 10) at 136.

111.    Defendant has advertised for new entertainers.  For instance, Defendant has posted "signs that say always looking for – if you're looking for employment or, you know, to be an entertainer, speak to one of the managers."  Savickas Tr. (Ex. 2) at 62.

112.    At the audition, a prospective entertainer will be introduced to the house mom who is on duty by a manager.  She is then "brought downstairs," where she will perform privately for the house mom and the manager.  "At that point, we [the house mom and manager] determine if she's a good fit for the establishment."  Savickas Tr. (Ex. 2) at 57-58, 63 (auditions consist of "putting on an outfit and then just getting on the stage and dancing around a little bit.  And then they remove their top, and at that point, you know, they make the decision if they're hireable [sic] or not").

113.    When conducting an audition, the managers and house moms look for entertainers who are "pretty, somewhat thin, hopefully not on drugs.  […]  Our criteria is that, you know,

you're good looking, have a nice body, and you know how to speak to the customers because you're an entertainer."  Savickas Tr. (Ex. 2) at 64-65.

114.     In order to work at the Foxy Lady, entertainers are neither expected nor required to have any sort of professional dance training, prior experience working at other clubs, or any particular level of education.  Savickas Tr. (Ex. 2 at) 65-66.

115.     If a prospective entertainer "fits the criteria," she will be offered a chance to work at the Foxy Lady "right on the spot" because "[y]ou really don't want to lose a good entertainer when they come in because if we say no to them, they're only going to go to the next club down the street."   If an entertainer does not fit the criteria, Ms. Savickas will typically tell her that "management has to look at the tape, and then … let them know if we decide to bring them on as an entertainer."  Savicker Tr. (Ex. 2) at 69-70.

116.     "More often than not," a prospective entertainer who either asks to audition or does audition is not permitted to work at the Foxy Lady.  Robinson Tr. (Ex. 1) at 39.

117.     If the entertainer is offered the opportunity to work at the Foxy Lady, she must produce a "valid license" and "sign a contract."  The contract is presented to the entertainer either by the house mom or by Ms. Savickas.  Robinson Tr. (Ex. 1) at 46; Savickas Tr. (Ex. 2) at 58, 86-87.

118.     The contract that each entertainer is required to sign is called a "license agreement."  No entertainer is permitted to work at the Foxy Lady without first signing a license agreement.  Robinson Tr. (Ex. 1) at 47; Savickas Tr. (Ex. 2) at 74-75; *see also* License Agreements ("Exhibit 5").

119.     "Probably 99 percent" of the entertainers who were presented with the license agreement "don't read it.  And they just sign away."  Savickas Tr. (Ex. 2) at 86.

120.    Ms. Savickas is not aware of any occasion on which an entertainer has attempted to negotiate the terms of the license agreement.  She herself has never personally been asked by an entertainer about changing a term or provision in the license agreement.  Savickas Tr. (Ex. 2) at 90.

121.    In addition to a license agreement, the entertainers are required to fill out a contact sheet containing their name, stage name, address, "position," social security number, driver's license number, date of birth, and emergency contact information.  A copy of their driver's license is also included on the contact sheet.  Robinson Tr. (Ex. 1) at 64-65; Savickas Tr. (Ex. 2) at 105-106; *see also* Robinson Deposition Exhibit 5 ("Contact Sheet") ("Exhibit 6").

122.    Defendant assembles a file for each entertainer who is permitted to work at the Foxy Lady.  These files are labeled with the entertainer's name, and contain the entertainer's contact sheet, the license agreement, and "Performance Record."  Robinson Tr. (Ex. 1) at 63, 76; Savickas Tr. (Ex. 2) at 90-91.

123.    Defendant has maintained files for the entertainers "for many years."  The more current files are maintained in boxes, "under lock and key," in a closet in the waitstaff dressing room.  Currently, there are more than 300 entertainer files in that closet.  Savickas Tr. (Ex. 2) at 91-92.

124.    Once an entertainer passes her audition, the house moms and managers "try to educate the girls on what they need to know about [the] nightclub so it will help them make money.  And we show them around the club so they know the format and know how to get around the club.  We show them where the emergency exits are, where the dressing rooms are, where the restrooms are.  And at that point … we want to make them feel comfortable in our

establishment because if they don't know how to make money for themselves, they're no good to themselves or no good to us."  Savickas Tr. (Ex. 2) at 72-73.

125.    Occasionally, waitresses and bartenders will ask to become "entertainers" because they can make more money that way.  When that has happened, the waitress or bartender simply asked a manager if she could work as an entertainer, and would sign an entertainer license agreement, but would not need to audition.  Savickas Tr. (Ex. 2) at 176-177.

**b.      The 2012 license agreement.**

126.    The license agreement that was in effect during 2012 and 2013 states that the entertainers are "self-employed in the entertainment industry" and disclaims that the entertainers have any employment-style relationship with Defendant.  2012 License Agreement (Ex. 5-A), p. 1 at ¶ 2, p. 3 at ¶ 9.

127.    The 2012 license agreement is indefinite in duration.  It provides that the entertainer's "license" to work at the Foxy Lady begins upon execution of the agreement and automatically renews each day unless revoked or terminated.  2012 License Agreement (Ex. 5-A), p. 2 at ¶ 2.

128.    The 2012 license agreement requires that entertainers submit their availability to work "no later than Wednesday in the week before the times and dates selected by the [entertainer] to utilize the license in the ensuing week(s)."  The agreement also provides that Defendant, "on or before Friday at 5:00 p.m. following the Wednesday in which the form is submitted by the [entertainers]," shall notify the entertainer of the "dates and times available of the non-exclusive License," meaning the dates and times on which Defendant will allow the entertainer to work at the Foxy Lady.  2012 License Agreement (Ex. 5-A), p. 2 at ¶ 3.

129.    The 2012 license agreement states that the entertainers do not expect to receive "a minimum wage" or "any wage whatsoever" from Defendant, and "agree[] to participate in [Defendant's] show presentations to patrons in the manner coordinated by [Defendant] in order to provide all non-exclusive [entertainers] and [sic] equal opportunity to obtain fee and tip income."  2012 License Agreement (Ex. 5-A), pp. 2-3 at ¶ 5.

130.    The 2012 license agreement states that the entertainers "consent[] to have any locker or dressing room or area, or any bag, handbag, or pursue, or any one or more of the foregoing subject to random inspection by authorized individuals of the Licensor, or by individuals from one the political entities or subdivisions forereferenced in order to ensure compliance with Section 10 of this License Agreement."  2012 License Agreement (Ex. 5-A), pp. 2 at ¶ 4.

131.    The 2012 license agreement provides that the "costumes worn by the [entertainers] must be in good taste and not in violation of federal, state, county, or city laws or regulations."  The agreement further provides that the entertainers "agree[] to immediately make changes to his or her costume if asked to do so by [Defendant] if the [Defendant] believes the costume worn by the [entertainers] is not consistent with the intent of [this section]."  2012 License Agreement (Ex. 5-A), p. 3 at ¶ 6.

132.    The 2012 license agreement states that entertainers must pay a per diem "Licensee fee," "which … shall be paid in advance at the beginning of each shift, or the first operative day thereafter, for each day the License is to be utilized by the [entertainer]."  2012 License Agreement (Ex. 5-A), p. 3 at ¶ 6.

133.    The 2012 license agreement provides that "[f]ailure to pay the licensee fee shall result in temporary suspension of the license for the day and time period for which the fee is applicable."  2012 License Agreement (Ex. 5-A), p. 3 at ¶ 6.

c.    **The 2014 license agreement.**

134.    Defendant's 2014 license agreement was prepared by outside counsel, including Dean Robinson, its Federal Rule of Civil Procedure 30(b)(6) deponent.  Robinson Tr. (Ex. 1) at 46.

135.    Defendant maintains blank copies of the 2014 agreement in the management office at the Foxy Lady.  "We always make sure we have extra copies.  We take them to Staples and have them made up at Staples."  Savickas Tr. (Ex. 2) at 84-85.

136.    The 2014 license agreement is indefinite in duration unless terminated.  2014 License Agreement (Ex. 5-B), ¶ 2 ("This Agreement shall commence upon execution and shall continue until terminated as hereinafter set forth.").

137.    The 2014 license agreement states that the entertainers are required to "pay to the Club a rental fee and license fee as posted in the Premises," in "consideration of the Club's granting to the [entertainer] the right to use and occupy the Premises under this Agreement." 2014 License Agreement (Ex. 5-B), ¶ 3.

138.    The 2014 license agreement states that the entertainers shall receive all their income in the form of tips and gratuities from customers directly, and that they shall not receive any income from Defendant.  2014 License Agreement (Ex. 5-B) at ¶ 4.

139.    The 2014 license agreement states that Defendant shall have the right to set minimum fees for certain types of performances (e.g., table dances, private performances), and that the entertainer may only charge less than those fees if she "first notifies the Club in writing

of any charges to Performer's customers of a lower amount."  2014 License Agreement (Ex. 5-B) at ¶ 4.

140.    The 2014 license agreement states that the entertainers agree not to leave the Foxy Lady during any "Show Period" that they have agreed to work, and that Defendant has the right to collect a "late fee" from any entertainer who "misses any portion of the Show Period accepted by the Performer."  2014 License Agreement (Ex. 5-B), ¶ 5.

141.    Emily Chicoine and Ruby Levi testified that they were required to pay a "late fee" while working at the Foxy Lady.  Ruby Levi Deposition ("Levi Tr.") at 140 ("Exhibit 9"); Emily Chicoine Deposition ("Chicoine Tr.") at 171-172 ("Exhibit 10").

142.    The 2014 license agreement states that the entertainers "agree[] to abide by and not violate any of the rules and regulations of the Club as may be modified from time to time hereafter by the Club, including but not limited to those rules listed" in an attachment labeled as "Exhibit A."  2014 License Agreement (Ex. 5-B), ¶ 9(a).

143.    The 2014 license agreement states that Defendant shall have the right to terminate its relationship with any entertainer, and revoke any entertainer's permission to perform at the Foxy Lady, if the entertainer "default[s] of any obligation to pay money under this Agreement or in the event [the entertainer] shall be in default of any non-monetary provision of this Agreement."  2014 License Agreement (Ex. 5-B) at ¶ 10(a).

144.    The 2014 license agreement states that the entertainers have no expectation of privacy while at the Foxy Lady, and that Defendant has the right to inspect any of the entertainers' possessions, including their lockers, for any reason and without prior notice.  2014 License Agreement (Ex. 5-B) at ¶ 11(a).

145.    The 2014 license agreement states that Defendant may request an entertainer to "undergo a medical test to detect and determine the presence of an illegal or controlled substance," upon "suspicion" by Defendant.  "In the event the Performer refuses to consent to any such tests, said refusal will be ground for immediate termination of this Agreement and Performer shall be banned from the Premises."  2014 License Agreement (Ex. 5-B) at ¶ 11(b).

146.    "Exhibit A" to the 2014 license agreement includes a caption at the top that reads, "CLUB RULES FOR ENTERTAINERS."  These rules include: "YOU MUST POSSESS PROPER PICTURE IDENTIFICATION SHOWING YOU ARE AT LEAST 21 YEARS OLD," "HAVE RESPECT FOR OTHER ENTERTAINERS," "DO NOT LEAVE THE PREMISES WITH A CUSTOMER OR MEET A CUSTOMER OUTSIDE THE PREMISES," "YOU MUST BE DRESSED BEFORE YOU LEAVE THE STAGE OR DANCE AREA," and "ALL PURSES, BAGS, AND LOCKERS ARE SUBJECT TO SEARCHES IF DRUG ACTIVITY IS SUSPECTED."  2014 License Agreement (Ex. 5-B) at Exhibit A.

### d.    The 2015 license agreement.

147.    Defendant's 2015 license agreement is indefinite in duration.  2015 License Agreement (Ex. 5-C), ¶ 2.

148.    The 2015 license agreement states that entertainers must pay a "License Fee" of $40 per week in exchange for the "right to use and occupy the [Foxy Lady]."  2015 License Agreement (Ex. 5-C), ¶ 3.

149.    The 2015 license agreement states that the entertainers will receive all of their compensation in the form of tips and gratuities from patrons, not from Defendant.  2015 License Agreement (Ex. 5-C), ¶ 4(a).

150.     The 2015 license agreement states that Defendant has the right to establish minimum fees for certain performances or facilities, including table dances, private space performances, and VIP space.  Per the agreement, entertainers may not charge less than those fees without Defendant's "prior express consent."  2015 License Agreement (Ex. 5-C), ¶ 4(c).

151.     The 2015 license agreement states that, to the "extent that [an entertainer] has accepted a scheduled reservation to perform at the [Foxy Lady], but fails to appear at the times and dates of her reservation or leaves before the expiration of her reservation, [entertainer] agrees to pay a reasonable non-appearance fee to compensate the [Defendant] for the burden and expense imposed on the [Defendant] and its efforts to coordinate a schedule for the limited space available at the [Foxy Lady]."   2015 License Agreement (Ex. 5-C), ¶ 5.

152.     The 2015 license agreement states that the entertainers have "no reasonable expectation of privacy, whatsoever, in or about the [Foxy Lady], and the [entertainers] expressly waive[] any and all such rights to privacy as [they] may have to the fullest extent permitted by law."  The agreement also provides that Defendant has the "express right" to inspect the entertainers' lockers, "at any time, for any reason and without notice."  2015 License Agreement (Ex. 5-C), ¶ 10.

153.     The 2015 license agreement states that it shall terminate immediately upon an entertainer's "default of any obligation under this Agreement," at which point Defendant "shall have the right to (A) immediately withdraw the License; and (B) remove [the entertainer] and her property from the Premises, without being deemed to have committed any manner of trespass." 2015 License Agreement (Ex. 5-C), ¶ 11.

e.    **Working as an entertainer at the Foxy Lady.**

154.    The entertainers at the Foxy Lady can choose to work either day shifts or night shifts.  Day shifts last from 11:30 a.m. to 7:00 p.m.  Night shifts last from 7:00 p.m. to closing. Savickas Tr. (Ex. 2) at 50-51.

155.    On Fridays, Defendant hosts an "Eggs and Legs Brunch," which is a "breakfast buffet" that lasts from 6:00 a.m. to 11:00 a.m.  The entertainers may also work that shift. Savickas Tr. (Ex. 2) at 120.

156.    The entertainers are provided with a "little schedule pad" on which they write their availability for the coming week.  The entertainers "usually give it to us by Sunday, and the schedule starts Monday."  The house moms or management then take the entertainers' availability and create a unified weekly schedule that is then posted in the management office for the house moms and managers to consult.  Savickas Tr. (Ex. 2) at 157-158; *see* "Foxy Lady Entertainer Schedule" ("Exhibit 7")

157.    Defendant suggests or encourages performers to work a minimum of three shifts per week.  Robinson Tr. (Ex. 1) at 112-113, 117-118.

158.    The house moms also create a Performance Record for each entertainer.  The Performance Record is a "calendar that allows management and house moms to know or to write down when girls come in to work, when they show up, and when they choose not to show up." The Performance Record also shows when the entertainers "walk in" (i.e., show up to work even though they were not previously on the schedule), when they call out sick, and when they are suspended or have their licenses revoked.  Savickas Tr. (Ex. 2) at 158; *see*, *e.g.*, Ruby Levi Performance Records (Ex. 3).

159.   Defendant "wants to know" if an entertainer leaves her shift early.  When entertainers want to leave early, "[t]hey have to speak to the manager on duty."  Savickas Tr. (Ex. 2) at 163.

160.   In order to work at the Foxy Lady, the entertainers are required to pay $60 per week as a "house fee."  Payment of that fee "enables them to come into the club and use our establishment for the purpose for them to make money."  The house fee used to be $40, and was collected on a daily basis, until about two years ago.  Savickas Tr. (Ex. 2) at 75, 107-108.

161.   The house moms are responsible for collecting the house fees and turning that money over to management.  When collecting the house fees, the house mom also fills out a form identifying that the entertainer paid the fee, and how much she paid, and then turns that paperwork over to management, who keeps it in the management office.  Savickas Tr. (Ex. 2) at 110, 177-179; *see* License Fee Form ("Exhibit 8").

162.   Defendant can "waive" the house fee, and has done so.  For example, Defendant will waive the house fee for entertainers who "come in and work on our Christmas parties." Defendant will also waive the house fee for entertainers who refer another entertainer to the club, if the new dancer stays for two months.  And Defendant will "give them [the entertainers] a complimentary house fee the following week" if they agree to work certain shifts.  Savickas Tr. (Ex. 2) at 119-120.

163.   Defendant's house moms will typically collect the house fee when the entertainers arrive for their shift.  However, if an entertainer does not have the money to pay the house fee at that time, Defendant will permit the dancer to work and then collect the house fee at the end of the shift.  Savickas Tr. (Ex. 2) at 123.

164.    Ruby Levi and Emily Chicoine both paid the house fees in order to work at the Foxy Lady. Levi Tr. (Ex. 9) at 171-172 (Ex. 9); Chicoine Tr. (Ex. 10) at 92-94, 137, 174-175.

165.    Defendant sets the amounts that the entertainers must collect from customers for certain types of performances.  For example, the "base price" for a private dance is $25 for one song.  Of that amount, $20 is retained by the entertainer, and $5 is paid to Defendant.  Savickas Tr. (Ex. 2) at 125.

166.    Similarly, Defendant sets a "rental charge" to use the cabanas and the skyboxes. The cabanas cost $160 for 15 minutes (of which the entertainer retains $100); the skyboxes cost $300 for a half-hour and $450 for an hour (of which the entertainer retains $200 and $300, respectively).  Savickas Tr. (Ex. 2) at 134-135.

167.    Customers can arrange to watch entertainers "perform" while taking a shower. This is known as a "shower show."  Defendant charges $180 for shower shows, of which $75 goes to the entertainer, $10 goes to the floor host (who arranges the shower show), and $95 goes "to the house."  Savickas Tr. (Ex. 2) at 35, 163-164.

168.    The rates for the private dances, cabanas, skyboxes, and shower shows are all minimum standards that are set by Defendant.  In the private dance area, there are signs stating that lap dances are $25 per song.  To the extent that an entertainer charges a customer less than the minimum rate, Defendant recoups the same amount for the service provided (e.g., if a dancer charged a customer $160 for a shower show, Defendant would still take $95).  Savickas Tr. (Ex. 2) at 163-166.

169.    The reason that Defendant sets minimum amounts for private dances is because, if it did not, the "customers would feel like it's gouging.  You have to have some kind of standard

only because you don't want to lose customers because they think they're being taken advantage of."  Savickas Tr. (Ex. 2) at 166-167.

170.    Using their credit cards, customers at the Foxy Lady may purchase "house money" or "scrip" called "Foxy money" from Defendant through its bartenders and hostesses. "Foxy money" is "generally used for dancers and for tipping.  And they give it to the entertainer of their choice."  Savickas Tr. (Ex. 2) at 129.

171.    At the end of their shifts, the entertainers must "cash out" the Foxy money they have collected.  This exchange is usually done by the door person, and is not a one-for-one exchange.  Rather, the "club takes 10 percent."  Thus, if an entertainer turns into $100 in Foxy money, she will receive back $90 in real currency. Savickas Tr. (Ex. 2) at 130-131.

172.    The entertainers pay for their own costumes, makeup, and services related to their personal appearance (such as tanning).  The entertainers do not pay for any of the infrastructure or staffing at the Foxy Lady, such as lighting or sound systems, the music, the waitress or bartenders' hourly wages, the lockers, general advertising, and "valuable governmental licenses and permits."  Robinson Tr. (Ex. 1) at 49-50; Savickas Tr. (Ex. 2) at 170; Performer License Agreement (Ex. 5) at ¶ 9(b); Chicoine Tr. (Ex. 10) at 156-157.

173.    Defendant has required the entertainers, including Ruby Levi and Emily Chicoine, to use the makeup services provided by makeup artists that it staffs at the Foxy Lady, and has required the entertainers to wear a "full face" of makeup.  At times when Ms. Levi was not wearing "enough" makeup, a house mom told her to add more.  Levi Tr. (Ex. 9) at 152-153; Chicoine Tr. (Ex. 10) at 86-88.

174.    Defendant "encourage[s]" the entertainers to keep their cell phones in their lockers and not to have them out on the floor.  Defendant also does not "allow boyfriends or

19

husbands in the club just for the fact that we don't need them to be sidetracking anything in the establishment."  If a boyfriend or husband does show up at the Foxy Lady, "we tell them [the entertainer] … you know, they're not allowed in here, and it's for a reason.  You're here to do your job."  Savickas Tr. (Ex. 2) at 171, 195-196.

175.    Defendant has "revoked" entertainers' permission to work at the Foxy Lady on many occasions, sometimes as often as a "couple times a month."  The reasons why Defendant may revoke a dancer's permission to work at the Foxy Lady is if she is a "drug addict, if she's a prostitute, if she causes trouble with everyone in the establishment, if she causes a fight."  Savickas Tr. (Ex. 2) at 152-153 ("Q.  Okay, have you ever had to revoke a dancer's permission to work at the Foxy Lady?  A.  It happens a lot.").

176.    On one occasion, Defendant revoked an entertainer's permission to work at the Foxy Lady because the dancer, who was not 21 years old, was caught holding an alcoholic beverage.  Defendant knew she was not 21 because Defendant maintains a list of its under-21 entertainers.  Robinson Tr. (Ex. 1) at 108-109; Savickas Tr. (Ex. 2) at 180-182.

177.    Defendant revoked Ruby Levi's permission to work at the Foxy Lady because her former boyfriend visited the club while she was there.  A floor host intercepted her boyfriend before he could make a "scene" and "escorted him out.  And then at that point, Ruby was let go."  Savickas Tr. (Ex. 2) at 193-194.

178.    Carol Moran, Defendant's former entertainment manager and a house mom, "fired" Emily Chicoine without explanation.  Specifically, she texted Ms. Chicoine to say that her "services were no longer needed."  Chicoine Tr. (Ex. 10) at 99.

179.    Ms. Chicoine believes that Ms. Moran terminated her because "I was always edgy.  I was always like the rocker, gothic looking one.  I always wore black.  I never work

colorful things, and she always wanted me to wear colorful things or change up my look and I just didn't do it.  So that could definitely attribute to why she fired me."  Chicoine Tr. (Ex. 10) at 100.

180.    Defendant hosts special events at the Foxy Lady throughout the year, such as parties for particular sporting events and holiday parties around Christmas.  In order to ensure that there are entertainers at those events, Defendant will "encourage them to come into work, like girls, we need you, the football game is in town this weekend, you know, or when we know something is happening within the town that they can generate money for themselves."  Savickas Tr. (Ex. 2) at 118, 151-152.

181.    The reason why Defendant will encourage entertainers to work at certain events is because it will "help our business."  Unlike with a typical sports bar, customers come to the Foxy Lady "expecting to see entertainers.  We're an adult entertainment nightclub."  Thus, it is helpful to Defendant's business to have entertainers on site during events.  Savickas Tr. (Ex. 2) at 151-152.

182.    Defendant has at times used photographs of its entertainers on its website and in its advertising.  Savickas Tr. (Ex. 2) at 96-97.

Respectfully submitted,
RUBY LEVI and EMILY CHICOINE,
on behalf of themselves and all others
similarly situated,

By their attorneys,


  /s/ Stephen J. Brouillard
Stephen J. Brouillard, Esq. (BBO #6284)
BIANCHI & BROUILLARD, P.C.
The Hanley Building
56 Pine Street, Suite 250
Providence, RI  02903
Tel.     (401) 223 - 2990
Fax.     (877) 548 - 4539
sbrouillard@bbrilaw.com

Brant Casavant (Mass. BBO #666029)
   Admitted *pro hac vice*
Stephen Churchill (Mass. BBO #564158)
   Admitted *pro hac vice*
FAIR WORK, P.C.
192 South Street, Suite 450
Boston, MA 02111
Tel.     (617) 607 - 3260
Fax.     (617) 488 - 2261
brant@fairworklaw.com
steve@fairworklaw.com

**Dated:** May 3, 2017.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document has been filed electronically and is available for viewing and downloading from the ECF system.  I further certify that this document will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on May 3, 2017.

 /s/ Stephen J. Brouillard     
Stephen J. Brouillard, Esq.