# Exhibit 1

# In The Matter Of:

*Ruby Levi, et al. vs.*
*Gulliver's Tavern, Incorporated, et al.*

---

*Dean Robinson, Esq.*
*November 28, 2016*

---



DORIS O. WONG
ASSOCIATES, INC.

COURT REPORTERS

50 Franklin St., Boston, MA 02110
Phone (617) 426-2432

*Original File ROBINSON.txt*
*Min-U-Script® with Word Index*

**Dean Robinson, Esq. - November 28, 2016**

1

```
                        Volume I
                        Pages 1 to 131
                        Exhibits 1 to 13

              UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF RHODE ISLAND

- - - - - - - - - - - - - - - - -x
                                 :
 RUBY LEVI and EMILY CHICOINE,   :
 on behalf of themselves and     :
 all others similarly            :
 situated,                       :
              Plaintiffs,        :
                                 :
         vs.                     :  C.A. No.
                                 :  1:15-cv-216S-PAS
 GULLIVER'S TAVERN,              :
 INCORPORATED, and SOLID GOLD    :
 PROPERTIES, INC., both d/b/a    :
 THE FOXY LADY,                  :
              Defendants.        :
                                 :
- - - - - - - - - - - - - - - - -x
```

```
        DEPOSITION OF GULLIVER'S TAVERN,
INCORPORATED, and SOLID GOLD PROPERTIES, INC.,
THROUGH THEIR DESIGNEE DEAN ROBINSON, ESQ., a
witness called on behalf of the Plaintiffs, taken
pursuant to Rule 30(b)(6) of the Federal Rules of
Civil Procedure, before Ken A. DiFraia, Registered
Professional Reporter and Notary Public in and for
the Commonwealth of Massachusetts, at the Offices of
Seyfarth Shaw LLP, Two Seaport Lane, Boston,
Massachusetts, on Monday, November 28, 2016,
commencing at 9:58 a.m.
```

```
PRESENT:

    Fair Work, P.C.
        (by Brant Casavant, Esq.)
        192 South Street, Suite 450,
        Boston, MA 02111,
        brant@fairworklaw.com, 617.607.3260
        for the Plaintiffs.

(Continued)
```

**Dean Robinson, Esq. - November 28, 2016**

2

```
PRESENT:   (Continued)

     Seyfarth Shaw LLP
          (by Barry J. Miller, Esq.)
          Seaport East, Two Seaport Lane, Suite 300,
          Boston, MA 02210-2028,
          BMiller@seyfarth.com, 617.946.4806
          for the Defendants.

                    *  *  *  *  *
```

**Dean Robinson, Esq. - November 28, 2016**

3

1                          I N D E X

2
   WITNESS                 DIRECT   CROSS   REDIRECT   RECROSS
3

4  DEAN ROBINSON, ESQ.

5   BY MR. CASAVANT          6

6   BY MR. MILLER                   126

7

8                       *  *  *  *

9                    E X H I B I T S

10
    NO.              DESCRIPTION                   PAGE
11
     1     Copy of Re-Notice of Rule 30(b)(6)       16
12         Deposition

13   2     Copy of floor plan                       18

14   3     Copy of document entitled "Performer     44
           License Agreement," Bates
15         Nos. GULLIVERS 000008-000021

16   4     Copy of document entitled "Performer     44
           License Agreement," Bates
17         Nos. GULLIVERS 000027-000040

18   5     Copy of information sheet, Bates         61
           No. GULLIVERS 000007
19
     6     Copy of information sheet, Bates         61
20         No. GULLIVERS 000026

21   7     Copy of document entitled               75
           "Performance Record," Bates
22         Nos. GULLIVERS 000001-000006

23   8     Copy of document entitled               75
           "Performance Record," Bates
24         Nos. GULLIVERS 000022-000025

**Doris O. Wong Associates, Inc.**

**Dean Robinson, Esq. - November 28, 2016**

4

```
1                   E X H I B I T S, Continued

2     NO.                  DESCRIPTION                    PAGE

3      9      Copy of posting entitled                     96
              "Attention Entertainers"
4
      10      Copy of Affidavit of Victoria Voe,          107
5             Bates Nos. GULLIVERS 000041-000043

6     11      Copy of Affidavit of Crystal White,         109
              Bates Nos. GULLIVERS 000051-000053
7
      12      Copy of Affidavit of Jane Creelman,         110
8             Bates Nos. GULLIVERS 000057-000058

9     13      Copy of Affidavit of Lucy Loe, Bates        117
              Nos. GULLIVERS 000044-000047
10

11
                         *   *   *   *
12

13

14

15

16

17

18

19

20

21

22

23

24
```

**Doris O. Wong Associates, Inc.**

**Dean Robinson, Esq. - November 28, 2016**

5

1                 P R O C E E D I N G S

2              MR. CASAVANT:  Would you like to do the

3    usual 30 days for the reading and signing?

4              MR. MILLER:  Sure.

5              MR. CASAVANT:  Save objections, except as

6    to form, until the time of trial and dispense with

7    the notary?

8              MR. MILLER:  We will agree to that with the

9    limitation that Mr. Robinson is being produced as a

10   30(b)(6) witness subject to the objections and

11   limitations in my letter of May 18, 2016 to you and

12   Steve Brouillard.

13             MR. CASAVANT:  Does that mean you won't be

14   allowing him to answer questions subject to those

15   objections or are you raising those objections to

16   preserve your rights later on?

17             MR. MILLER:  It depends on the questions.

18   We may limit his testimony as described in the

19   letter or we may just designate it as non 30(b)(6)

20   testimony to the extent he has percipient knowledge,

21   which I don't anticipate, or we may just object.

22

23

24

**Dean Robinson, Esq. - November 28, 2016**

6

```
 1                  DEAN ROBINSON, ESQ.
 2   a witness called for examination by counsel for the
 3   Plaintiffs, having been satisfactorily identified by
 4   the production of his driver's license and being
 5   first duly sworn by the Notary Public, was examined
 6   and testified as follows:
 7                  DIRECT EXAMINATION
 8      BY MR. CASAVANT:
 9      Q.   Good morning.
10      A.   Morning.
11      Q.   Could you once again state your name for
12   the record.
13      A.   Dean Robinson.
14      Q.   Thank you, Mr. Robinson.  Would you state
15   your residential address for the record.
16      A.   404 New Meadow Road, Barrington, Rhode
17   Island 02806.
18      Q.   How long have you lived there?
19      A.   Approximately 15 years.
20      Q.   Have you ever been deposed before or
21   attended a deposition?
22      A.   Yes.
23      Q.   So I'm sure you are familiar, then, with
24   sort of what to expect today, but, for the record,
```

Dean Robinson, Esq. - November 28, 2016

 1   I'll be asking you questions.  Your job is to

 2   provide me with true and accurate answers to the

 3   best of your ability.

 4          What that means is that I don't want you to

 5   guess or speculate in an answer, but if you are able

 6   to provide a reasonable answer based on your memory

 7   or experience, I would ask that you provide me with

 8   that answer.

 9          It also means if you don't understand the

10   question that I'm asking or you are unclear, ask me

11   to clarify what the question is so that we know we

12   are both on the same page.

13          If at any time you need a break, feel free

14   to ask for one.  I would just ask if there's a

15   question pending, that you answer the question prior

16   to taking the break.

17          The last two points are, one, it's

18   important that you give verbal answers to the

19   questions, like yes or no as opposed to saying

20   "uh-huh" or "nuh-huh," because it's hard for the

21   reporter to take that down or they are ambiguous in

22   the record.

23          Lastly, it's important not to talk over one

24   other.  I'll try not to interrupt you when you

**Dean Robinson, Esq. - November 28, 2016**

8

1   answer.  Likewise, I would ask that you don't
2   interrupt me when I ask the questions, just so the
3   record is clear.  Does that make sense?
4        A.   Yes.
5        Q.   Great.  How many other depositions have you
6   attended in your professional life?
7        A.   As a witness?
8        Q.   No, just as attending.
9        A.   Oh, 40 or 50.
10       Q.   Are you an attorney?
11       A.   Yes.
12       Q.   Have any of the depositions that you've
13   attended either as a witness or as an observer
14   involved Gulliver's Tavern or Solid Gold Properties?
15       A.   Yes.
16       Q.   Have any of those depositions involved
17   exotic dancers or claims brought by exotic dancers?
18            MR. MILLER:  Objection.
19       A.   No.
20       Q.   Are you currently employed?
21       A.   Yes?
22       Q.   And by whom are you employed?
23       A.   I'm actually self-employed.
24       Q.   You have a law firm?

**Dean Robinson, Esq. - November 28, 2016**

```
1       A.   Yes.

2       Q.   What is the name of the law firm?

3       A.   The same, Dean Robinson.

4       Q.   Are you the only attorney that works at

5  that firm?

6       A.   Yes.

7       Q.   Are you familiar with a company called

8  "Gulliver's Tavern, Inc."?

9       A.   Yes.

10      Q.   Are you familiar with a company called

11 "Solid Gold Properties, Inc."?

12      A.   Yes.

13      Q.   What is Gulliver's Tavern, Inc.?

14           MR. MILLER:  Objection.  You can answer if

15 you have an answer.

16      A.   It's a corporation that was formed some

17 years ago to operate a business.

18      Q.   And what business does it operate?

19      A.   A nightclub.

20      Q.   What nightclub is that?

21      A.   It's known as "The Foxy Lady."

22      Q.   Is that nightclub located at 318 Chalkstone

23 Avenue in Providence?

24      A.   Yes, "Chalkstone."
```

**Dean Robinson, Esq. - November 28, 2016**

10

1      Q.    In Providence, Rhode Island?

2      A.    Yes.

3      Q.    You say it was formed some years ago.  How

4  long ago was it formed?

5      A.    I believe it was incorporated in 1979.

6      Q.    Has it continuously operated the nightclub

7  called "The Foxy Lady" since then?

8      A.    Yes.

9      Q.    You initially used the term "operate."

10  What do you mean by "operate"?

11     A.    It runs the business.  It operates the

12  business.

13     Q.    The business being The Foxy Lady?

14     A.    The nightclub known as The Foxy Lady, yes.

15     Q.    Throughout the deposition, I'll be

16  referring to "The Foxy Lady."  Can we agree that

17  when I refer to The Foxy Lady -- well, do you

18  understand when I refer to The Foxy Lady, I'm

19  referring to the nightclub located at 318 Chalkstone

20  Avenue in Providence?

21     A.    Yes.

22     Q.    Just for ease of reference.

23     A.    Yes.

24     Q.    And the entity known as Solid Gold

11

```
 1    Properties, what does that entity do?
 2              MR. MILLER:  Objection.
 3        A.    That entity owns and leases real estate.
 4        Q.    Does it have any connection or relationship
 5    with The Foxy Lady?
 6              MR. MILLER:  Objection.
 7        A.    Yes.
 8        Q.    What is that relationship?
 9        A.    Solid Gold Properties, Inc., leases the
10    property where The Foxy Lady nightclub is located.
11        Q.    Does it lease it from someone or something
12    or does it lease it to somebody?
13        A.    It leases it to Gulliver's Tavern,
14    Incorporated.
15        Q.    So Solid Gold owns the property itself and
16    leases that property to Gulliver's Tavern?
17        A.    Yes.
18        Q.    Does Solid Gold Properties have any other
19    connection or relationship with The Foxy Lady?
20              MR. MILLER:  Objection.
21        A.    No.
22        Q.    Does Gulliver's Tavern have any employees?
23        A.    Yes.
24        Q.    And what about Solid Gold Properties?
```

**Dean Robinson, Esq. - November 28, 2016**

```
 1      A.    No.
 2      Q.    Have you ever been employed by Gulliver's
 3   Tavern?
 4      A.    No.
 5      Q.    What is your relationship with Gulliver's
 6   Tavern?
 7            MR. MILLER:  Objection.
 8      A.    I am corporate counsel for Gulliver's
 9   Tavern.
10      Q.    How long have you served as corporate
11   counsel for Gulliver's Tavern?
12      A.    Approximately 20 years.
13      Q.    Do you have any relationship with Solid
14   Gold Properties?
15      A.    I'm also the corporate counsel for Solid
16   Gold Properties, Inc.
17      Q.    Does Gulliver's Tavern have officers?
18      A.    Yes.
19      Q.    Who are those officers?
20      A.    The sole officer is Patricia Tsoumas.
21      Q.    And what particular title or titles does
22   she have?
23      A.    For?
24      Q.    For Gulliver's Tavern.
```

**Dean Robinson, Esq. - November 28, 2016**

13

```
 1      A.   She is the president, secretary and
 2  treasurer.
 3      Q.   How long has she had those positions at
 4  Gulliver's Tavern?
 5      A.   I'm not sure.  That predates my
 6  representation.
 7      Q.   Solid Gold Properties, does that company
 8  have any officers?
 9      A.   Yes.
10      Q.   Who are those officers?
11      A.   Patricia Tsoumas.
12      Q.   Anyone else?
13      A.   No.
14      Q.   What are her titles as officer of Solid
15  Gold Properties?
16      A.   President, treasurer and secretary.
17      Q.   What employees does Gulliver's Tavern have
18  besides Patricia Tsoumas?
19          MR. MILLER:  Objection.  One of the things
20  that was set forth in our May 18th letter, which I
21  think is going to be something that recurs
22  throughout the deposition, is that in our view the
23  period of time germane to Ms. Chicoine's and
24  Ms. Levi's claim is May 2012 to October 2014.  I am
```

**Doris O. Wong Associates, Inc.**

**Dean Robinson, Esq. - November 28, 2016**

```
 1    not going to instruct him not to answer a question
 2    that's phrased in the present tense as you just
 3    posed that one, but I want to make that objection
 4    for the record.
 5              MR. CASAVANT:  Okay.  That's fine.
 6       Q.   For purposes of your answer, I think we can
 7    agree to the extent there was some ambiguity about
 8    the time period in my questions, you can assume that
 9    I'm referring to the time period after May 23, 2012,
10    unless I specify otherwise.  For the time period of
11    May 23, 2012 going forward, what other employees has
12    Gulliver's Tavern had?
13       A.    I believe they had bartenders, waitresses
14    and managers.
15       Q.   Are those individuals who all work at The
16    Foxy Lady?
17              MR. MILLER:  Objection.
18       A.    In the nightclub?
19       Q.   Yes.
20       A.   Yes.
21       Q.   This is just so that we're clear about who
22    was working where.  Does Gulliver's Tavern own and
23    operate any nightclubs besides The Foxy Lady in
24    Providence?
```

**Doris O. Wong Associates, Inc.**

**Dean Robinson, Esq. - November 28, 2016**

```
 1      A.   No.
 2      Q.   What have been your responsibilities with
 3 respect to Gulliver's Tavern over the past three or
 4 four years?
 5           MR. MILLER:  Objection.
 6      A.   I'm not sure I understand the question.
 7      Q.   What did you say your relationship was with
 8 Gulliver's Tavern again?  I'm sorry.
 9      A.   Corporate counsel.
10      Q.   So as corporate counsel, what sort of
11 responsibilities do you have with respect to
12 Gulliver's Tavern?
13      A.   Providing legal services when requested.
14      Q.   Anything else?
15      A.   No.
16      Q.   Have you ever physically visited The Foxy
17 Lady in the past three or four years?
18      A.   Yes.
19      Q.   How many times have you done so?
20           MR. MILLER:  Objection.
21      A.   I'm not sure, a handful of times.
22      Q.   What have been the purposes of those
23 visits?
24           MR. MILLER:  Objection.
```

**Dean Robinson, Esq. - November 28, 2016**

1      A.    To meet with representatives of the company.

2      Q.    Does Gulliver's Tavern have a corporate

3  office or headquarters?

4      A.    To the extent it has a headquarters or an

5  office, it's located at 318 Chalkstone Avenue.

6      Q.    Is it located in the same building as The

7  Foxy Lady?

8      A.    Yes.

9      Q.    How about Solid Gold Properties, does that

10 entity have an office or a headquarters somewhere?

11     A.    No.

12                 (Document marked as Robinson

13                 Exhibit 1 for identification)

14     Q.    The court reporter has handed you what

15 we've marked as Exhibit 1.  Once you had the chance

16 to look at the document, would you let me know if

17 you recognize it.

18     A.    (Examines document)  Yes.

19     Q.    Could you identify it for me.

20     A.    This appears to be the Re-Notice of today's

21 Rule 30(b)(6) deposition.

22     Q.    And looking through the deposition notice,

23 you will see there are several numbered paragraphs

24 with subjects or topics identified; do you see those

17

1   there?

2        A.   Yes.

3        Q.   Do you feel that you are adequately

4   prepared to answer questions regarding these topics

5   today?

6        A.   Yes.

7             MR. MILLER:  Again, subject to the

8   limitations in my correspondence to Mr. Casavant of

9   May 18th.

10             THE WITNESS:  Right, subject to.

11        Q.   Is there anyone you can think of that would

12   have more or better knowledge with regard to these

13   topics than yourself?

14             MR. MILLER:  Objection.

15        A.   No.

16        Q.   You can put that aside.

17             Going back a second to the employees of

18   Gulliver's Tavern, I may have just missed this, but

19   does Gulliver's Tavern employ any managers that work

20   at The Foxy Lady?

21        A.   Yes.

22        Q.   Are you familiar with a position called

23   "house mom"?

24        A.   Yes.

**Dean Robinson, Esq. - November 28, 2016**

18

```
 1      Q.    What is a house mom?
 2      A.    A house mom is an individual who basically
 3  assists the entertainers when they are on the
 4  premises.
 5      Q.    The entertainers at The Foxy Lady?
 6      A.    Yes.
 7      Q.    Are they employees of Gulliver's Tavern,
 8  the house moms?
 9      A.    No.
10      Q.    Is there security personnel that work at
11  The Foxy Lady?
12      A.    I'm not sure what you mean by "security
13  personnel."
14      Q.    Like bouncers or doormen or anyone who is
15  sort of in charge of the security of the facility.
16      A.    Well, they call them "floor hosts."
17      Q.    Are the floor hosts employees of Gulliver's
18  Tavern?
19      A.    Yes.
20                  (Document marked as Robinson
21                   Exhibit 2 for identification)
22      Q.    The court reporter has handed you what
23  we've marked as Exhibit 2.  Could you identify that
24  document for me.
```

**Doris O. Wong Associates, Inc.**

**Dean Robinson, Esq. - November 28, 2016**

```
 1        A.    It looks like a floor plan of a building
 2   labeled "Upper Level."
 3        Q.    Do you have any understanding as to what
 4   building this floor plan refers to?
 5        A.    Not this particular document because it's
 6   not labeled as such.
 7        Q.    If I were to represent to you that this was
 8   produced to us in this litigation as an approximate
 9   or rough floor plan of The Foxy Lady, would that
10   refresh your recollection at all as to what it
11   depicts?
12              MR. MILLER:   Objection to that
13   characterization of the document.
14        Q.    I believe you can still answer if you
15   understand the question.
16              MR. MILLER:   Yes, you can.
17        A.    If you were to represent to me that this is
18   the floor plan of The Foxy Lady; is that what you
19   are asking?
20        Q.    Yes.
21        A.    I'll accept your representation.   If it's
22   been produced, yes.
23        Q.    But absence that characterization or
24   representation from me, this doesn't independently
```

**Dean Robinson, Esq. - November 28, 2016**

1   look familiar to you as the floor plan of The Foxy

2   Lady?

3        A.   Well, it's been quite some time since I've

4   been in this part of the building so I can't say for

5   sure, but it could represent that, yes.

6        Q.   When was the last time that you went to The

7   Foxy Lady?

8        A.   I don't know exactly, but I'm guessing

9   maybe six months ago.

10        Q.   Does The Foxy Lady have more than one floor?

11        A.   Yes.

12        Q.   Are patrons allowed to go to both floors --

13   strike that.  I'll back up.  How many floors does

14   The Foxy Lady have?

15        A.   There are two floors.

16        Q.   Are patrons allowed to visit both floors?

17             MR. MILLER:  Objection.

18        A.   To the best of my knowledge, yes.

19        Q.   Are you familiar with an individual named

20   "John Webber"?

21        A.   I've heard the name.

22        Q.   Other than hearing the name, have you ever

23   met John Webber?

24        A.   I may have.  I don't recall for sure.

**Doris O. Wong Associates, Inc.**

**Dean Robinson, Esq. - November 28, 2016**

1    Q.   Do you have an understanding as to what

2  Mr. Webber's relationship is with The Foxy Lady?

3    A.   My understanding is that he's the general

4  manager.

5    Q.   And how long has he been the general

6  manager of The Foxy Lady?

7    A.   It's been a number of years, from what I

8  understand.  I don't know exactly when.

9    Q.   Is he an employee of Gulliver's Tavern?

10   A.   Yes.

11   Q.   Do you know if Mr. Webber is still the

12  general manager of The Foxy Lady as of today?

13        MR. MILLER:  Objection.

14   A.   To the best of my knowledge.

15   Q.   Are you familiar with an individual named

16  "Lori Savickas"?

17   A.   Yes.

18   Q.   Who is Lori Savickas?

19   A.   She is a manager of Gulliver's Tavern.

20   Q.   Does she work at The Foxy Lady?

21   A.   You mean on the premises?

22   Q.   Yes.

23   A.   Yes.

24   Q.   Is she employed by Gulliver's Tavern?

**Doris O. Wong Associates, Inc.**

22

```
 1        A.    Yes.

 2        Q.    Do you know an individual named "Richard

 3    Angell"?

 4        A.    Yes.

 5        Q.    Who is Mr. Angell?

 6        A.    He's also a manager.

 7        Q.    At The Foxy Lady?

 8        A.    Yes.

 9        Q.    Is he employed by Gulliver's Tavern?

10        A.    Yes.

11        Q.    Are both Ms. Savickas and Mr. Angell still

12    employed by Gulliver's Tavern today?

13              MR. MILLER:   Objection.

14        A.    Yes, to the best of my knowledge.

15        Q.    Are you familiar with an individual named

16    "Robert Travisono"?

17        A.    I have heard the name.

18        Q.    Do you have an understanding as to who he

19    is?

20        A.    I believe he's also a manager at Gulliver's

21    Tavern.

22        Q.    Does he work at The Foxy Lady on the premises?

23        A.    Yes.

24        Q.    Is he an employee of Gulliver's Tavern?
```

**Dean Robinson, Esq. - November 28, 2016**

```
 1        A.   Yes.
 2        Q.   How long has he worked for Gulliver's Tavern?
 3        A.   I'm not sure.  I think it's at least the
 4   period of time that we're discussing today.
 5        Q.   Do you know an individual named "Joseph
 6   Elias"?
 7        A.   I've heard the name.
 8        Q.   Who is Mr. Elias?
 9        A.   I believe he was a manager at Gulliver's
10   Tavern.
11        Q.   Was he an employee of Gulliver's Tavern?
12        A.   I believe he was for a period of time, yes.
13        Q.   So did he have responsibilities with
14   respect to The Foxy Lady?
15             MR. MILLER:  Objection.
16        Q.   Or did he work at The Foxy Lady?
17        A.   Did he work at The Foxy Lady?
18        Q.   Yes.
19        A.   Yes, he did work at The Foxy Lady.
20        Q.   When did he stop working for Gulliver's
21   Tavern?
22        A.   I'm not sure of the exact date.
23        Q.   Do you have a rough sense as to how long
24   ago it was that he stopped working?
```

**Doris O. Wong Associates, Inc.**

**Dean Robinson, Esq. - November 28, 2016**

24

```
 1      A.   No.

 2      Q.   Do you know an individual named "Stephanie

 3 Nunez"?

 4      A.   Yes.

 5      Q.   Who is she?

 6      A.   I believe she is a house mom at The Foxy

 7 Lady.

 8      Q.   Do you know if she's currently working at

 9 The Foxy Lady?

10           MR. MILLER:   Objection.

11      A.   I believe so.

12      Q.   Has she, as far as you know, ever been

13 employed by Gulliver's Tavern?

14      A.   I think she may have been, but I'm not

15 really sure.

16      Q.   Do you know if she's ever worked as a

17 manager at The Foxy Lady?

18      A.   She may have.

19      Q.   Do you know an individual named "Nadine

20 Ramos"?

21      A.   I have heard the name.

22      Q.   Do you have an understanding as to who she

23 is?

24      A.   My understanding is she's also a house mom.
```

**Dean Robinson, Esq. - November 28, 2016**

1      Q.   Is she employed by Gulliver's Tavern?

2      A.   To the best of my knowledge, yes.

3      Q.   Do you know if she's had any positions with

4   respect to The Foxy Lady other than as a house mom?

5      A.   I do not.

6      Q.   Is she still currently employed by

7   Gulliver's Tavern?

8           MR. MILLER:  Objection.

9      A.   I believe so.

10      Q.   Do you know an individual named "Carol

11   Moran"?

12      A.   Yes.

13      Q.   Who is she?

14      A.   She was a house mom at The Foxy Lady.

15      Q.   And she's no longer working there?

16      A.   No.

17      Q.   Do you have a sense as to when she stopped

18   working there?

19      A.   I believe it's been at least a year since

20   she worked there.

21      Q.   Was she an employee of Gulliver's Tavern?

22      A.   No.  She was a house mom.

23      Q.   Besides the individuals we've just

24   mentioned, are there any other managers who you can

**Dean Robinson, Esq. - November 28, 2016**

1    think of that have worked at The Foxy Lady in the

2    past three or four years?

3         MR. MILLER:  Objection.

4    A.    No.

5    Q.    What about any house moms?

6    A.    No, none that I know of.

7    Q.    That's fine.  I want to go through the

8    positions that work at The Foxy Lady to make sure I

9    have them all.  I believe we already mentioned

10   bartenders.  There are bartenders that work at The

11   Foxy Lady; is that right?

12   A.    Yes.

13   Q.    They are employees of Gulliver's Tavern?

14   A.    Yes.

15   Q.    Then there are floor hosts; is that right?

16   A.    Yes.

17   Q.    They are employee of Gulliver's Tavern?

18   A.    Yes.

19   Q.    Then are there DJs that work at The Foxy

20   Lady?

21   A.    They work in the building, but they are not

22   employees.

23   Q.    Are there doormen who work at The Foxy Lady?

24        MR. MILLER:  Objection.

**Dean Robinson, Esq. - November 28, 2016**

27

1    A.    I'm not sure what you mean by "doormen."

2    Q.    Someone who stands at the front door or,

3  you know, the customer entrance to check IDs, and so

4  forth.

5    A.    There are individuals that do that, yes.

6    Q.    Do those individuals have a title or a role

7  that they are referred to as?

8    A.    I don't know if they have a title, to be

9  honest with you.

10    Q.    Are they employed by Gulliver's Tavern?

11    A.    Yes, to the best of my knowledge they are.

12    Q.    And we discussed the house moms.  They are

13  not employees of Gulliver's Tavern; is that correct?

14    A.    That's correct.

15    Q.    But they work at The Foxy Lady?

16    A.    Excuse me?

17    Q.    They work at The Foxy Lady?

18    A.    At The Foxy Lady?

19    Q.    Yes.

20    A.    Yes.

21    Q.    Are there cocktail servers at The Foxy Lady?

22    A.    Well, they would fall under the heading of

23  waitresses.

24    Q.    So there are waitresses that work at The

**Dean Robinson, Esq. - November 28, 2016**

28

```
 1    Foxy Lady?
 2         A.    Yes.
 3         Q.    Are there any other positions that work at
 4    The Foxy Lady that we have not identified that I
 5    missed?
 6               MR. MILLER:  Objection.
 7         A.    That work at or for?
 8         Q.    At.
 9         A.    Well, I believe there may be women that
10    come in and provide hairdressing services, but they
11    are not employees.
12         Q.    I think one category we probably overlooked
13    is there are entertainers that work at The Foxy
14    Lady; is that right?
15         A.    At The Foxy Lady?
16         Q.    At The Foxy Lady, yes.
17         A.    Yes.
18         Q.    And what services do these entertainers
19    provide at The Foxy Lady?
20               MR. MILLER:  Objection.
21         A.    Entertainment services.
22         Q.    What type of entertainment services?
23         A.    They dance at The Foxy Lady.
24         Q.    Going back to the list of positions we just
```

**Dean Robinson, Esq. - November 28, 2016**

```
 1   identified, what responsibilities do the bartenders

 2   have at The Foxy Lady?

 3           MR. MILLER:  Objection.

 4      A.   To serve drinks.

 5      Q.   To customers?

 6      A.   Sometimes to customers, but they also

 7   provide drinks to the waitress to bring to customers.

 8      Q.   And the waitresses, I assume they also

 9   provide drinks to customers?

10      A.   Yes.

11      Q.   That's their responsibility?

12      A.   Yes.

13      Q.   What about the floors hosts, what is their

14   responsibility?

15           MR. MILLER:  Objection.

16      A.   The floor hosts are responsible for making

17   sure that order is maintained within the premises.

18      Q.   And how do they do that?

19           MR. MILLER:  Objection.

20      A.   I'm not sure I understand the question.

21      Q.   Do they patrol the club to make sure

22   everything is operating smoothly?

23           MR. MILLER:  Objection.

24      A.   Well, if you mean by patrol walk around or
```

**Doris O. Wong Associates, Inc.**

**Dean Robinson, Esq. - November 28, 2016**

30

```
 1    through the club, yes, they do that.

 2         Q.   Do they have any responsibilities with

 3    respect to the entertainers?

 4              MR. MILLER:  Objection.

 5         A.   Not that I'm aware of.

 6         Q.   What services do the hairdressers provide?

 7         A.   If an entertainer would like to have her

 8    hair done while she's at the club, they can arrange

 9    for that.

10         Q.   What about the house moms, what do they do

11    at The Foxy Lady?

12         A.   Well, they help to schedule the dances that

13    the entertainers perform, assist in that way.

14         Q.   Assist in scheduling the dancers?

15         A.   Yes.

16         Q.   Do they have any other responsibilities

17    with respect to the dancers besides scheduling?

18              MR. MILLER:  Objection.

19         A.   Well, to make sure that the premises are

20    safe for the entertainers.

21         Q.   How do they make sure the premises are safe

22    for the entertainers?

23         A.   Well, they make sure that there are no

24    issues that are ongoing on the premises that would
```

**Doris O. Wong Associates, Inc.**

**Dean Robinson, Esq. - November 28, 2016**

31

```
 1   interfere with their safety.

 2        Q.    What sorts of issues would those be?

 3             MR. MILLER:  Objection.

 4        A.    Well, I would think that one issue would be

 5   if someone were to bring in an illegal substance on

 6   the club premises, they would want to make sure that

 7   that was discovered and handled.

 8        Q.    Anything else that you can think of?

 9        A.    No.

10        Q.    What are the hours during which The Foxy

11   Lady is open to the public?

12        A.    My understanding is that during the week,

13   which would be Monday through -- Sunday through

14   Thursday, they are open from -- well, let me back

15   up.  Sundays I believe they open at 3:00 in the

16   afternoon and close at 1:00 in the morning.  Monday

17   through Thursday, I believe they open at 11:30 in

18   the morning and are open until 1 o'clock the

19   following morning.  On Friday and Saturday, they

20   stay open until 2:00 in the morning.

21        Q.    What time do they open on Friday and

22   Saturday?

23        A.    Friday they open early.  I think it's 7:00

24   or 8:00.  Saturday I believe it's 11:00 or 11:30.
```

**Dean Robinson, Esq. - November 28, 2016**

32

1      Q.    Are there days of the week or times of the

2  day that the customers need to pay an amount of

3  money to get into The Foxy Lady?

4      A.    Yes.

5      Q.    What are those days or times when they need

6  to do that?

7      A.    My understanding is that they pay a fee

8  most of the time that the club is open, an

9  admissions fee.

10     Q.    An admissions fee, okay.  Do you know how

11  much that fee has been since May of 2012?

12         MR. MILLER:  Objection.

13     A.    No.

14     Q.    Do you know how much that fee is today?

15     A.    No.

16     Q.    Do you have an understanding if it changes

17  based on the day of the week?

18     A.    It may.

19     Q.    Of the time that the club is open to

20  customers, are there ever times when there are not

21  entertainers on the premises?

22         MR. MILLER:  Objection.

23     A.    More than likely.

24     Q.    What would be the circumstances in which

**Doris O. Wong Associates, Inc.**

**Dean Robinson, Esq. - November 28, 2016**

33

```
 1   the club would be open to the public when there
 2   would not be entertainers there?
 3        A.   I mean, the situation varies from day to
 4   day and time to time.  It's hard to say really.
 5        Q.   So the entertainers that we've been
 6   referring to, they are not employees of Gulliver's
 7   Tavern; is that correct?
 8        A.   That is correct.
 9        Q.   They are independent contractors or
10   independent operators; is that correct?
11        A.   Of Gulliver's Tavern?
12        Q.   Sure.
13        A.   Yes.
14        Q.   Do you have a sense as to how many
15   entertainers have worked at The Foxy Lady since May
16   of 2012?
17        A.   No.
18        Q.   You can't even estimate it or ballpark it?
19        A.   No idea.
20        Q.   Do you know who would know that?
21             MR. MILLER:  Objection.
22        A.   No.  I'm not sure anybody does really.  I'm
23   not sure that anybody would have that information.
24        Q.   Are the entertainers that work at The Foxy
```

**Doris O. Wong Associates, Inc.**

**Dean Robinson, Esq. - November 28, 2016**

34

```
 1    Lady still treated as independent contractors by
 2    Gulliver's Tavern?
 3              MR. MILLER:  Objection.
 4       A.    You mean at the present time?
 5       Q.    Yes.
 6       A.    Yes.
 7       Q.    In the past three years, has there been a
 8    period of time where the entertainers have been
 9    treated as employees?
10       A.    Of Gulliver's Tavern?
11       Q.    Correct.
12       A.    No.
13       Q.    Do you have a sense as to how long an
14    entertainer will typically perform at The Foxy Lady
15    for, meaning period of days, months, a year, et
16    cetera?
17              MR. MILLER:  Objection.
18       A.    I'm not sure I understand that question.
19    Are you asking me the period of time that they would
20    work -- I'm not sure I understand the question.
21       Q.    We can come back to that.  What is the
22    process for an entertainer starting work at The Foxy
23    Lady?
24              MR. MILLER:  Objection.
```

**Dean Robinson, Esq. - November 28, 2016**

35

```
 1      A.   What do you mean by "process"?  I'm not
 2  sure I understand.
 3      Q.   How do they either get permission or, you
 4  know, get allowed to work at The Foxy Lady?
 5      A.   My understanding is that there would be an
 6  audition.  If they are accepted, they would start
 7  after that.
 8      Q.   Who conducts the auditions?
 9           MR. MILLER:  Objection.
10      A.   From what I understand, it's done by Lori
11  Savickas.
12      Q.   Has she done the auditions over the past
13  three years?
14           MR. MILLER:  Objection.
15      A.   I believe so, yes.
16      Q.   How does an entertainer get an audition at
17  The Foxy Lady?
18           MR. MILLER:  Objection.
19      A.   I would imagine that they would somehow
20  contact Lori Savickas to arrange for that.
21      Q.   You said you would imagine they do that.
22  Are you just conjecturing that's what the process
23  would be or do you have an understandings of what
24  the process is?
```

**Dean Robinson, Esq. - November 28, 2016**

36

```
 1      A.   Well, I mean, somebody would have to get
 2  word to Lori Savickas to conduct the audition.  My
 3  understanding is that that's the way it's done.
 4      Q.   What happens at the audition?
 5           MR. MILLER:  Objection.
 6      A.   I never attended one, and so I can't tell
 7  you directly.
 8      Q.   Do you have an understanding as to what
 9  happens at the audition?
10      A.   I would only be guessing if I were to
11  answer that.
12      Q.   But Lori Savickas would be the person that
13  would know that?
14      A.   Oh, yes, I believe so.
15      Q.   Who is it that makes the determination as
16  to whether an entertainer who has auditioned can
17  work at the club?
18           MR. MILLER:  Objection.
19      A.   I would imagine that Lori Savickas would
20  have the most input in that decision, but she may
21  speak to others.
22      Q.   What factors does Lori take into
23  consideration when auditioning a dancer?
24           MR. MILLER:  Objection.
```

**Dean Robinson, Esq. - November 28, 2016**

37

```
 1      A.   I couldn't tell you that.

 2      Q.   Do you know, like, what quality she looks

 3 for or qualifications?

 4      A.   No.

 5      Q.   Are the entertainers that work at The Foxy

 6 Lady required to have any prior experience of any

 7 sort?

 8           MR. MILLER:  Objection.

 9      A.   Not to my knowledge.

10      Q.   Does Lori look for any professional dance

11 training or anything along that line?

12      A.   She may.

13      Q.   Do you know if she gets references or asks

14 for references from new prospective entertainers?

15      A.   I would assume so.

16      Q.   But you don't know?

17      A.   Not for sure, no, but I would assume she

18 does.

19      Q.   Why would you assume that to be the case?

20      A.   Because she's very thorough, and I'm sure

21 she would want to do her due diligence.

22      Q.   Does The Foxy Lady require the entertainers

23 to have any particular licenses in order to work at

24 the nightclub?
```

**Doris O. Wong Associates, Inc.**

**Dean Robinson, Esq. - November 28, 2016**

38

```
 1        A.    Not that I'm aware of.

 2        Q.    Does The Foxy Lady or Lori require the

 3   entertainers to carry any particular type of

 4   insurance?

 5        A.    I don't think it's a requirement.  I mean,

 6   if they want to have insurance, that's up to them.

 7        Q.    In the past three years, has The Foxy Lady

 8   ever had a recruiting drive or a job fair for new

 9   entertainers?

10        A.    Not that I'm aware of.

11        Q.    Are there times of the year where The Foxy

12   Lady does not accept new applicants or entertainers?

13              MR. MILLER:  Objection.

14        A.    No, not that I'm aware of.

15              MR. CASAVANT:  Excuse me one second.

16              (Pause)

17        Q.    Are you aware of circumstances in which

18   Lori has ever declined to allow a dancer to work at

19   The Foxy Lady after auditioning?

20        A.    When you say "circumstances," are you

21   asking me if she ever turned anybody down?

22        Q.    Yes.

23        A.    Yes, she has.

24        Q.    How often has that happened?
```

**Dean Robinson, Esq. - November 28, 2016**

39

```
 1      A.    More often than not I would say.
 2      Q.    What are the circumstances in which she
 3 would decline someone?
 4            MR. MILLER:  Objection.
 5      A.    I couldn't tell you that.  It's really up
 6 to her in the end.
 7      Q.    Are you aware of any particular instance
 8 that's been brought to your attention that someone
 9 was not allowed to work at The Foxy Lady after
10 auditioning?
11      A.    Not particularly, no.  I mean, I'm aware
12 that many individuals have not been allowed, but I
13 don't know the circumstances.  I really have not
14 discussed that with her.
15      Q.    Aside from auditioning prospective
16 entertainers, what other responsibilities does Lori
17 have?
18            MR. MILLER:  Objection.
19      A.    My understanding is that she also does some
20 of the bookkeeping work for the corporation.
21      Q.    For Gulliver's Tavern?
22      A.    Gulliver's Tavern, correct.
23      Q.    What about John Webber, what are his
24 responsibilities with respect to The Foxy Lady as
```

**Dean Robinson, Esq. - November 28, 2016**

1  general manager?

2          MR. MILLER:  Objection.

3      A.   Well, he would be in charge of the overall

4  operation of the business on a day-to-day basis.

5      Q.   Do you know how frequently, if ever, he's

6  at the nightclub?

7          MR. MILLER:  Objection.

8      A.   Well, I would think he would be there most

9  days.  I'm sure he has days off.

10      Q.   But you are not aware of what his schedule

11  is?

12      A.   No.

13      Q.   How about Lori, what hours does she keep at

14  the club, if any?

15      A.   I would think they would vary.

16      Q.   But you don't know what?

17      A.   I would think it would vary on a day-to-day

18  basis.  I don't know what her schedule is.

19      Q.   Is there always a manager working at The

20  Foxy Lady during the hours that it's open?

21          MR. MILLER:  Objection.

22      A.   To the best of my knowledge, yes.

23      Q.   Is there always at least one house mom

24  working at The Foxy Lady during the hours that it's

**Doris O. Wong Associates, Inc.**

**Dean Robinson, Esq. - November 28, 2016**

41

```
 1   open?
 2          MR. MILLER:  Objection.
 3      A.   That I don't know.
 4      Q.   Earlier we discussed that there are hours
 5   that the club is open in which there may not be any
 6   entertainers on the premises, do you recall that?
 7      A.   I remember you asking me that, yes.
 8      Q.   How often would it be the case that The
 9   Foxy Lady would be open to the public but there
10   would be no entertainers on the premises?
11          MR. MILLER:  Objection.
12      A.   That would depend.  Again, it varies from
13   day to day.
14      Q.   Is it more often the case that there are --
15   that the facility is open to the public but there
16   are no entertainers working?
17      A.   Sorry, could you repeat that.
18      Q.   Sure.  Is it more often the case that the
19   club is open to customers but there are no
20   entertainers on the premises?
21      A.   I don't know.  I don't think anybody ever
22   kept track of that information.
23      Q.   Do you know if any of the management staff
24   would have a sense as to how often the club is open
```

**Dean Robinson, Esq. - November 28, 2016**

42

```
 1   to the public but there are dancers or no dancers on

 2   the premises?

 3            MR. MILLER:  Objection.

 4       A.   I don't have a sense of that.  I don't

 5   think anybody keeps track of that information, from

 6   what I understand.

 7       Q.   For clarity of the record, I keep

 8   mistakenly referring to the entertainers as dancers

 9   and the dancers as entertainers.  Do you understand

10   that I'm referring to the same group of people in

11   doing that?

12       A.   Yes.

13       Q.   Assuming that an entertainer is allowed to

14   work at The Foxy Lady after auditioning -- strike

15   that.  Are entertainers ever allowed to work at The

16   Foxy Lady without having to audition first?

17       A.   One thing I should point out is -- and I

18   want to be sure we understand this -- when you say

19   "work at The Foxy Lady," I take that to mean

20   providing services at The Foxy Lady.  Is that what

21   you are referring to?

22       Q.   Yes.  We are entirely on the same page.  I

23   mean physically just performing services at the

24   facility.
```

**Dean Robinson, Esq. - November 28, 2016**

43

```
 1      A.   And the question is are they ever allowed
 2  to do that without auditioning?
 3      Q.   Correct.
 4      A.   My sense is the answer is no.
 5      Q.   What do you derive that sense from?
 6      A.   Discussions that I've had with Lori
 7  Savickas.  She's very thorough.
 8      Q.   How often do you have discussions with Lori
 9  Savickas?
10      A.   From time to time.
11      Q.   Like, once a week, once a month?
12      A.   No.  If I happen to be on the premises for
13  a meeting, I'll speak to her at that time.  It's not
14  very often.
15      Q.   So assuming a dancer has auditioned and is
16  going to be allowed to work and provide services at
17  The Foxy Lady, do they then have to fill out any
18  paperwork?
19      A.   Yes.
20      Q.   What sort of paperwork are they presented
21  with?
22      A.   Well, they would need to provide some
23  identification to confirm their age, first of all.
24  They would fill out a brief form indicating their
```

**Doris O. Wong Associates, Inc.**

44

1    name, address and an emergency contact for their own

2    safety.  Then they would be presented with a

3    licensing agreement.

4                    (Documents marked as Robinson

5                    Exhibits 3-4 for identification)

6        Q.    The court reporter has handed you two

7    documents, the first of which begins with Bates

8    No. GULLIVERS 000008 at the bottom.  That's Exhibit

9    No. 3.  The second one begins with Bates

10   No. GULLIVERS 000027.  That's marked as Exhibit 4.

11   Can you identify these documents for me.

12       A.    Yes.  They appear to be copies of the

13   performer license agreements that have been executed

14   by the Plaintiffs in this case.

15       Q.    Are these the same type of agreements that

16   you referenced as being agreements that dancers

17   would sign after auditioning?

18       A.    If they were accepted, yes.

19       Q.    In Exhibit 3, which is the document Bates

20   numbered GULLIVERS 8, on the signature page, which

21   is Bates numbered GULLIVERS 18, do you see a

22   signature line for Gulliver's Tavern, Incorporated?

23       A.    (Examines document)  I do.

24       Q.    Do you know whose signature that is?

**Dean Robinson, Esq. - November 28, 2016**

45

1      A.    I don't.

2      Q.    Are these two agreements the same

3  agreements that all dancers who have been accepted

4  after auditioning sign?

5            MR. MILLER:  Objection.

6      A.    Are you talking about the time period that

7  is in question here?

8      Q.    Yes.

9      A.    Well, I don't know the answer to that

10 because I have not seen any other license agreements

11 that have been executed.

12     Q.    According to the first page of these

13 documents, it looks like they were executed on the

14 4th of January 2014.  Are you aware of any different

15 versions of these performer license agreements from

16 2012 or 2013?

17     A.    I am not aware of any, no.

18     Q.    When did Gulliver's Tavern start having

19 entertainers sign performer license agreements?

20           MR. MILLER:  Objection.

21     A.    I don't know the exact time.  It was a

22 number of years ago.

23     Q.    Was it prior to May 2012?

24     A.    Yes.

**Dean Robinson, Esq. - November 28, 2016**

46

```
 1      Q.   Since May 2012, you don't know if the
 2   performer license agreement has been changed or
 3   modified in any way?
 4           MR. MILLER:   Objection.
 5      A.   I am not aware that it has, no.
 6      Q.   Do you know who it was that prepared these
 7   performer license agreements?
 8      A.   Well, I know I had worked on them.  I'm not
 9   sure if they had any other counsel, outside counsel
10   work on them as well.
11      Q.   Specifically with regard to Exhibit 3 and
12   Exhibit 4, are these agreements that you prepared?
13   Do you know if these are the agreements that you
14   prepared?
15      A.   They appear to be, but I can't say for sure
16   if they were the exact ones that I worked on.
17      Q.   Who presents the entertainers with the
18   performer license agreements to sign?
19      A.   I believe it's Lori Savickas.
20      Q.   Does she keep blank versions of these
21   agreements at The Foxy Lady for new dancers to sign?
22      A.   I'm not sure if she does or not.
23      Q.   But it's not the case that new performer
24   license agreements are drafted up whole cloth each
```

**Doris O. Wong Associates, Inc.**

Dean Robinson, Esq. - November 28, 2016

47

1    time a new dancer passes the audition; is that

2    correct?

3              MR. MILLER:  Objection.

4         A.   I can't answer that.  I don't know about

5    any of the other ones other than these two right

6    here.

7         Q.   Are you aware of circumstances in which an

8    entertainer will be accepted after auditioning and

9    be allowed to perform at The Foxy Lady without

10   signing a performer license agreement?

11        A.   My understanding is that they are not

12   allowed until the agreement is signed.

13        Q.   You don't know whether they all sign the

14   same version of the agreement or a different version

15   of the agreement?

16        A.   No, because, like I said earlier, I have

17   not seen any other signed agreement other than these

18   two.

19        Q.   But in your role as the corporate counsel

20   for Gulliver's Tavern, you are not aware of other

21   versions of performer license agreements that

22   dancers have signed?

23             MR. MILLER:  Objection.  To be clear, this

24   is not 30(b)(6) testimony.  You can respond.

**Dean Robinson, Esq. - November 28, 2016**

48

1    A.   Are you asking if I have ever seen another

2  version?

3    Q.   Correct.

4    A.   No, I have never seen another version.

5    Q.   Another version that appears different than

6  Exhibits 3 or 4?

7    A.   Well, I just gave these two documents a

8  cursory glance so it's hard for me to say, but these

9  appear to be ones that they were using for the

10  entertainers.  I can't say if any of them were

11  modified at any later date, though.  I just don't

12  know.

13    Q.   Are you aware of circumstances in which a

14  dancer has ever attempted to negotiate or change the

15  terms in the performer license agreement that she's

16  been presented with?

17    A.   I am not aware of any circumstances, no.

18    Q.   Would Lori be aware of any circumstances in

19  which that occurred?

20        MR. MILLER:  Objection.

21    A.   I would assume so.

22    Q.   Does Gulliver's Tavern maintain copies of

23  the executed performer license agreements that

24  dancers sign?

**Dean Robinson, Esq. - November 28, 2016**

49

```
 1          MR. MILLER:  Objection.
 2      A.   I would assume so.  Again, we are talking
 3  about the time period from --
 4      Q.   Yes, May 2012.
 5      A.   Yes, I would assume so.
 6      Q.   What would you base that assumption on?
 7      A.   It's just something that I think they would
 8  want to keep in the normal course of recordkeeping.
 9      Q.   Do you know where those agreements, if they
10  are kept, would be kept?
11      A.   No, I do not.
12      Q.   Looking at Exhibit 3, Paragraph 7, do you
13  see Paragraph 7, which is captioned "Services
14  Provided by the Club"?
15      A.   Yes.
16      Q.   It lists several items here, and the
17  paragraph opens, "In addition to the use of the Club
18  Premises, the Club shall provide the following
19  services at the Club."  Would my assumption that the
20  club providing these services means that it pays for
21  some of these services unless specified otherwise in
22  this contract?
23          MR. MILLER:  Objection.
24      A.   Well, to the extent that there's any kind
```

**Doris O. Wong Associates, Inc.**

**Dean Robinson, Esq. - November 28, 2016**

50

```
 1    of a fee due, yes.
 2         Q.    So according to this, the club pays for the
 3    music?
 4              MR. MILLER:  Objection.
 5         A.    Yes.
 6         Q.    And it pays for the dressing facilities,
 7    the lockers, the wait staff, and the beverage service?
 8         A.    It wouldn't pay anything for the dressing
 9    room and the lockers because they are already there.
10    They are part of the facility.  The wait staff and
11    the beverage service would be provided by the
12    waitresses and the bartenders, yes.
13         Q.    Then "Advertisement of the Club," that's
14    something that is provided by Gulliver's Tavern?
15         A.    Yes.
16         Q.    Meaning that to the extent that advertising
17    costs money, Gulliver's Tavern pays that bill?
18              MR. MILLER:  Objection.
19         A.    If you are talking about general
20    advertising of the club, then obviously the club
21    would pay for that.  As it says here, if it's
22    specific to the performer, the performer shall pay
23    the cost.
24         Q.    Are you aware of circumstances in which
```

**Dean Robinson, Esq. - November 28, 2016**

51

```
 1    performers have had advertising specifically for

 2    them?

 3         A.    I'm not aware of any, no.

 4         Q.    Are you aware of circumstances in the past

 5    three or four years in which a performer has paid

 6    for the cost and expense of advertising?

 7              MR. MILLER:   Objection.

 8         A.    No, I'm not aware of that.

 9         Q.    Do you know of anyone that would be aware

10    of that?

11         A.    I'm assuming that Lori Savickas would know.

12    I don't know for sure, though.

13         Q.    What sort of general advertising does

14    Gulliver's Tavern pay for?

15         A.    I think that's been provided in the

16    discovery.   There's been copies of at least

17    newspaper ads that were provided.   I know there's

18    newspaper advertising that is done.

19         Q.    What about fliers or posters?

20         A.    They may.

21         Q.    Have any of the entertainers been featured

22    in any of these newspaper ads or other advertisements?

23         A.    Well, when you refer to "the entertainers,"

24    I don't understand what you are talking about.
```

**Dean Robinson, Esq. - November 28, 2016**

52

```
 1       Q.   I'm referring to the women that perform the
 2   dancing services at The Foxy Lady.
 3       A.   Not to my knowledge.
 4       Q.   When you say not to your knowledge, you
 5   mean you don't know or you mean that in the
 6   advertisements that you have seen, there have not
 7   been entertainers that --
 8       A.   Well, I'm assuming that the provisions of
 9   this agreement would control any advertising for a
10   specific performer and that they would be paying for
11   that.  That's what I'm basing my answer on.
12       Q.   But you are not aware of a general
13   advertisement, such as a newspaper ad or flier, that
14   features an entertainer on it not by name but just
15   their image, their photograph?
16       A.   No, I am not aware of that.
17       Q.   So going back to Exhibit 3 on document
18   Bates No. GULLIVERS 19, there's an Exhibit A
19   attachment, do you see that?
20       A.   (Examines document)  Yes.
21       Q.   Do you know who drafted Exhibit A?
22       A.   Well, I had a hand in drafting it after
23   discussion with several of the managers at The Foxy
24   Lady.
```

**Dean Robinson, Esq. - November 28, 2016**

1    Q.   When did that discussion take place?

2    A.   It was a number of years ago, I don't know,

3  seven, eight, nine years ago.

4    Q.   So prior to 2012?

5    A.   Oh, yes.

6    Q.   Do you know if this Exhibit A has been

7  included as an attachment to all the performer

8  license agreements in use since May 2012?

9    A.   I don't know the answer to that.

10    Q.   Would Lori know the answer to that?

11    MR. MILLER:  Objection.

12    A.   She may.

13    Q.   Exhibit A, for lack of a better word, the

14  title seems to be "Club Rules for Entertainers"; is

15  that fair to say?

16    MR. MILLER:  Objection.

17    A.   That's what it says, yes.

18    Q.   Have these bulleted items changed at all

19  over the past three years?

20    A.   I don't think so, but I cannot say for sure

21  because I have not seen all of the agreements that

22  have been executed during that time frame.

23    Q.   What was the thought process that went into

24  identifying these particular items under the heading

**Doris O. Wong Associates, Inc.**

**Dean Robinson, Esq. - November 28, 2016**

54

1    "Club Rules for Entertainers"?

2            MR. MILLER:  I will object to the form.  I

3    will instruct you to exclude from the response any

4    attorney-client communications.

5        A.   Well, then, I can't answer.

6        Q.   Okay.  So the thought process that went

7    into crafting this was all part of an

8    attorney-client conversation or communication?

9        A.   I would say so, yes.

10       Q.   Would it be fair to say that these are the

11   rules that the entertainers are required to follow

12   while performing at The Foxy Lady?

13           MR. MILLER:  Objection.

14       A.   I don't think I would phrase it that way,

15   no.

16       Q.   How would you phrase it?

17       A.   Well, there's no requirement.  I think

18   these rules are more for their own safety than

19   anything else, also to make sure that nothing is

20   done by anybody really to put the licenses, the

21   entertainment and liquor license, in jeopardy.  So

22   it's just common sense guidelines, is what I would

23   call them.

24       Q.   Are you aware of circumstances in which

**Dean Robinson, Esq. - November 28, 2016**

55

1  managers have enforced these rules with respect to

2  the entertainers at The Foxy Lady?

3  MR. MILLER:  Objection.

4  A.  Well, I believe one of your clients was let

5  go because she brought drugs onto the premises.  So

6  yes, I am aware of that.

7  Q.  Are you aware of any other circumstances?

8  A.  Personally?

9  Q.  Sure.

10  A.  In the last three years?

11  Q.  Yes.

12  A.  No.

13  Q.  Aside from the incident that you just

14  mentioned with regard to one of the Plaintiffs in

15  this case?

16  A.  I am not, but that doesn't mean it didn't

17  happen.  They don't tell me every time someone fails

18  to follow a rule like that.

19  Q.  What is the reason for stating that the

20  entertainer must possess proper picture

21  identification showing that you are at least

22  21 years old?

23  MR. MILLER:  Objection.

24  A.  To make sure that the entertainers are of

**Dean Robinson, Esq. - November 28, 2016**

56

```
 1    an age that they won't run afoul of the state and

 2    local statutes and ordinances.

 3         Q.    Do you have to be 21 years old in order to

 4    work as an entertainer at The Foxy Lady?

 5              MR. MILLER:  Objection.

 6         A.    According to this you do, yes.

 7         Q.    As a practical matter, do you know if

 8    entertainers are expected to be 21 years old in

 9    order to work at The Foxy Lady?

10         A.    I believe so, yes.

11         Q.    The second item on this list is "Have

12    respect for other entertainers."  What is the

13    rationale or the basis for that?

14         A.    Again, I think it's common sense.  I would

15    think you would always want to have individuals who

16    are performing services with other individuals to

17    treat them with respect.

18         Q.    The third item is, "Do not leave the

19    premises with a customer or meet a customer outside

20    the premises."  What is the basis or the rationale

21    for that?

22              MR. MILLER:  Objection.

23         A.    Well, clearly I think the safety of the

24    entertainer is what they are trying to ensure there.
```

**Doris O. Wong Associates, Inc.**

**Dean Robinson, Esq. - November 28, 2016**

57

```
 1      Q.   I assume that the item, "No possession or
 2  use of illegal drugs on the premises" is in order to
 3  comply with drug laws?
 4          MR. MILLER:  Objection.
 5      A.   Well, certainly that's a primary
 6  consideration, but again, as I mentioned earlier,
 7  the club has a vested interest in maintaining their
 8  entertainment and liquor licenses, and so they want
 9  to make sure that events don't occur that would put
10  those licenses in jeopardy.  That's part of it as
11  well.
12      Q.   Is that the same rationale for the "No
13  excessive drinking in the club" item under that?
14          MR. MILLER:  Objection.
15      A.   I would assume so, safety as well.
16      Q.   Safety of who?
17      A.   Well, excessive drinking is not good for
18  your health.
19      Q.   Any reason other than those two items?
20      A.   Which two items?
21      Q.   The safety and the not jeopardizing the
22  liquor license or other licenses.
23      A.   I would think those would be the reasons,
24  yes.
```

**Dean Robinson, Esq. - November 28, 2016**

58

```
 1      Q.   Are the entertainers allowed to consume
 2   alcoholic beverages at The Foxy Lady?
 3           MR. MILLER:  Objection.
 4      A.   I don't know if they are allowed to.  They
 5   may.  I just don't know.
 6      Q.   Do you know who would know that?
 7           MR. MILLER:  Objection.
 8      A.   Well, I would think Lori Savickas would
 9   know.
10      Q.   The next item is "You must be dressed
11   before you leave the stage or dance area."  What is
12   the reason for that item?
13      A.   I'm guessing that they probably don't want
14   entertainers walking around the club premises
15   without clothes on.  Again, that's just...
16      Q.   But the performances that the entertainers
17   do at the club involve them removing their clothes,
18   correct?
19           MR. MILLER:  Objection.
20      A.   Yes, while they are on the stage or a dance
21   area.
22      Q.   Skipping the next two, the item reads, "Two
23   feet are to remain on the floor when in any dance
24   area," do you see that?
```

**Doris O. Wong Associates, Inc.**

**Dean Robinson, Esq. - November 28, 2016**

59

```
 1      A.    Yes.
 2      Q.    What is the rationale behind that line
 3   item?
 4            MR. MILLER:  Objection.
 5      A.    Well, I'm sure that is there to discourage
 6   activities which, again, may jeopardize the license
 7   and/or be illegal.
 8      Q.    What about the item "All booths, cabanas
 9   and other semi private rooms are subject to
10   inspection at any time," what is the reason or
11   rationale for that?
12            MR. MILLER:  Objection.
13      A.    I would say the same.
14      Q.    Being safety and not jeopardizing the
15   licenses?
16      A.    Yes, and not participating in illegal
17   activities.
18      Q.    The next item is "All purses, bags and
19   lockers are subject to searches if drug activity is
20   suspected."  Have such searches been conducted at
21   The Foxy Lady during the past three years that you
22   are aware of?
23      A.    I'm not aware that they have.  I just don't
24   know.
```

**Dean Robinson, Esq. - November 28, 2016**

60

1     Q.    What was the reason for implementing this

2  item?

3           MR. MILLER:  Objection.

4     A.    Well, as you can see from your own client,

5  there are times when illegal substances are brought

6  onto the club premises, and so they really want to

7  make sure that there are no illegal activities going

8  on within the club premises.

9     Q.    What is the reason behind the item that

10 says that no item is allowed to enter the DJ area

11 for any reason?

12          MR. MILLER:  Objection.  I think you

13 misread that.

14    Q.    What did I say?  In any event, what is the

15 reason behind that item?

16    A.    Well, I'm guessing, but I would think that

17 you want to make sure that there's no interference

18 with the DJ as he is performing his services.

19    Q.    Have there been circumstances in which an

20 entertainer has interfered with the DJ during the

21 performance of his services?

22          MR. MILLER:  Objection.

23    A.    In the last three years?

24    Q.    Uh-huh.

**Dean Robinson, Esq. - November 28, 2016**

61

```
 1      A.   Not that I'm aware of.
 2           MR. MILLER:  If you are switching gears,
 3   Brant, a bathroom break would be good.
 4           MR. CASAVANT:  Sure.  We can take a break.
 5           (Recess at 11:09 a.m.)
 6                  (Documents marked as Robinson
 7                  Exhibits 5-6 for identification)
 8   BY MR. CASAVANT:  (11:21 a.m.)
 9      Q.   The court reporter just handed you what
10   were marked as Exhibits 5 and 6.  Exhibit 5 is Bates
11   No. GULLIVERS 000007, and Exhibit 6 is Bates
12   No. GULLIVERS 000026.  Could you identify what these
13   document are.
14      A.   These appear to be the information sheet,
15   sheets that were prepared by your clients when they
16   began providing -- before they began providing
17   services at The Foxy Lady.
18      Q.   Services as entertainers?
19      A.   Yes.
20      Q.   When you say "prepared," do you mean they
21   filled in the information on these forms?
22           MR. MILLER:  Objection.
23      A.   Well, I didn't see them do it, but I am
24   assuming that that's their writing.
```

**Doris O. Wong Associates, Inc.**

**Dean Robinson, Esq. - November 28, 2016**

62

1     Q.   But they didn't prepare these in the sense
2  that they typed up the club position, shift, start
3  date items?
4     A.   I would say not.
5     Q.   Are these forms filled out by all
6  entertainers who have obtained a license to perform
7  at The Foxy Lady?
8          MR. MILLER:  Objection.
9     A.   Well, I'm not sure they've obtained a
10 license.  They are being allowed to perform
11 services.  I would say that this is a fair
12 representation of a form that they would fill out,
13 yes.
14    Q.   Do you know who created these forms?
15         MR. MILLER:  Objection.
16    A.   I do not.
17    Q.   So it's fair to say you did not create
18 these forms?
19    A.   I did not.
20    Q.   Do you know if Gulliver's Tavern keeps
21 these filled out sheets for their dancers anywhere?
22         MR. MILLER:  Objection.
23    A.   I guess that would vary on the
24 entertainers.  I don't know where they would keep

**Doris O. Wong Associates, Inc.**

**Dean Robinson, Esq. - November 28, 2016**

63

1  them.  I just don't know that.

2      Q.    Are you familiar with the term known as a

3  "dancer file"?

4      A.    Dancer file?

5      Q.    Yes.

6      A.    No.  I never heard the term.

7      Q.    Do you know if Gulliver's Tavern maintains

8  records for the entertainers that perform services

9  at The Foxy Lady?

10          MR. MILLER:  Objection.

11     A.    Do I know if they do?

12     Q.    Yes.

13     A.    Again, I think that would depend.  I don't

14  know for sure.  And if you are referring to the

15  period of time from May 2012, I would think that

16  they would have a file for any entertainer who was

17  presently providing services at the club.

18     Q.    Do you have a sense as to what items or

19  documents would be in that file?

20     A.    More than likely it would include these

21  information sheets that have been marked as

22  Exhibits 5 and 6 and the performer license agreement

23  that had been executed by the individual.  Again, I

24  have not seen any other information sheets besides

**Dean Robinson, Esq. - November 28, 2016**

64

```
 1    the two that I have in front of me, so I can't say
 2    for sure.
 3         Q.   Can you think of any other documents that
 4    would be in those files besides the two items that
 5    you just identified?
 6              MR. MILLER:  Objection.
 7         A.   No, because I have never seen a file.  I
 8    can't answer that.
 9         Q.   And you have no sense as to where these
10    files would be kept physically?
11              MR. MILLER:  Objection.
12         A.   No, I don't.
13         Q.   Besides the performer license agreement and
14    these information sheets, are you aware of any other
15    document that entertainers fill out after they have
16    auditioned and given permission to perform services
17    at The Foxy Lady?
18         A.   I am not.
19         Q.   Why does Gulliver's Tavern have their
20    entertainers fill out these information sheets which
21    are Exhibits 5 and 6?
22         A.   Well, certainly one of the reasons is to
23    provide an emergency contact for their own safety in
24    case of an emergency; as you can see, they ask for a
```

**Dean Robinson, Esq. - November 28, 2016**

65

1  copy of their identification, in this case driver's

2  license, for proof of age.

3      Q.   Why does Gulliver's Tavern request that

4  they provide what looks like their Social Security

5  number?

6          MR. MILLER:  Objection.

7      A.   I don't know.

8      Q.   Thanks.  You can put that to the side.

9          Has it ever occurred that an entertainer

10 has lost permission or had their permission to

11 perform at The Foxy Lady revoked?

12     A.   Yes.

13     Q.   What are the circumstances in which that

14 has occurred?

15     A.   One of your clients lost her right to

16 provide services because she had brought drugs onto

17 the premises.

18     Q.   Are you aware of any other circumstances?

19         MR. MILLER:  Objection.

20     A.   Well, those are the only two files that I

21 have looked at, and so I'm not aware of any others,

22 no.

23     Q.   Other than bringing illegal substances onto

24 club property, what are some of the other reasons

**Doris O. Wong Associates, Inc.**

**Dean Robinson, Esq. - November 28, 2016**

66

```
 1    for why an entertainer might lose permission to
 2    perform at The Foxy Lady?
 3              MR. MILLER:  Objection.
 4       A.   I can't answer that.  I mean, just not
 5    having seen any of the other files, I just don't
 6    know.
 7       Q.   Who would make the decision to revoke
 8    permission for an entertainer to work at The Foxy
 9    Lady?
10              MR. MILLER:  Objection.
11       A.   I think that would depend on the case.
12       Q.   What would it depend on?
13       A.   Just the circumstances of each case.  I
14    can't answer that because I don't know in what other
15    cases an entertainer has been told she can no longer
16    perform services.  I don't know who would make that
17    decision in those cases.
18       Q.   Who made the decision in the case of the
19    Plaintiff in this matter that you were referring to?
20       A.   I don't know who did that.
21       Q.   Could Lori revoke an entertainer's right to
22    perform at the club?
23              MR. MILLER:  Objection.
24       A.   I don't know.  Again, I can't answer that
```

**Dean Robinson, Esq. - November 28, 2016**

1   because I have not seen any of the other

2   circumstances.

3        Q.   So you don't know whether she would have

4   the authority to do that?

5        A.   She may, but without having seen the actual

6   facts of the case, I can't say for sure.

7        Q.   What about Mr. Webber, would he have the

8   authority as general manager to tell a dancer that

9   she cannot perform at the club anymore?

10       A.   Same answer.  Again, that would depend on

11  what happened.

12       Q.   Are you aware of any circumstances in which

13  a dancer has had her permission to work at the club

14  revoked and then was allowed to come back at a later

15  date?

16       A.   I am not aware of any in the time period

17  that we're talking about.

18       Q.   Aside from dancing, do the entertainers

19  provide any other services at The Foxy Lady?

20            MR. MILLER:  Objection.

21       A.   No.

22       Q.   How are the dancers compensated for the

23  work that they do at The Foxy Lady?

24       A.   They are not compensated by The Foxy Lady.

68

```
 1        Q.    Are they compensated in any other way?

 2        A.    Well...

 3        Q.    Not by The Foxy Lady but in any sense.

 4        A.    Well, they may receive gratuities from

 5   customers, but nothing from The Foxy Lady.

 6        Q.    Is it fair to say that their sole source of

 7   remuneration from working at The Foxy Lady would be

 8   money paid to them by customers?

 9        A.    Yes.

10        Q.    Do the entertainers have to pay any sort of

11   a fee to Gulliver's Tavern in order to perform at

12   The Foxy Lady?

13        A.    No.

14        Q.    Do they have to pay any sort of a fee to

15   any entity in order to perform at The Foxy Lady?

16        A.    No.

17        Q.    Has that changed at all in the past three

18   years?

19        A.    Not that I'm aware of.

20        Q.    Have the entertainers had to pay rent in

21   order to perform at the club?

22        A.    No, they don't have to.

23        Q.    Has it happened, whether it's required or

24   permitted or otherwise, that entertainers have paid
```

**Dean Robinson, Esq. - November 28, 2016**

69

```
 1   rent or fees to perform at The Foxy Lady?
 2        A.    It has happened but it's extremely rarely.
 3        Q.    What do you mean by "extremely rarely"?
 4        A.    I can probably count the number of times on
 5   both hands.
 6        Q.    That an entertainer has paid a sum of money
 7   to provide services at The Foxy Lady?
 8        A.    Yes.
 9        Q.    How would you know that it's only happened
10   enough times to count on two hands?
11        A.    Because I have had discussions with
12   managers at The Foxy Lady, and they have indicated
13   that.
14        Q.    Indicated that it doesn't happen --
15        A.    Almost never.
16        Q.    That it almost never happens?
17        A.    Yes.
18        Q.    Returning to Exhibit 3, which is the
19   agreement that would have Levi's name on it, if you
20   turn to the second page, Paragraph 3 says, "Rental
21   Fee," do you see that paragraph?
22        A.    I do.
23        Q.    That refers to the performer agreeing to
24   pay the club a rental or license fee as posted on
```

**Doris O. Wong Associates, Inc.**

**Dean Robinson, Esq. - November 28, 2016**

70

```
 1    the premises, do you see that?
 2         A.    I do.
 3         Q.    Is that paragraph not accurate?
 4         A.    It's accurate but seldom enforced.
 5         Q.    So it's seldom the case that management at
 6    The Foxy Lady collects a rental fee from the
 7    entertainers?
 8         A.    That's correct.
 9         Q.    Aside from your communications with the
10    managers about the rental fee, do you have any other
11    independent basis for determining how often
12    entertainers have paid a rental fee to work at the
13    club?
14         A.    No.
15         Q.    To the extent that entertainers have paid a
16    rental fee, who would they pay that to?
17              MR. MILLER:  Objection.
18         A.    I don't know.  I guess it would depend on
19    the circumstances.  I just don't know.
20         Q.    Would the managers who you communicated
21    with about this issue know?
22              MR. MILLER:  Objection.
23         A.    They may.
24         Q.    What is your understanding as to why it is
```

**Dean Robinson, Esq. - November 28, 2016**

71

1    that the rental fee is almost never collected from

2    entertainers?

3          A.    I don't have an understanding because I

4    didn't ask that question.

5          Q.    But it's a term in the performer license

6    agreement?

7          A.    Yes.

8          Q.    And you yourself have drafted some version

9    of the performer license agreement at some point; is

10   that correct?

11         A.    That's correct.

12         Q.    Do you recall including a provision about

13   the rental fee?

14         A.    Yes.

15         Q.    Why include it in the performer license

16   agreement if it's almost never going to be enforced

17   or applied?

18         A.    I can't speak for the motivations as to why

19   the fee was or was not collected.  It's in the

20   agreement, and that's as far as my part of it went.

21         Q.    To the extent the rental fee has been paid

22   or collected at any point, do you have a sense as to

23   how much it was?

24         A.    No, I don't.

**Doris O. Wong Associates, Inc.**

**Dean Robinson, Esq. - November 28, 2016**

72

1      Q.   Are you aware of a circumstance in which a

2   performer has had her permission to work at the club

3   revoked as a result of failing to pay a rental fee?

4      A.   I am not.

5      Q.   Are you aware of a circumstance in which a

6   dancer has had permission to work at the club

7   revoked due to getting into a physical altercation

8   with a customer?

9      A.   No, I'm not aware of any -- of the

10  circumstances of any termination of the right to

11  perform other than these two cases that are in front

12  of us now.

13     Q.   So if I went through a specific list of

14  examples of entertainers having their permission

15  terminated to work at The Foxy Lady, you would not

16  be able to provide me with any answer as to whether

17  you know that happened or not, again, aside from

18  these two individuals who are the Plaintiffs in this

19  case?

20     A.   Correct.

21     Q.   Has anyone at The Foxy Lady ever collected

22  any other fees from the entertainers besides the

23  rental fee?

24          MR. MILLER:   Objection.

**Dean Robinson, Esq. - November 28, 2016**

73

```
 1        A.    I am not aware of it, no.
 2        Q.    Are you familiar with a term called a "late
 3   fee"?
 4        A.    Late fee?
 5        Q.    Yes.
 6        A.    No.  I have not heard that term.
 7        Q.    Do you know if the entertainers at The Foxy
 8   Lady are expected to be available to work a certain
 9   number of shifts per week?
10             MR. MILLER:  Objection.
11        A.    No.  I don't think they are expected to,
12   no.  That's not my understanding.
13        Q.    What is your understanding?
14        A.    That they are not expected to.
15        Q.    So entertainers can work any number of
16   shifts that they would like to at The Foxy Lady?
17        A.    Yes.
18        Q.    Be it one shift per week or 50 shifts per
19   week?
20        A.    That's correct.
21        Q.    You are not aware of a guideline that they
22   be available to work at least, say, three shifts per
23   week?
24             MR. MILLER:  Objection.
```

**Doris O. Wong Associates, Inc.**

**Dean Robinson, Esq. - November 28, 2016**

74

1      A.   If such a guideline exists -- and I'm not

2   sure it does -- I'm sure it's just a suggestion, not

3   a requirement.

4      Q.   Do you know how scheduling of the

5   entertainers works at The Foxy Lady?

6      A.   There is no scheduling.  They come and go

7   as they please.

8      Q.   So entertainers are not scheduled to work

9   particular shifts in advance?

10      A.   No.

11      Q.   How does the facility ensure that it has

12   any entertainers on site at any particular time?

13      A.   Well, I guess they just have to wait and

14   see who shows up.

15      Q.   So has that been consistently the case

16   since May of 2012, that the club just waits to see

17   who shows up?

18      A.   I'm sure it has.

19      Q.   How are you so sure?

20      A.   Because I'm not aware that things have

21   changed.

22      Q.   So management at the club doesn't take any

23   steps to ensure that there will be entertainers on

24   site during any particular time of day or day of the

**Dean Robinson, Esq. - November 28, 2016**

75

1    week?

2         A.    Not that I'm aware of.

3         Q.    Are you aware of particular shifts, like a

4    morning shift, afternoon shift, evening shift, that

5    entertainers work?

6         A.    I'm not sure I understand what you mean by

7    "shift."  Are you talking about blocks of time?

8         Q.    Yes.

9         A.    No, I don't know.  I mean, obviously the

10   club is open for certain hours.  You know, there's

11   going to be people coming and going throughout.

12        Q.    But as far as you are aware, at The Foxy

13   Lady the entertainers don't work scheduled shifts,

14   meaning from, like, 4:00 p.m. to 10:00 p.m., or

15   10:00 p.m. to 1:00 a.m., or something along those

16   lines?

17        A.    No.

18                   (Documents marked as Robinson

19                   Exhibits 7-8 for identification)

20        Q.    The court reporter handed you what we've

21   marked as Exhibits 7 and 8.  No. 7 is Bates

22   No. GULLIVERS 1, and No. 8 is GULLIVERS 22.  Can you

23   identify what these are for me.

24        A.    They appear to be copies of -- they are

**Doris O. Wong Associates, Inc.**

**Dean Robinson, Esq. - November 28, 2016**

76

```
 1    labeled, "Performance Record," and they're for the
 2    two Plaintiffs in this case.
 3         Q.   Aside from being labeled "Performance
 4    Record," do you have an independent understanding of
 5    what they are?
 6         A.   My understanding is that these documents
 7    were used to keep track of the times that these
 8    individuals did provide services at the club.
 9         Q.   You used the past tense there.  You mean
10    this records prior time, like times they performed
11    previously?
12         A.   No.  I used the past tense because we are
13    talking today about an event that happened in the
14    past.
15         Q.   I see.  Okay.  Do you know who filled out
16    these particular performance records, Exhibits 7 and
17    8?
18         A.   I don't.
19         Q.   Does The Foxy Lady maintain performance
20    records for all of its entertainers?
21         A.   I cannot answer that because, again, I only
22    looked at these two files.
23         Q.   Do you know who would know whether The Foxy
24    Lady has maintained performance records for its
```

**Doris O. Wong Associates, Inc.**

**Dean Robinson, Esq. - November 28, 2016**

1  dancers?

2      A.   It would depend.  I mean, it's hard for me

3  to say.

4      Q.   Do you know if these performance records

5  were maintained in the files for Ms. Levi and

6  Ms. Chicoine?

7      A.   I don't know that.

8      Q.   Exhibit 7 and Exhibit 8 show days that the

9  two Plaintiffs either worked at the club as an

10  entertainer or failed to show up or walked in; is

11  that fair to say?

12      A.   It would appear that that's the case, yes.

13      Q.   At the bottom of each page, there's a -- I

14  don't know how to describe it.  There's sort of a

15  caption for various acronyms, one of which is "SU,"

16  which I guess, according to this document, stands

17  for show up, do you see that?

18      A.   I do.

19      Q.   Looking at Exhibit 7, for instance, there

20  are several instances of SU, SU, which at least,

21  again, according to the document, means that she

22  showed up, I assume; is that fair to say?

23          MR. MILLER:  Objection.

24      A.   Well, again, I was not there when they

**Doris O. Wong Associates, Inc.**

**Dean Robinson, Esq. - November 28, 2016**

78

1    filled these out, when they were filled out.  If you

2    believe the legend at the bottom of the page, that's

3    apparently what it indicates.

4        Q.   Were the days on these calendars filled out

5    contemporaneously with the particular day of the

6    week of that month?

7             MR. MILLER:  Objection.

8        A.   I don't know at what time period they were

9    filled out.

10       Q.   So you don't know if they were filled out

11   after the fact or the same day?

12       A.   No, I don't know that.

13       Q.   On the legend there's an item for no show.

14   It says, "NS," do you see that?

15       A.   Yes.

16       Q.   If Ms. Weldon or Ms. Chicoine didn't have a

17   preset schedule to work as an entertainer at the

18   facility, why would there be a no show option?

19            MR. MILLER:  Objection.

20       A.   Most likely just for recordkeeping, nothing

21   more than that really.

22       Q.   Why keep track of when a dancer, such as

23   the Plaintiffs, don't show up if they are never

24   expected to show up and they can just walk in

**Dean Robinson, Esq. - November 28, 2016**

79

```
 1    whenever they like?

 2         A.    Just to complete the record.  I mean,

 3    there's no other reason that I can think of.

 4         Q.    But, then, shouldn't every day on this

 5    calendar they are not at The Foxy Lady say "NS" on

 6    it on days they didn't work?

 7              MR. MILLER:  Objection.

 8         A.    I don't know the answer to that.  I had no

 9    involvement in the preparation of these documents,

10    so I can't answer that.

11         Q.    So your testimony today is that the

12    entertainers at The Foxy Lady have no preset

13    schedule that they are expected to work at The Foxy

14    Lady?

15         A.    Correct.

16         Q.    And you are not aware of any member of the

17    management staff who makes schedules for the dancers

18    or calls them to arrange them to work in particular

19    shifts or anything along those lines?

20         A.    No, I am not.  I don't think that happens.

21         Q.    Are you aware of dancers being required to

22    work particular events?

23              MR. MILLER:  Objection.

24         A.    No.  I've never heard that.
```

**Doris O. Wong Associates, Inc.**

**Dean Robinson, Esq. - November 28, 2016**

80

1      Q.    On Fridays, during the past three years,

2   has The Foxy Lady offered a service called "Legs and

3   Eggs Brunch"?

4      A.    I believe they have, yes.

5      Q.    What is your understanding as to what that

6   event is?

7      A.    I believe that that is just an event that

8   occurs on that particular day of the week that is

9   designed to increase business for that period of

10  time.

11     Q.    What is offered at the Legs and Eggs Brunch?

12     A.    There is a brunch, so there's food, and of

13  course alcohol and perhaps entertainment.

14     Q.    Entertainment in what form?

15     A.    The dancing.

16     Q.    Are you aware of any circumstances in which

17  an entertainer was told they need to work an Eggs

18  and Legs Brunch?

19     A.    No, I am not.

20     Q.    You are not aware of a circumstance in

21  which a manager has told a specific dancer that they

22  need to work an Eggs and Legs Brunch?

23     A.    No.  They are not told they have to work.

24  It's all voluntary.

**Dean Robinson, Esq. - November 28, 2016**

81

1      Q.    Under any circumstance?

2      A.    As far as I know.

3      Q.    Does the facility have a Monday Night

4   Football evening?

5      A.    I don't know if they still are doing that.

6      Q.    But were they doing it at some point in the

7   last three years?

8      A.    They may have.

9      Q.    Does the nightclub offer entertainment in

10   the form of dancers at that event?

11          MR. MILLER:   Objection.

12     Q.    Or did it back when it was happening?

13          MR. MILLER:   Objection.

14     A.    I cannot say for sure.  If the club was

15   open during that time -- and I'm assuming that it

16   was -- and entertainers showed up to dance, they

17   probably did.

18     Q.    But it's not the case, you are saying, that

19   a manager would have told any dancers that they

20   needed to work on a Monday Night Football shift?

21     A.    I am not aware of any circumstance where

22   that happened, no.

23     Q.    Turning back quickly to Exhibits 7 and 8,

24   the performance records, do you know if Gulliver's

**Dean Robinson, Esq. - November 28, 2016**

82

1    Tavern or The Foxy Lady maintains these records for

2    any of the other individuals that work at The Foxy

3    Lady?

4         A.    I don't know that.

5         Q.    Are there stages inside The Foxy Lady?

6         A.    Are you referring to dance stages?

7         Q.    Yes.

8         A.    Yes.

9         Q.    How many are located within the facility?

10        A.    My best recollection from the last time I

11   was in that part of the club would be three or four.

12        Q.    Are those stages located on both floors of

13   the facility or just one floor?

14        A.    I believe on both.

15        Q.    Do the dancers use those stages to perform?

16        A.    Yes.

17        Q.    Are the dancers scheduled to perform on the

18   stage a certain number of times per night or per

19   day?

20        A.    No.

21        Q.    So they can perform on stage as many times

22   as they want?

23        A.    Yes.

24        Q.    How is it determined who will do a stage

**Dean Robinson, Esq. - November 28, 2016**

1  performance at what time or who will use which

2  stage?

3      A.    Well, when an entertainer shows up at the

4  club indicating that they want to perform, then it's

5  up to the house mom to indicate which stage they

6  would dance on at that point.

7      Q.    When you say "it's up to the house mom,"

8  what do you mean by that?

9      A.    Well, there has to be somebody who informs

10 the entertainers which stage they can utilize to

11 perform their services, and that's the job of the

12 house mom.

13     Q.    How many house moms are usually present at

14 the club each day?

15          MR. MILLER:   Objection.

16     A.    At any one time or during the whole day?

17     Q.    At any one time.

18     A.    My understanding is there's usually one.

19     Q.    Are the entertainers expected to perform a

20 certain number of stage performances while they are

21 at the club?

22     A.    No.

23     Q.    During the stage performances, the dancers

24 collect tips from customers; is that correct?

**Dean Robinson, Esq. - November 28, 2016**

84

1     A.    Yes.

2     Q.    Do they get to keep all that money?

3     A.    I would assume so.

4     Q.    They don't have to pay the facility a

5     portion of that money at the end of the shift?

6     A.    Well, are you talking about the dancing on

7     stage?

8     Q.    Yes.

9     A.    No.

10    Q.    So there isn't any specific fee or

11    commission that the venue collects for stage

12    performances?

13    A.    No.

14    Q.    How is it determined what particular music

15    the dancers will perform to while on stage?

16    A.    That's up to the DJ.

17    Q.    So he decides what music will be used?

18    A.    Yes.

19    Q.    Do the dancers have any input on that?

20          MR. MILLER:   Objection.

21    A.    They may make suggestions, I don't know,

22    but I think the ultimate decision is up to the DJ.

23    Q.    When an entertainer is not performing on

24    stage, what are they typically doing at the

**Dean Robinson, Esq. - November 28, 2016**

85

```
 1    facility?

 2              MR. MILLER:  Objection.

 3         A.   I don't know.  I have not been in there

 4    during that time.

 5         Q.   Is there an expectation by the club as to

 6    what they should be doing?

 7         A.   No.  They are free to associate with

 8    customers if they feel that's what they want to do.

 9         Q.   Is there a locker room at The Foxy Lady

10    that the entertainers can use?

11         A.   Yes.

12         Q.   Is it a private locker room?  Customers are

13    not allowed to enter?

14         A.   Absolutely not.  Customers cannot go in.

15         Q.   So absolutely it's private?

16         A.   Yes.

17         Q.   When an entertainer is not performing on

18    stage, can she just hang out in the locker room the

19    whole time?

20         A.   Yes.

21         Q.   Could an entertainer show up at The Foxy

22    Lady, perform on stage just once and then just leave?

23         A.   Yes.

24         Q.   Are you aware of a circumstance in which
```

**Dean Robinson, Esq. - November 28, 2016**

86

```
 1     management at The Foxy Lady has communicated to the

 2     entertainers they need to be there for a particular

 3     duration once they show up?

 4         A.    No.

 5         Q.    Are you aware of any circumstances that

 6     managers at The Foxy Lady communicated to dancers

 7     that they need to perform a certain number of stage

 8     performances while they are there?

 9             MR. MILLER:  Objection.

10         A.    No.

11             MR. CASAVANT:  Off the record.

12             (Discussion off the record)

13             (Recess at 11:58 a.m.)

14     BY MR. CASAVANT:  (12:05 p.m.)

15         Q.    Does management at the club have a

16     preference for how many times per week an

17     entertainer will work at The Foxy Lady?

18             MR. MILLER:  Objection.

19         A.    No.  I mean, there's no preference, no.

20         Q.    If an entertainer walks in off the street

21     and hasn't previously auditioned or signed an

22     entertainer agreement, will she be allowed to

23     perform at The Foxy Lady?

24         A.    My understanding is no.
```

**Dean Robinson, Esq. - November 28, 2016**

87

1     Q.    So are you aware of circumstances in which

2   an entertainer walked in off the street and asked to

3   audition to work there?

4     A.    Asked to audition?

5     Q.    Yes.

6     A.    I'm sure it's happened.

7     Q.    Are you aware of circumstances in which an

8   entertainer walked in off the street and asked to

9   perform at The Foxy Lady?

10    A.    I'm sure that happened too, but they

11  wouldn't be allowed to.

12    Q.    Until they audition?

13    A.    That's correct.

14    Q.    And sign the entertainer license agreement?

15    A.    Correct.

16    Q.    Does The Foxy Lady have VIP areas?

17          MR. MILLER:  Objection.

18    A.    What do you mean by that?

19    Q.    Private or semi-private rooms or cabanas.

20    A.    Yes.

21    Q.    Are those available for customers to use?

22    A.    Yes.

23    Q.    How does a customer arrange to use those

24  spaces?

**Dean Robinson, Esq. - November 28, 2016**

88

1      A.   Well, my understanding is that they would

2  more than likely have a particular entertainer in

3  mind to accompany them, at which point they would

4  more than likely speak to a floor host and let them

5  know of their interest.  Then if the entertainer is

6  willing to meet with them, then it would be arranged

7  at that point.

8      Q.   Does the customer have to pay any sort of a

9  fee to the venue in order to use the VIP area?

10     A.   No.

11     Q.   And it's the floor hosts who make those

12 arrangements?

13     A.   I think it's the floor hosts who are at

14 least the initial contact.  It may have to be

15 mentioned to a manager, the manager on duty.  I'm

16 not 100 percent sure of the protocol, but some

17 member of the staff would have to be informed to

18 arrange it.

19     Q.   And that's because there's a finite number

20 of rooms and you don't want to double-book if they

21 are all used or something like that?

22     A.   Yes, and also the entertainer has to agree.

23     Q.   Right.  Are you aware of circumstances in

24 which an entertainer has declined to go to a VIP

**Dean Robinson, Esq. - November 28, 2016**

89

1   room with a customer?

2        A.    I'm sure it's happened.

3        Q.    Why are you sure it's happened?

4        A.    Because human nature being what it is, they

5   may not want to.

6        Q.    Aside from human nature, are you aware of

7   specific occasions where a dancer had declined to go

8   to a VIP room with a customer?

9        A.    I am not personally aware.

10       Q.    Do dancers offer customers anything along

11  the line of a table dance or a lap dance when they

12  are not on stage?

13       A.    That could happen.

14       Q.    Does it happen?

15       A.    I'm sure it does.

16       Q.    Dancers collect money from customers for

17  performing those services; is that right?

18       A.    That's correct.

19       Q.    Are there particular set amounts they are

20  supposed to collect for table dances or lap dances?

21            MR. MILLER:  Objection.

22       A.    They are not supposed to do anything.  I

23  think there's guidelines or suggestions that are

24  given to them.

**Dean Robinson, Esq. - November 28, 2016**

1      Q.   What are the guidelines or suggestions that

2   are given to them?

3      A.   I don't know the exact numbers off the top

4   of my head, but I think that the numbers would vary

5   based on the circumstances.  For example, table

6   dance versus lap dance versus cabana, the suggested

7   amount to be collected is different in each case.

8      Q.   Can you give me the range of the suggested

9   amounts?

10      A.   I think the minimum is probably $25, and I

11   think it could go up to $250 depending on which one

12   of the options are selected.

13      Q.   Who sets those guidelines or suggestions?

14      A.   I think it's just something that -- I would

15   have to say the management.

16      Q.   Are they posted in writing anywhere in the

17   club?

18      A.   Not that I'm aware of.

19      Q.   To the extent it's management that conveys

20   that, how is that information -- how do the managers

21   relay that information to an entertainer?

22      A.   I would assume it's through the house moms

23   they would probably convey that information.

24      Q.   But you don't know for certain?

**Dean Robinson, Esq. - November 28, 2016**

91

```
1        A.    No, I don't.
2        Q.    From the amounts that dancers collect for
3   things like table dances and lap dances, do they
4   have to turn any of that over to the facility?
5        A.    Yes.
6        Q.    What do they have to turn over?
7        A.    What amount?
8        Q.    Yes.
9        A.    It varies, again, based on the option.  I
10  think it's a percentage, 10 or 15 percent of
11  whatever is taken in by the entertainer.
12       Q.    Is that a requirement?
13       A.    It's a suggestion.
14       Q.    Who do the dancers pay that amount to?
15       A.    I'm not sure if it's the house mom or the
16  manager.  I don't know.
17       Q.    When are they supposed to pay over that
18  amount?
19       A.    I would think before they leave the club.
20       Q.    What does the club do with that money?
21             MR. MILLER:  Objection.
22       A.    Put it in the bank.
23       Q.    So it keeps it as revenue?
24       A.    Yes.
```

**Dean Robinson, Esq. - November 28, 2016**

92

```
 1        Q.    Are you aware of circumstances in which a
 2   dancer has refused to pay the percentage out of
 3   those amounts?
 4        A.    It may have happened, but I'm not aware of
 5   any.
 6        Q.    You are not aware of any circumstances in
 7   which that has happened?
 8        A.    No, I am not.
 9        Q.    Have you had conversations with the
10   management at The Foxy Lady concerning the
11   percentages collected from table dances and lap
12   dances, and so forth?
13             MR. MILLER:   I'm going to instruct you to
14   exclude from the response any communications that
15   occurred in an attorney-client capacity.
16        A.    Then I will to decline.
17        Q.    So all of those conversations would fall
18   into that?
19        A.    Yes.
20        Q.    Are you aware that management at The Foxy
21   Lady maintains any lists of who among the
22   entertainers has paid percentages from their private
23   dance collections?
24        A.    No.   I mean, Gulliver's Tavern does not
```

**Doris O. Wong Associates, Inc.**

**Dean Robinson, Esq. - November 28, 2016**

93

```
 1    keep track of their side of it.  That's up to them.
 2        Q.   Who are you referring to by "that's up to
 3    them"?
 4        A.   The entertainers.  Gulliver's Tavern
 5    doesn't keep track of that information.
 6        Q.   Gulliver's Tavern does not keep track of
 7    the amount that the entertainers have paid to
 8    Gulliver's?
 9        A.   No.  Gulliver's does not keep track of the
10    money that is retained by the entertainers.
11        Q.   My question is slightly different.
12    Gulliver's does not keep track of the amounts that
13    the entertainers keep for themselves?
14        A.   That's correct.
15        Q.   But then of the table dances and private
16    dances that we discussed where it is suggested that
17    the dancers pay a percentage to the club, are you
18    aware of managers keeping track of that money
19    anywhere?
20        A.   Well, I don't think the managers do it.  I
21    think it's done by the bookkeeping people.
22        Q.   And who are the bookkeeping people?
23        A.   Whoever is working in bookkeeping in the
24    office.
```

**Doris O. Wong Associates, Inc.**

**Dean Robinson, Esq. - November 28, 2016**

94

1      Q.    That's sometimes Lori, I think you said; is

2    that right?

3      A.    It could be a manager, yes.

4      Q.    Does Gulliver's Tavern employ anyone in the

5    role of bookkeeper aside from the managers?

6      A.    An outside bookkeeper?

7      Q.    Yes.

8      A.    Not that I'm aware of.

9      Q.    So Gulliver's Tavern doesn't have an

10   in-house accountant or in-house bookkeeper?

11     A.    Are you referring to somebody who is

12   dedicated to that position?

13     Q.    Yes.

14     A.    No.

15     Q.    So bookkeeping is done by a variety of

16   people?

17     A.    Yes.

18     Q.    Are the dancers encouraged to try to get

19   customers to purchase beverages at The Foxy Lady?

20          MR. MILLER:   Objection.

21     A.    I wouldn't say encouraged, no.

22     Q.    What would you say?

23     A.    I would say if they want to do it, they can

24   do it.

**Dean Robinson, Esq. - November 28, 2016**

95

1      Q.    So the dancers are not expected to have

2  customers that they are interacting with buy a

3  certain number of drinks?

4      A.    No.   There's no expectation.

5      Q.    Are you aware of entertainers having to pay

6  a fee or a fine to The Foxy Lady for failing to show

7  up for work or failing to show up to perform?

8      A.    No.

9      Q.    Aside from the very occasional rental fees

10 that we discussed earlier and the percentages from

11 the private dances that we discussed, are there any

12 amounts that you are aware of of entertainers paying

13 money to The Foxy Lady?

14     A.    No.

15     Q.    Are the entertainers at The Foxy Lady

16 encouraged or is it suggested that they tip out or

17 provide some tips to other positions?

18          MR. MILLER:   Objection.

19     A.    There's no encouragement.   That's totally

20 discretionary.   It's totally up to the entertainers.

21     Q.    So it's totally up to them, but they can do

22 it?

23     A.    If they so choose, yes.

24     Q.    What positions are you aware of that the

**Dean Robinson, Esq. - November 28, 2016**

1    entertainers have tipped out at The Foxy Lady?

2           MR. MILLER:  Objection.

3       A.   Well, they may tip out the DJ if they so

4    choose.  They may tip out the house mom if they so

5    choose.  I would assume if they have their hair

6    done, they would give a tip to the hairdressers if

7    they so choose.

8       Q.   Are there particular amounts that are

9    suggested for these tip outs?

10          MR. MILLER:  Objection.

11      A.   There's no suggestion.  It's entirely up to

12   the entertainer.

13                 (Document marked as Robinson

14                 Exhibit 9 for identification)

15      Q.   The court reporter has handed you what

16   we've marked as Exhibit 9.  Have you ever seen

17   either this document before or the document that it

18   is essentially a photograph of?

19      A.   (Examines document)  I have not.

20      Q.   Have you ever seen a document similar to

21   this posted anywhere at The Foxy Lady?

22      A.   I have not.

23      Q.   Have you ever seen any notice posted at The

24   Foxy Lady concerning amounts that the entertainers

**Dean Robinson, Esq. - November 28, 2016**

97

```
 1     are expected or it is suggested that they pay to

 2     other positions at the club?

 3          A.   I have not.

 4          Q.   You can put that aside.

 5               For the amounts that the entertainers pay

 6     to the club from their private dance money, does

 7     Gulliver's Tavern provide them with a 1099 at the

 8     end of the year?

 9          A.   No.

10          Q.   Why is that?

11          A.   Because Gulliver's Tavern is not paying

12     them anything, so there's no reason to give them a

13     1099.

14          Q.   Does it collect 1099s from the entertainers?

15          A.   Not that I'm aware of.

16          Q.   Why would it not collect a 1099 from the

17     entertainers if it's collecting money from them?

18          A.   My guess is that they are probably under

19     the limit for -- either under the limit for

20     providing a 1099 or just not asking for one.  I

21     mean, that would be my guess.

22          Q.   Is there a shower at The Foxy Lady?

23               MR. MILLER:  Objection.

24          A.   A shower?
```

**Dean Robinson, Esq. - November 28, 2016**

98

1      Q.   Yes, like a physical shower where a

2   performer can take a shower.

3      A.   You mean as part of the locker room?

4      Q.   Yes.

5      A.   I've never been in there, but I would

6   assume so.

7      Q.   You would assume there is a shower?

8      A.   Yes.

9      Q.   Is the shower something that customers can

10  watch the entertainers shower in?

11         MR. MILLER:   Objection.

12     A.   No.

13     Q.   Are there guidelines or suggestions at The

14  Foxy Lady concerning the entertainers' appearance?

15     A.   I'm not sure I understand.   What do you

16  mean by "appearance"?

17     Q.   The way they physically look or the way

18  they present themselves.

19     A.   Not that I'm aware of.

20     Q.   Are there guidelines about what types of

21  shoes the entertainers are supposed to wear?

22     A.   Not that I'm aware of.

23     Q.   Are there guidelines about whether

24  entertainers can have tattoos?

**Dean Robinson, Esq. - November 28, 2016**

99

```
 1        A.    I have not heard of any or seen any.
 2        Q.    Are there guidelines about what type of
 3   makeup the entertainers are supposed to wear or what
 4   they are supposed to look like in terms of wearing
 5   makeup?
 6        A.    I don't think so, no.
 7        Q.    How about the way they wear their hair?
 8        A.    Not that I'm aware of.
 9        Q.    Are the entertainers expected to wear
10   specific types of costumes for certain events, like
11   Monday Night Football or the Legs and Eggs Brunch
12   event?
13        A.    There's no expectation.  It's -- no.
14        Q.    So there's no expectation or guidelines
15   from The Foxy Lady or the management of The Foxy
16   Lady about what the entertainers are to wear while
17   they are working at the venue?
18        A.    No, not that I'm aware of.
19        Q.    Could an entertainer wear whatever she
20   wants to work at The Foxy Lady?
21        A.    That would depend on the entertainer.  I
22   mean, there's no guidelines coming from The Foxy
23   Lady to the entertainer.  Let's put it that way.
24        Q.    Are there any suggestions?
```

**Doris O. Wong Associates, Inc.**

**Dean Robinson, Esq. - November 28, 2016**

100

1     A.   Are you talking about while they are
2   performing services in the club?
3     Q.   Yes.
4     A.   No.
5     Q.   The outfits that the entertainers do wear
6   while they perform services at the club, who pays
7   for those?
8     A.   I would assume they do.
9     Q.   The entertainers?
10    A.   Yes.
11    Q.   Are you aware of management ever discussing
12  weight with any particular entertainer, how much a
13  particular entertainer weighs?
14    A.   No, I'm not aware of that.
15    Q.   Are there guidelines or rules at The Foxy
16  Lady concerning whether entertainers can use their
17  cell phones out on the floor?
18    A.   Not that I'm aware of but -- no, not that
19  I'm aware of.
20    Q.   So could an entertainer use her cell phone
21  out in the customer area of the venue?
22    A.   Are you talking about while they are
23  performing or not performing?
24    Q.   Well, when you say "performing," do you

**Dean Robinson, Esq. - November 28, 2016**

101

1    mean on stage?

2         A.    On stage.

3         Q.    I'm talking about not on stage.

4         A.    So the question is are there rules

5    governing cell phone use while they are not on stage?

6         Q.    That's correct.

7         A.    Not that I am aware of.

8         Q.    What about chewing gum, are the

9    entertainers allowed to chew gum either while they

10   are performing on stage or not performing on stage

11   but are at the club?

12        A.    I don't think there's any rule.  No, I

13   don't think there's any rule on that.

14        Q.    Is there an expectation that they will not

15   do that?

16        A.    No, there's no expectation.  There's no

17   rule or expectation that I'm aware of.

18        Q.    Are you aware of managers at the club ever

19   holding meetings with a group of entertainers?

20             MR. MILLER:  Objection.

21        A.    I'm not sure I understand the question.

22   Are you talking about while the entertainers are on

23   the premises?

24        Q.    Yes.

**Doris O. Wong Associates, Inc.**

**Dean Robinson, Esq. - November 28, 2016**

102

1  A.  At a time when they are performing services?

2  Q.  Or asking them to show up at a particular

3  time in order to have a meeting.

4  A.  No.  I have not heard of that.

5  Q.  Do you know who Thomas Tsoumas is?

6  A.  Yes.

7  Q.  Who is he?

8  A.  He is a consultant to Gulliver's Tavern,

9  Incorporated.

10  Q.  Are you aware him ever attending meetings

11  with the entertainers prior to an event, like a

12  Christmas party, for instance?

13  A.  No, I'm not aware of that.

14  Q.  Do you know how often he in the past three

15  years has visited The Foxy Lady?

16  A.  No, I don't know that.

17  Q.  How about Patricia Tsoumas, how often does

18  she visit The Foxy Lady?

19  A.  I don't know that.

20  Q.  Are the entertainers allowed to drink

21  bottled water out on the floor?

22  A.  I don't know.  I don't think there's any

23  rule in place.  I just don't know.

24  Q.  Are there rules concerning how the

**Dean Robinson, Esq. - November 28, 2016**

103

```
 1    entertainers do their stage performances?
 2            MR. MILLER:  Objection.
 3       A.   No.
 4       Q.   Are there suggestions or guidelines about
 5    how they do their stage performances?
 6       A.   Not that I am aware of.
 7       Q.   There are no guidelines about how much
 8    clothes they can take off or how much they can leave
 9    on?
10       A.   Not that I'm aware of.
11       Q.   So an entertainer can perform on stage and
12    remove as much or as little clothing as she wants?
13       A.   That's my understanding, yes.
14       Q.   You are not allowed to smoke indoors at The
15    Foxy Lady, correct?
16       A.   That's correct.
17       Q.   Do you know if any of the entertainers smoke?
18            MR. MILLER:  Objection.
19       Q.   Just as a general matter.
20       A.   Do I know?
21       Q.   Yes.
22       A.   I don't personally know.  I'm guessing some
23    of them do.
24       Q.   If an entertainer wanted to have a
```

**Dean Robinson, Esq. - November 28, 2016**

104

1    cigarette, where do they go to do that?

2              MR. MILLER:  Objection.

3       A.    There's an area outside the club to comply

4    with state law where they can go to do that.

5       Q.    Is that area separate from where customers

6    would stand outside to smoke?

7       A.    I believe it is.

8       Q.    Where the entertainers go to smoke, is that

9    the same area that would be used by the bartenders

10   and wait staff and other individuals that work at

11   the club?

12      A.    It may be, yes.

13      Q.    What entrance are the entertainers expected

14   to use when they show up at The Foxy Lady to perform

15   services?

16      A.    My understanding is that there is a

17   separate entrance, separate from the customer

18   entrance, on a different location of the premises

19   that they would use.

20      Q.    Is that the same entrance that is used by

21   the other positions that work at The Foxy Lady?

22              MR. MILLER:  Objection.

23      A.    I don't know what entrance the other

24   positions use to get in.

**Doris O. Wong Associates, Inc.**

**Dean Robinson, Esq. - November 28, 2016**

105

1    Q.   But the entertainers use an entrance that

2    is separate from the customers?

3    A.   Yes.

4    Q.   What is the reason for having those two

5    separate entrances?

6         MR. MILLER:  Objection.

7    A.   I think for the ease of the entertainers,

8    so that they have more direct access to the locker

9    room.

10   Q.   Does that entrance lead directly into the

11   locker room?

12   A.   Well, it's closer to the locker room than

13   where the main entrance would be, yes.

14   Q.   If an entertainer wanted to take a break

15   for any reason, are they required to notify someone

16   that they are leaving the premises?

17   A.   Well, I think for their own safety they

18   should do that.  They are not required to, but I

19   think for their own safety they should.

20   Q.   And do they?

21   A.   Well, I don't know.  I can't say for sure.

22   Q.   Would the managers who work at The Foxy

23   Lady know that?

24        MR. MILLER:  Objection.

**Dean Robinson, Esq. - November 28, 2016**

106

```
1      A.   I don't know.  Every situation is
2  different.  Every day is different.  I couldn't
3  answer that.
4      Q.   Are you aware of any posters or notices
5  that are put up in the entertainers' locker room at
6  The Foxy Lady?
7           MR. MILLER:  Objection.
8      A.   No.  I've never been in the locker room, so
9  I can't answer that.
10     Q.   Aside from obviously themselves and the
11 outfits they are going to be wearing, are the
12 entertainers expected to bring anything with them
13 when they are going to be performing services at The
14 Foxy Lady?
15          MR. MILLER:  Objection.
16     A.   There is no expectation.
17     Q.   Are there any suggestions or advice offered
18 by management about what they should bring?
19     A.   Not that I'm aware of.
20     Q.   So it's not suggested that they bring CDs
21 or i-Pods or i-Phones with music on it to play
22 during their performances?
23     A.   I have not heard that.
24     Q.   Are you aware of any entertainers at The
```

**Doris O. Wong Associates, Inc.**

**Dean Robinson, Esq. - November 28, 2016**

107

1    Foxy Lady holding any other positions at The Foxy

2    Lady, like also working as a bartender or in some

3    other role?

4         A.   No.  I have not heard that.

5         Q.   Are you aware of that happening?

6         A.   I am not aware of that happening, no.

7         Q.   Gulliver's Tavern does not pay the

8    entertainers any form of compensation; is that

9    correct?

10        A.   That is correct.

11        Q.   It doesn't pay them by the hour or a salary

12   or anything along those lines?

13        A.   No, it does not.

14        Q.   Does it offer them any benefits, like

15   health insurance or anything along those lines?

16        A.   No.

17        Q.   Does it offer health insurance to its

18   bartenders or employees?

19        A.   I would assume so.

20             MR. CASAVANT:  Off the record.

21             (Discussion off the record)

22                  (Document marked as Robinson

23                  Exhibit 10 for identification)

24        Q.   The court reporter has handed you what was

**Dean Robinson, Esq. - November 28, 2016**

108

```
 1   marked as Exhibit 10.  Do you know what this is?
 2           MR. CASAVANT:  For the record, it's Bates
 3   numbered GULLIVERS 41.
 4      A.   This appears to be a copy of an affidavit
 5   signed by an individual named "Victoria Voe."
 6      Q.   Aside from describing it based on having
 7   looked at it right now, have you ever seen this
 8   document before?
 9      A.   Yes.
10      Q.   Did you have any role in drafting this
11   affidavit?
12      A.   I did not.
13      Q.   Do you know who Victoria Voe is personally?
14      A.   I do not.
15      Q.   In Paragraph 4 of this affidavit, she
16   references circumstances in which her license to
17   perform was revoked.  She mentions a list of
18   entertainers who are under 21 who are not allowed to
19   drink alcohol, do you see that?
20      A.   Yes.
21      Q.   Is it true the club maintains a list of
22   entertainers who are under 21?
23      A.   I don't know.  I would assume that they
24   would have the ages of the individuals based on
```

**Doris O. Wong Associates, Inc.**

Dean Robinson, Esq. - November 28, 2016

109

1    their identification that they provided.

2        Q.   Is it the case that entertainers who are

3    under 21 are allowed to perform at The Foxy Lady?

4        A.   Yes, that is correct.

5        Q.   What is the minimum age that an entertainer

6    needs to be to perform at The Foxy Lady?

7        A.   18.

8                    (Document marked as Robinson

9                    Exhibit 11 for identification)

10       Q.   The court reporter has handed you what was

11   marked as Exhibit 11, which is Bates numbered

12   GULLIVERS 51.  Could you tell me what this document

13   is.

14       A.   It appears to be an affidavit signed by a

15   individual named "Crystal White."

16       Q.   Do you know who Crystal White is?

17       A.   No.

18       Q.   You don't know her personally?

19       A.   I don't.

20       Q.   Did you play any role in drafting this

21   affidavit?

22       A.   I did not.

23       Q.   On the second page, in Paragraph 6 there's

24   a reference to Emily Chicoine, quote, "going so far

**Dean Robinson, Esq. - November 28, 2016**

110

```
 1    as to start physical altercations with at least one
 2    such individual," individual being an entertainer,
 3    do you see that?
 4        A.   Yes.
 5        Q.   Are you aware of those incidents?
 6        A.   I am not.
 7        Q.   What was your understanding as to why
 8    Ms. Chicoine had her license to perform at The Foxy
 9    Lady revoked?
10        A.   I can't remember exactly, but one of the
11    two of them had her license revoked because she
12    brought drugs into the premises.  The other one I
13    believe had her license revoked because her
14    boyfriend somehow gained admission to the club and
15    started an altercation on the premises.
16        Q.   And you don't know which one of the two
17    Plaintiffs was which?
18        A.   I don't remember offhand.
19             MR. MILLER:  I believe that is stated in
20    the interrogatory responses if you care to look it
21    up.
22                  (Document marked as Robinson
23                   Exhibit 12 for identification)
24        Q.   The court reporter has handed you what was
```

**Dean Robinson, Esq. - November 28, 2016**

111

1    marked as Exhibit 12, Bates numbered GULLIVERS 57.

2    Let me know if you recognize that document.

3         A.    Yes.  It appears to be an affidavit signed

4    by an individual named "Jane Creelman."

5         Q.    Do you know Jane Creelman?

6         A.    No.

7         Q.    It says here she worked at The Foxy Lady as

8    a house mom.  Do you have any basis for disputing

9    that?

10        A.    No.

11        Q.    Do you know if she still works at The Foxy

12   Lady as a house mom?

13        A.    No, I don't know.

14        Q.    In Paragraph 5 of this affidavit, she says,

15   "The club keeps track of the entertainers'

16   whereabouts within the facility while they are

17   performing, but this is only for safety purposes,"

18   do you see that?

19        A.    Yes.

20        Q.    How does the club keep track of the

21   entertainers' whereabouts?

22             MR. MILLER:  Objection.

23        A.    Well, I would assume that if an entertainer

24   is on the premises, some employee or perhaps the

**Doris O. Wong Associates, Inc.**

**Dean Robinson, Esq. - November 28, 2016**

112

1   house mom would be able to tell where they are at

2   any one time.

3        Q.   Does the club use any documents to keep

4   track of the entertainers' whereabouts within the

5   facility?

6        A.   No.

7        Q.   There's not anything along the lines of a

8   shift schedule or roster of the individuals on site?

9        A.   No.  It's all by sight.

10       Q.   In the preceding paragraph, Paragraph 4,

11  there's a sentence that reads, "While the club

12  prefers that entertainers work at least three

13  scheduled performances per week, this is not a

14  strict requirement, and the club is very flexible in

15  acceding to entertainers' scheduling requests," do

16  you see that?

17       A.   Yes.

18       Q.   Have I read that correctly?

19       A.   Yes.

20       Q.   She references a preference for scheduled

21  performances, but I believe your prior testimony was

22  that the club has no preference or guidelines as to

23  how many times an entertainer works at the club; is

24  that fair to say?

**Dean Robinson, Esq. - November 28, 2016**

113

1      A.   Yes.  I think I distinguished the term
2  "expectations" or "guidelines" with "suggestion."
3  This was a suggestion, not a guideline or an
4  expectation.
5      Q.   What in your mind is the distinction
6  between a guideline and a suggestion with regard to
7  The Foxy Lady?
8      A.   A guideline I believe is in general, in the
9  general usage of the term, is that it is something
10  that is more along the lines of a requirement,
11  whereas a suggestion is something that the
12  individual can take under advisement and do with it
13  as they please.
14      Q.   So the club's suggestion is that
15  entertainers work at least three scheduled
16  performances per week?
17      A.   Well, I think the suggestion is made for
18  the entertainers because if they work more shifts,
19  they make more money.
20      Q.   Right, but why would the club be concerned
21  at all with how many performances the entertainers
22  do per week in terms of how much money they are
23  making?
24          MR. MILLER:  Objection.

**Dean Robinson, Esq. - November 28, 2016**

114

```
1        A.    Well, I don't think they are concerned.

2        Q.    So then why make the suggestion of three

3   performances per week?

4        A.    It's really up to the entertainers.

5        Q.    Why would the club make the suggestion of

6   three performances per week?

7              MR. MILLER:  Objections.

8        A.    I think probably for the convenience of the

9   entertainers, nothing more.

10       Q.    I'm just not following what you are saying.

11  If the club isn't concerned with how often the

12  entertainers perform and how much money they are

13  making and it's in the entertainers' interest to

14  work as often or as little as they want because they

15  are the ones making the money, why does the club

16  make any suggestions about how many scheduled

17  performances they make per week?

18             MR. MILLER:  Objection.

19       A.    I don't know why.  I would say it's for the

20  entertainers to take under advisement and do as they

21  see fit.

22       Q.    It's not for the club's convenience or for

23  its own scheduling purposes?

24       A.    Not at all.
```

**Doris O. Wong Associates, Inc.**

**Dean Robinson, Esq. - November 28, 2016**

115

```
 1      Q.   So it doesn't benefit the club to suggest
 2   to the entertainers that they be there at least
 3   three scheduled performances per week?
 4           MR. MILLER:  Objection.
 5      A.   No, no.
 6      Q.   The third sentence of this paragraph, the
 7   one that reads, "At any given time the club is open
 8   to the public, between one-third and one-half of the
 9   entertainers performing at the Club are walk-ins who
10   were not previously scheduled," did I read that
11   correctly?
12      A.   You did.
13      Q.   Her reference to "previously scheduled," to
14   me, implies that there is a schedule for the
15   entertainers that has been previously made.  Is my
16   assumption completely mistaken?
17           MR. MILLER:  Objection.
18      A.   Well, I think -- let me clarify one of my
19   previous answers on this issue, and that is that
20   entertainers will often express to the house mom or
21   someone else in management that they would like to
22   work on a particular day.  It's not a schedule in
23   the sense that the club is writing down dates and
24   times that the person will work.  If they have heard
```

**Dean Robinson, Esq. - November 28, 2016**

116

1    from an entertainer that they would like to work on

2    a particular day, then they will make a note of

3    that -- and I think we have seen that on the

4    exhibit -- and if the entertainer shows up, it's

5    noted.  If the entertainer doesn't show up, that's

6    noted as well.  That doesn't imply that there's a

7    schedule that is made via the club.  When she's

8    referring to the word "schedule," she's referring to

9    the entertainer's expressed desire to work a

10   particular day.

11       Q.   Has it ever occurred where too many

12   entertainers have expressed a desire to work a

13   particular day of the week?

14           MR. MILLER:   Objection.

15       A.   I'm not aware of that, no.

16       Q.   Are you aware of circumstances in which

17   house moms have called entertainers on their phone

18   to ask them to come to The Foxy Lady because they

19   need entertainers?

20       A.   No, I am not aware of that.

21       Q.   You are not aware of it one way or the

22   other or you are aware it has not happened?

23       A.   No, I'm not aware of it.

24

**Dean Robinson, Esq. - November 28, 2016**

117

```
 1              (Document marked as Robinson

 2              Exhibit 13 for identification)

 3      Q.   I'm handing you what was marked as Exhibit

 4   No. 13, Bates numbered GULLIVERS 44.  Once you have

 5   had the chance it look through that, please let me

 6   know if you can identify it for me.

 7      A.   (Examines document)  Okay.

 8      Q.   Could you tell me what this is.

 9      A.   It appears to be an affidavit that has been

10   signed by an individual named "Lucy Loe."

11      Q.   Did you play any part in drafting this

12   document?

13      A.   No.

14      Q.   Do you know who Lucy Loe is?

15      A.   I don't.

16      Q.   On the second page, Paragraph 20, do you

17   see the sentence, "Although the club promotes a

18   policy of requiring performers to attend a minimum

19   of three shifts per week, I have often worked fewer

20   shifts with no adverse consequences"?

21      A.   Yes.

22      Q.   Is she correct that the club promotes a

23   policy of requiring performers to attend a minimum

24   of attending three shifts per week?
```

**Dean Robinson, Esq. - November 28, 2016**

118

```
 1      A.   I would not phrase it that way, no.  It's
 2  not a requirement.
 3      Q.   You would phrase it as a suggestion?
 4      A.   Yes.
 5      Q.   She references "shifts."  In the context of
 6  The Foxy Lady, what are shifts?
 7      A.   My understanding is that they are blocks of
 8  time in each day within which the entertainers will
 9  provide services.
10      Q.   What are those blocks of time?
11      A.   I don't know.
12      Q.   Does The Foxy Lady suggest that
13  entertainers work the entirety of a shift when they
14  work?
15      A.   No.
16      Q.   No?
17      A.   No.  Again, they can come and go as they
18  please.
19      Q.   They can show up when they want and leave
20  when they want?
21      A.   Yes.
22      Q.   When they leave, are they expected to
23  notify anybody when they are leaving?
24      A.   Well, I wouldn't call it an expectation.
```

**Doris O. Wong Associates, Inc.**

**Dean Robinson, Esq. - November 28, 2016**

119

1    Again, what I would call it is a suggestion for

2    their own safety.  Because if they have left the

3    premises, then they would be considered to be on

4    their own in terms of whatever happens to them.  If

5    they were to leave the premises and intend to come

6    back, that could be different.  It's really a safety

7    issue.  It's not a requirement.

8         Q.   If you could turn back to Exhibit 3 and go

9    to Paragraph 5.  Do you see a reference there to a

10   "show period"?

11        A.   Yes.

12        Q.   That sentence reads, "While performer has

13   no obligation to perform during any day or evening

14   that the club designates as a show period (a 'Show

15   Period')."  Can you elaborate on what exactly a show

16   period is in the context of The Foxy Lady.

17             MR. MILLER:   Objection.

18        A.   My understanding is that it's just a period

19   of time when there are dancers that are providing

20   entertainment.

21        Q.   What are the designated show periods at The

22   Foxy Lady?

23        A.   I would say anytime that there is

24   entertainment being provided.

**Doris O. Wong Associates, Inc.**

**Dean Robinson, Esq. - November 28, 2016**

120

1      Q.    Are show periods set up or established in

2    advance?

3      A.    No.

4      Q.    The last sentence of the paragraph reads,

5    "Performer agrees that if a performer misses any

6    portion of a show period accepted by performer,

7    performer may be subject to a late fee as posted on

8    the premises," do you see that?

9      A.    I do.

10      Q.    Did I read that correctly?

11      A.    You did.

12      Q.    Are you aware of dancers paying late fees

13    for missing a show period?

14      A.    No, I am not aware of that.

15      Q.    Are you not aware that it's ever happened

16    or you know that it never happened?

17      A.    I am not aware that it's happened.

18      Q.    There's a reference to late fee being

19    posted in the premises in that sentence, right?

20      A.    Yes.

21      Q.    Are there posters or notices anywhere about

22    late fees at The Foxy Lady?

23      A.    Not that I'm aware of.

24      Q.    Have there been in the past three years?

**Doris O. Wong Associates, Inc.**

**Dean Robinson, Esq. - November 28, 2016**

121

1      A.    I have never seen one.

2      Q.    Do you have a sense as to how much money

3    the entertainers typically make at The Foxy Lady on

4    average?

5      A.    No, I don't.  I can only go by what one of

6    your clients provided in the course of discovery.

7    It would appear that she was averaging I believe

8    $75 an hour.

9      Q.    So aside from that, you have no independent

10   understanding as to how much the entertainers

11   typically make?

12     A.    No.

13     Q.    Gulliver's Tavern doesn't keep track of

14   that information at all?

15     A.    They do not.

16     Q.    Has anyone at Gulliver's Tavern ever

17   contacted a state or Federal agency concerning how

18   it treats or compensates the entertainers at The

19   Foxy Lady?

20     A.    Has anyone at Gulliver's Tavern ever

21   contacted?

22     Q.    Yes.

23     A.    Not that I'm aware of.

24     Q.    Are you aware of anyone acting on behalf of

**Dean Robinson, Esq. - November 28, 2016**

122

```
 1    The Foxy Lady contacting a state or Federal agency

 2    for advice about how to compensate or classify

 3    exotic dancers?

 4        A.    Not that I'm aware of.

 5        Q.    Have you done that?

 6        A.    Me personally?

 7        Q.    Yes.

 8        A.    No.

 9        Q.    Outside of conversations you may have had

10    with Attorney Miller or someone representing you in

11    this lawsuit, prior to the filing of this lawsuit,

12    were you aware of other lawsuits being brought by

13    exotic dancers against nightclubs or strip clubs

14    alleging misclassification as independent contractors?

15            MR. MILLER:  Objection.  Are you asking

16    that of him as a percipient witness?

17            MR. CASAVANT:  Yes.

18            MR. MILLER:  You can answer.

19        A.    Are you talking about anywhere or just in

20    this area?

21        Q.    Anywhere.

22        A.    I have heard that other cases have been

23    brought, yes.

24        Q.    In what context have you heard about those
```

**Dean Robinson, Esq. - November 28, 2016**

123

 1    cases?

 2        A.    Just from reading, in the News, just

 3    hearing about it that way.

 4        Q.    And you've been corporate counsel to

 5    Gulliver's Tavern over the past several years?

 6        A.    Yes, I have.

 7             MR. CASAVANT:  Off the record.

 8             (Discussion off the record)

 9             (Recess at 12:57 p.m.)

10    BY MR. CASAVANT:  (1:03 p.m.)

11        Q.    I believe you testified that you have no

12    knowledge as to how many entertainers have worked or

13    performed services at The Foxy Lady over the past

14    three years; is that right?

15        A.    That's correct.

16        Q.    If I wanted to determine how many

17    entertainers have worked at The Foxy Lady over the

18    past three years, how would I go about doing that?

19             MR. MILLER:  Objection.

20        A.    I'm not sure that you could get that

21    information.  I don't know if it's available.

22        Q.    You may have answered this already.  Are

23    you aware of Gulliver's Tavern maintaining copies of

24    the performer license agreements and information

**Dean Robinson, Esq. - November 28, 2016**

124

```
 1   sheets, ID sheets for entertainers that have worked
 2   at the venue for the past three years?
 3             MR. MILLER:  Objection.
 4        A.    They may, but I don't know for sure.
 5        Q.    Gulliver's has every entertainer who wants
 6   to work or perform at The Foxy Lady sign a performer
 7   license agreement, right?
 8        A.    That's my understanding, yes.
 9        Q.    So if Gulliver's Tavern maintained
10   performer license agreements for everyone who has
11   performed services there as a dancer over the past
12   three years, presumably I could count each one of
13   the agreements to arrive at a number of dancers that
14   worked there over the past three years?
15             MR. MILLER:  Objection.
16        A.    Is that a question?
17        Q.    Yes.  My question is, is that a fair
18   assumption?
19             MR. MILLER:  Objection.
20        A.    I think you are assuming that they retain
21   every one -- every license agreement in a file
22   somewhere both for entertainers that are currently
23   working and providing services at The Foxy Lady and
24   those that are not; but in the context of preparing
```

**Doris O. Wong Associates, Inc.**

**Dean Robinson, Esq. - November 28, 2016**

125

```
 1    for this deposition, I only reviewed the two files

 2    for the Plaintiffs.  I cannot answer that question

 3    with any certainty as to anybody else.

 4        Q.   Because you don't know if they -- if the

 5    club has maintained agreements for all of its

 6    dancers going back three years?

 7        A.   That's correct.

 8        Q.   Do you have an understanding as to whether

 9    there are certain nights or days of the week that

10    The Foxy Lady is busier than others?

11            MR. MILLER:  Objection.

12        A.   Well, I don't have any definitive proof,

13    but my assumption would be that the weekends would

14    be busier than weekdays.

15        Q.   That's just your assumption?

16        A.   Yes.

17        Q.   Do you have an understanding as to on a

18    busier day or night how many entertainers would be

19    on the premises at The Foxy Lady?

20            MR. MILLER:  Objection.

21        A.   No, I don't.

22            MR. CASAVANT:  I have no further questions

23    for this witness, although he did reference

24    newspaper advertisements being produced in this
```

**Doris O. Wong Associates, Inc.**

126

1   litigation, which I don't believe I have seen.

2   Pending sorting out that issue as to whether we are

3   entitled to that and whether it was produced, I will

4   suspend until we have had the chance to look at

5   those.

6           MR. MILLER:  Okay.  I think he maybe

7   mischaracterized to his memory what was produced.

8   We can straighten that out off the record.

9           I have some questions.

10                  CROSS EXAMINATION

11    BY MR. MILLER:

12    Q.   Mr. Robinson, Mr. Casavant asked you a few

13  questions about revenue that the club receives in

14  association with space that is used by dancers and

15  customers, do you recall that?

16    A.   I do.

17    Q.   For recordkeeping purposes, do you have an

18  understanding of how the club characterizes that

19  revenue?

20    A.   I believe that they characterize it as

21  being paid by the customer.

22    Q.   Instead of by the dancer?

23    A.   Yes.

24    Q.   And the club proceeds with the assumption

**Dean Robinson, Esq. - November 28, 2016**

127

1    that such amounts paid by the customer would be

2    outside the scope of any tax-reporting requirement?

3        A.   That's correct.

4        Q.   So there's no cause to issue tax-reporting

5    documents to either the customer or the entertainer?

6        A.   That's correct.

7            MR. MILLER:  That's all I have.

8              (Whereupon the deposition

9              was suspended at 1:07 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**Doris O. Wong Associates, Inc.**

SUGGESTED CORRECTIONS

RE:                Ruby Levi, et al. vs. Gulliver's Tavern, Incorporated, et al.

Witness:           Dean Robinson, Esq., Vol. I.

The above-named witness wishes to make the following changes to the testimony as originally given:

| PAGE | LINE | SHOULD READ | REASON |
|------|------|-------------|--------|
| 25 | 14 | "house mom and manager" | Misspoke during deposition |
| 46 | 5 | "Yes" | Misspoke during deposition |
| 56 | 6, 10 | "No" | Misspoke during deposition |
| 68 | 13, 16 | "In some instances, Entertainers pay a weekly house fee, as contemplated by their agreements.  In other instances, the Club waives and the Entertainers do not pay such a fee." | Misspoke during deposition |
| 69 | 2 | "In some instances, Entertainers pay a weekly house fee, as contemplated by their agreements.  In other instances, the Club waives and the Entertainers do not pay such a fee." | Misspoke during deposition |
| 69 | 15, 17 | "In some instances, Entertainers pay a weekly house fee, as contemplated by their agreements.  In other instances, the Club waives and the Entertainers do not pay such a fee." | Misspoke during deposition. |
| 70 | 4, 8 | "In some instances, Entertainers pay a weekly house fee, as contemplated by their agreements.  In other instances, the Club waives and the Entertainers do not pay such a fee." | Misspoke during deposition |
| 74 | 6-7, 10 | "They come and go as they please. However, entertainers can schedule themselves in advance." | Misspoke during deposition |
| 88 | 10 | "Yes" | Misspoke during deposition |

| 98 | 12 | "Yes.  There is a separate shower on the main floor where dancers can choose to perform a 'shower show.'. This does not occur in the shower available for dancer's personal use, which is located near the dressing rooms." | Misspoke during deposition |
|----|----|-----|-----|

## CERTIFICATE

I, DEAN ROBINSON, ESQ., do hereby certify that I have read the foregoing transcript

of my testimony and further certify under the pains and penalties of perjury that said transcript

with suggested corrections is a true and accurate record of sad testimony.

Dated at _PROVIDENCE_ EAST this _16_ day of _JAN._, 2017.

130

```
 1   COMMONWEALTH OF MASSACHUSETTS )

 2   SUFFOLK, SS.                  )

 3       I, Ken A. DiFraia, RPR and Notary Public in and

 4   for the Commonwealth of Massachusetts, do hereby

 5   certify that there came before me on the 28th day of

 6   November, 2016, at 9:58 a.m., the person hereinbefore

 7   named, who was by me duly sworn to testify to the

 8   truth and nothing but the truth of his knowledge

 9   touching and concerning the matters in controversy

10   in this cause; that he was thereupon examined upon

11   his oath, and his examination reduced to typewriting

12   under my direction; and that the deposition is a

13   true record of the testimony given by the witness.

14

15       I further certify that I am neither attorney or

16   counsel for, nor related to or employed by, any

17   attorney or counsel employed by the parties hereto

18   or financially interested in the action.

19

20       Under Federal Rule 30:

21           _X_    Reading and Signing was requested

22           ____   Reading and Signing was waived

23           ____   Reading and Signing was not requested

24
```

**Dean Robinson, Esq. - November 28, 2016**

131

1        In witness whereof, I have hereunto set my hand

2     and affixed my notarial seal this 9th day of

3     December, 2016.

4

5     *Ken A. DiFraia*

6     Notary Public

7     Commission expires 2/24/2023

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**Dean Robinson, Esq. - November 28, 2016**

D I S C L A I M E R

This transcript in any format is a confidential

communication between Doris O. Wong Associates,

Inc., a professional court reporting firm, and the

parties to this matter and their counsel.  Any

reproduction or distribution of this transcript

without the express permission of the parties is a

violation of this confidentiality.  To fulfill any

request to the court reporter for an additional copy

or copies from persons or entities without standing

in this matter will require the consent of the

parties and/or counsel and/or a court order for such

delivery.

**Doris O. Wong Associates, Inc.**